2021R00482/DKC/MPP

USDC- BALTIM
'23 JAN 11 PM4:32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** JKB -22-146 |
| **v.** | (Healthcare Fraud, 18 U.S.C. § 1347; Aiding & Abetting, Principal, 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)) |
| **RON K. ELFENBEIN,** | |
| **Defendant.** | |

### SUPERSEDING INDICTMENT

The Grand Jury charges that:

### COUNTS 1-5
### Health Care Fraud
### (18 U.S.C. § 1347)

At all times material to this Superseding Indictment:

### The Defendant and Relevant Entities

1.    Defendant **RON K. ELFENBEIN**, a resident of Anne Arundel County, Maryland, was a physician, owner, and the medical director of Drs ERgent Care, LLC.

2.    Drs ERgent Care, LLC, d/b/a First Call Medical Center and Chesapeake ERgent Care (hereinafter "Drs ERgent Care"), was a Maryland limited liability company that operated medical clinics in Gambrills, Maryland, in the District of Maryland, and elsewhere. Drs ERgent Care operated COVID-19 testing sites, including drive-through testing sites, in Anne Arundel and Prince George's Counties, including a location in Earleigh Heights, Maryland.

### The Medicare, Medicaid, and TRICARE Programs

3.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and

1

2021R00482/DKC/MPP

disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care, including laboratory tests.

4.     The Medicaid Program ("Medicaid") was jointly funded by the federal and state governments and was a program that provided health care benefits to certain low-income individuals and families in states. Medicaid was administered by CMS and various state agencies. Medicaid helped pay for reasonable and necessary medical procedures and services, such as physician services, provided by qualified health care professionals.   Maryland Medicaid, also called Medical Assistance, was administered by the Maryland Department of Health and Mental Hygiene.

5.     The United States Department of Defense, through the Defense Health Agency, administered the TRICARE program ("TRICARE"), which was a comprehensive health care insurance program that provided health care benefits to United States military personnel, retirees, and their families.

6.     Medicare, Medicaid, and TRICARE were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

7.     Individuals who received benefits under Medicare, Medicaid, and TRICARE were

2

2021R00482/DKC/MPP

referred to as "beneficiaries" or "recipients."

8.     Physicians, clinics, laboratories, and other health care providers (collectively, "providers") upon enrolling in Medicare, Medicaid, and TRICARE, could provide items and services to beneficiaries and recipients, and upon submitting claims, receive reimbursement.

9.     To enroll in Medicare, Medicaid, and TRICARE, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement for the particular health care benefit program.

10.     For instance, the Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider to enroll in Medicare. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [] will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

11.     An enrolled provider who provided items or services to beneficiaries or recipients was able to submit claims for reimbursement to the appropriate health care benefit program. Payments were often made directly to the provider, rather than to a beneficiary or recipient. This

3

2021R00482/DKC/MPP

payment occurred when the provider submitted the claim for payment, either directly or through a billing company.

12.     Medicare, Medicaid, and TRICARE regulations required providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records that documented actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare, Medicaid, and TRICARE required complete and accurate patient medical records so that Medicare, Medicaid, and TRICARE would be able to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, Medicaid, or TRICARE, or their contractors, to review the appropriateness of payments made to the provider.

13.     When seeking reimbursement for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted seeking reimbursement included: (a) the beneficiary's or recipient's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary or recipient; and (c) the name of the rendering provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").

4

2021R00482/DKC/MPP

14.    Medicare, Medicaid, and TRICARE paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented.   By submitting claims to Medicare, Medicaid, and TRICARE, the provider certified, among other things, that its services on behalf of beneficiaries and recipients complied with Medicare, Medicaid, and TRICARE's rules and regulations and Federal law, including those related to fraud, waste, and abuse.

### Commercial Insurance Plans

15.    Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services. Individuals who received benefits from Commercial Insurers were referred to as "members."

16.    Each of the Commercial Insurers was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b) and Title 18, United States Code, Section 220(e)(3).

17.    Commercial Insurers often made payments directly to providers, rather than to members who received the health care benefits, items, and services.

18.    To obtain payment for treatment or services provided to a member, providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically. The claim form required certain important information, including: the member's name and identification number; a description of the health care benefit, item, or service that was provided or supplied to the member; the billing codes for the benefit, item, or service; the date upon which the benefit, item, or service was provided or

5

2021R00482/DKC/MPP

supplied to the member; and the name of the referring provider, as well as the applicable identification number for the referring provider.

19.     When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

### HRSA COVID-19 Uninsured Program

20.     The Families First Coronavirus Response Act ("FFCRA") was a federal law enacted on or about March 14, 2020, as part of the federal government's initial response to the then-emerging coronavirus pandemic.

21.     The FFCRA, among other things, appropriated funds to reimburse the cost of providing diagnostic testing and services for COVID-19 in individuals without health insurance. These funds, and additional funds appropriated through subsequent legislation for testing, treatment, and vaccines for uninsured individuals, were distributed through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program ("HRSA COVID-19 Uninsured Program"). The HRSA COVID-19 Uninsured Program was administered by HHS through its agency, the Health Resources and Services Administration ("HRSA"). HRSA had a contract with UnitedHealth Group to handle claims administration and payments and provided reimbursements on a rolling basis directly to eligible providers.

6

2021R00482/DKC/MPP

22.     The HRSA COVID-19 Uninsured Program was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

23.     In order to receive reimbursement under the HRSA COVID-19 Uninsured Program, a provider had to submit claims, with respect to uninsured individuals, for: (a) COVID-19 testing, which meant a test for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19, as well testing-related items and services such as an office visit or telehealth visit that resulted in the administration of a COVID-19 test; (b) care or treatment related to positive diagnoses of COVID-19, where COVID-19 was the primary reason for treatment; or (c) administering a COVID-19 vaccination.

24.     Providers seeking reimbursement under the HRSA COVID-19 Uninsured Program were required to enroll as a provider participant, check to ensure that patients were uninsured, submit claims and patient information electronically, and receive payment through direct deposit. Reimbursements were generally made at Medicare rates.

### Evaluation and Management CPT Codes

25.     In 2020, evaluation and management services (sometimes referred to as "E/M Services" or "office visits") were billed using CPT codes 99201 through 99205 for new patients, and 99211 through 99215 for existing patients. In 2021, CPT code 99201 was deleted, and E/M Services were billed using CPT codes 99202 through 99205 for new patients, and 99211 through 99215 for existing patients. The code that providers were required to bill for E/M Services were organized into various categories and levels. In general, the more complex the visit, the higher the

2021R00482/DKC/MPP

level of code a provider could bill within the appropriate category. To bill any code, the services furnished must have met the definition of the code, been medically necessary, and occurred as represented.

26.     The 2020 code description for CPT code 99204 was: "[o]ffice or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 45 minutes are spent face-to-face with the patient and/or family." The 2021 code description for CPT code 99204 was: "Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. When using time for code selection, 45-59 minutes of total time is spent on the date of the encounter."

27.     The 2020 code description for CPT code 99214 was: "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: A detailed history; A detailed examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or

8

2021R00482/DKC/MPP

family."   The 2021 code description for CPT code 99214 was: "Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. When using time for code selection, 30-39 minutes of total time is spent on the date of the encounter."

<h3 align="center">The Scheme to Defraud</h3>

28.     From in or around March 2020, and continuing through in or around February 2022, in the District of Maryland, the defendant, **RON K. ELFENBEIN**, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, TRICARE, Commercial Insurers, and the HRSA COVID-19 Uninsured Program, and to obtain and attempt to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare, Medicaid, TRICARE, Commercial Insurers, and the HRSA COVID-19 Uninsured Program, in violation of Title 18, United States Code, Sections 1347 and 2 (hereinafter the "scheme to defraud").

<h3 align="center">Purpose of the Scheme to Defraud</h3>

29.     It was a purpose of the scheme to defraud for the defendant, **RON K. ELFENBEIN**, to unlawfully enrich himself and others by: (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, Commercial

9

2021R00482/DKC/MPP

Insurers, and the HRSA COVID-19 Uninsured Program for E/M Services during the COVID-19 pandemic that were medically unnecessary, not provided as represented, and ineligible for reimbursement; (b) concealing the submission of false and fraudulent claims and the receipt and transfer of the proceeds of the fraud; and (c) using proceeds of the fraud for the personal use and benefit of the defendant and others.

<b><u>Manner and Means of the Scheme to Defraud</u></b>

30.     The manner and means by which the defendant, **RON K. ELFENBEIN**, and others known and unknown to the Grand Jury sought to accomplish the objects and purpose of the scheme to defraud included, among other things:

a.   **RON K. ELFENBEIN** controlled, operated, and directed Drs ERgent Care.

b.   **RON K. ELFENBEIN** submitted and caused the submission of enrollment documents to Medicare for Drs ERgent Care, in which he attested he would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [] will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

c.   **RON K. ELFENBEIN** caused Drs ERgent Care to enroll and contract with Commercial Insurers, including CareFirst BlueCross BlueShield, to provide services to the Commercial Insurers' members.

d.   **RON K. ELFENBEIN** caused Drs ERgent Care to offer COVID-19 testing to members of the public, as the effects of the COVID-19 pandemic were felt in the United States and many individuals were reporting difficulty obtaining tests to

10

2021R00482/DKC/MPP

determine whether they were infected with the COVID-19 virus.

e.   **RON K. ELFENBEIN**, through Drs ERgent Care, offered COVID-19 testing, but required that the COVID-19 tests and the reporting of results be bundled, i.e., required to be billed in combination with more lucrative, but medically unnecessary, services, such as E/M Services, that were purportedly of a 30-minute or longer duration, or involving moderate or high levels of medical decision making, but did not in fact occur as represented.

f.   **RON K. ELFENBEIN** instructed providers and other employees of Drs ERgent Care to submit claims to Medicare and other payors for these lucrative E/M Services knowing that some or all of the beneficiaries were being seen by providers for less than five minutes total. Nevertheless, **RON K. ELFENBEIN** instructed providers and other employees to bill the encounters as moderate complexity E/M Services even though such encounters did not occur as represented.

g.   **RON K. ELFENBEIN** instructed providers and other employees of Drs ERgent Care to submit claims for these lucrative E/M Services because the higher complexity E/M Services were "the 'bread and butter' of how we get paid . . . a 99202 pays way less than a 99204."

h.   **RON K. ELFENBEIN**, through Drs ERgent Care, submitted and caused the submission of claims to Medicare, Medicaid, TRICARE, Commercial Insurers, and the HRSA COVID-19 Uninsured Program for E/M Services that were medically unnecessary, not provided as represented, and ineligible for reimbursement.

11

2021R00482/DKC/MPP

    i.   **RON K. ELFENBEIN**, through Drs ERgent Care, submitted in excess of the approximate amount of $30 million in claims for reimbursement to Medicare, Medicaid, TRICARE, Commercial Insurers, and the HRSA COVID-19 Uninsured Program for moderate complexity E/M Services in conjunction with COVID-19 tests, and was paid approximately $10 million on those claims.

### The Charges

31.    On or about the dates set forth as to each count below, in the District of Maryland, the defendant,

### RON K. ELFENBEIN,

aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the scheme to defraud as described above, submitted and caused the submission of the following false and fraudulent claims to Medicare and CareFirst Blue Cross Blue Shield for E/M Services that were medically unnecessary, not provided as represented, and ineligible for reimbursement, each submission constituting a separate count:

| Count | Medicare Beneficiary | Date of Submission of Claim | Date of Service | Claim No. | Payor | Procedure Code; Amount Billed |
|-------|---------------------|-----------------------------|-----------------|-----------|-------|-------------------------------|
| 1 | A.H. | 03/29/2021 | 03/25/2021 | 691021088249240 | Medicare | CPT 99204 $354.22 |
| 2 | W.R. | 05/03/2021 | 04/23/2021 | 691021123406780 | Medicare | CPT 99204 $354.22 |
| 3 | D.M. | 05/12/2021 | 05/10/2021 | 691021132127230 | Medicare | CPT 99204 $354.22 |
| 4 | J.J. | 03/5/2021 | 03/2/2021 | 372663924 | CareFirst BCBS | CPT 99214 $231.50 |

2021R00482/DKC/MPP

| Count | Medicare Beneficiary | Date of Submission of Claim | Date of Service | Claim No. | Payor | Procedure Code; Amount Billed |
|---|---|---|---|---|---|---|
| 5 | S.T. | 04/28/2021 | 04/19/2021 | 327993824 | CareFirst BCBS | CPT 99204 $354.22 |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

13

2021R00482/DKC/MPP

## FORFEITURE ALLEGATION
### (18 U.S.C. § 982, 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c))

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses charged in this Superseding Indictment.

2.      Upon conviction of any of the offenses set forth in this Superseding Indictment, the defendant, **RON K. ELFENBEIN**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### Substitute Assets

3.      If any of the property described above, as a result of any act or omission of the defendant:

>    a.   cannot be located upon the exercise of due diligence;
>
>    b.   has been transferred or sold to, or deposited with, a third party;
>
>    c.   has been placed beyond the jurisdiction of the Court;
>
>    d.   has been substantially diminished in value; or
>
>    e.   has been commingled with other property that cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. §

14

2021R00482/DKC/MPP

853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

Erek L. Barron / MPP
Erek L. Barron
United States Attorney
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201


GLENN S. LEON
Chief
Criminal Division, Fraud Section
United States Department of Justice


D. KEITH CLOUSER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W., Eighth Floor
Washington, D.C. 20005
(202) 256-0867


A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

1/11/2023
Date

15