**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| |
|---|
| UNITED STATES OF AMERICA |
| |
| v. |
| |
| RON ELFENBEIN, |
| |
| *Defendant.* |

Crim. No. JKB-22-146

**MOTION *IN LIMINE* TO EXCLUDE**
**GOVERNMENT'S SUMMARY EXHIBITS**

June 26, 2023
Baltimore, MD

Martin S. Himeles, Jr. (Bar No. 03430)
Gregg L. Bernstein (Bar No. 01340)
Samantha A. Miller (Bar No. 21374)
Zuckerman Spaeder LLP
100 East Pratt Street - Suite 2440
Baltimore, MD 21202-1031
Tel. No: (410) 332-0444
Fax No: (410) 659-0436
mhimeles@zuckerman.com
gbernstein@zuckerman.com
samiller@zuckerman.com

*Counsel for Defendant Ron Elfenbein*

# **TABLE OF CONTENTS**

MOTION *IN LIMINE* TO EXCLUDE GOVERNMENT'S SUMMARY EXHIBITS...................1

BACKGROUND .........................................................................................................................1

ARGUMENT ............................................................................................................................2

    I.   The government's summary exhibits include inaccurate definitions of the key billing codes and a misleading analysis that is based on the inaccurate code definitions.......................... 4

      a.      Summary exhibits that include inaccurate E/M code descriptions must be excluded. 4

      b.      A summary exhibit that assumes Dr. Elfenbein and his providers coded  based on time illustrates the problems that will be caused if the government is permitted to use inaccurate code descriptions, and it too must be excluded. ................................ 11

    II.  Summary exhibits aggregating allegedly fraudulent claims with those not alleged to be fraudulent should be excluded. .......................................................................................... 14

    III. "Amounts billed" have far greater prejudicial effect than probative value and  should not be presented to the jury. ...................................................................................................... 19

    IV. The Exhibit summarizing Dr. Elfenbein's tax returns should be excluded. ....................... 23

CONCLUSION.........................................................................................................................25

CERTIFICATE OF SERVICE .................................................................................................27

## MOTION *IN LIMINE* TO EXCLUDE
## GOVERNMENT'S SUMMARY EXHIBITS

Defendant Ron Elfenbein respectfully submits this motion *in limine* to exclude 26 of the 35 summary exhibits that the government plans to present through two witnesses: Stephen Quindoza (expert witness) and Marylee Robinson (summary witness).

## BACKGROUND

The superseding indictment's central allegation is that Dr. Elfenbein, through Drs ERgent Care ("DEC"), the urgent care business of which he was the Medical Director, defrauded health care benefit programs by seeking reimbursement for Evaluation and Management services—*i.e.*, office visits—that were medically unnecessary and did not occur as represented. Superseding Indictment (ECF No. 29) ¶ 30 (Sup. Ind.). Specifically, the government contends that, from March 2020 through February 2022, Dr. Elfenbein required that providers at his urgent care locations "bundle" COVID-19 tests with office visits coded as Evaluation and Management services described as involving "moderate or high levels of medical decision making," *id*. ¶ 25–27, 30(e), which were medically unnecessary and did not involve the moderate or high levels of medical decision described by the submitted billing codes. *Id*. ¶ 30.

The government intends to present 35 summary exhibits to the jury through Stephen Quindoza, the government's expert witness, and Marylee Robinson, whom the government characterizes as a summary witness. Ms. Robinson's exhibits summarize data for all claims submitted by DEC to all payers, including the government programs and commercial insurers identified in the superseding indictment; Mr. Quindoza's exhibits summarize Medicare claims. Aside from the risk of confusing the jury by "summarizing" data in 35 different ways, some of the government's summaries include, or are based on, demonstrably inaccurate descriptions of the Current Procedural Terminology ("CPT") codes used in medical billing, and others will mislead

and confuse the jury in other ways, all prejudicial to Dr. Elfenbein. Because any probative value of these inaccurate and misleading summary exhibits is far outweighed by the danger of confusing the issues, misleading the jury, and unfairly prejudicing Dr. Elfenbein, they must be excluded under Rule 403 of the Federal Rules of Evidence.[1]

## ARGUMENT

The use of summary exhibits at trial is governed by Federal Rule of Evidence 1006. The rule allows for the admission of charts "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). "To comply with this Rule, . . . a chart summarizing evidence must be an *accurate* compilation of the voluminous records sought to be summarized." *Id.* (emphasis in original).

As with all evidence, a summary exhibit is not admissible "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[U]nder Rule 403, relevant evidence is inadmissible 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence." *United States v. Martinez*, No. 19-4818, 2021 WL 4240378, at *1 (4th Cir. Sept. 17, 2021) (quoting *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011)). In weighing possible prejudice, courts should consider that "[t]he dangers inherent in using a summary witness in a federal criminal prosecution to support the government's case-in-chief are plain and are only exacerbated in circumstances . . .

---

[1] To assist the Court in keeping track of the substantial number of summary exhibits and the multiple grounds on which Dr. Elfenbein objects to them—including objections to some exhibits on more than one ground—attached as an Addendum is a list of the summary exhibits and the grounds for their exclusion.

where the witness was also testifying in the role of an expert." *United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995). A summary chart is "misleading," and thus inadmissible under the Rule, when it has "the airs of comprehensiveness," but in fact serves the "hidden" purpose of "further[ing] the proponent's theory of the case." *See City of Huntington v. AmerisourceBergen Drug Corp.*, Civil Action No. 3:17-01362, 2021 WL 2907893, at *5 (S.D.W. Va. July 9, 2021) (citing *United States v. Oloyede*, 933 F.3d 302, 310–11 (4th Cir. 2019)).

The government characterizes the exhibits sponsored by Mr. Quindoza and Ms. Robinson as "summary exhibits," and that is what they purport to be: they are "summar[ies] [offered] to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. They are not "charts and summaries" offered under Rule 611(a) "to facilitate the presentation and comprehension of evidence already in the record." *Janati*, 374 F.3d at 273. But if they were offered under Rule 611(a)—which would require printing and sending to the jury the underlying spreadsheets containing tens of thousands of rows of data that are too voluminous to print and have so many columns that they would be illegible if they were printed—they would be objectionable for the same reasons. Exhibits may be shown to the jury under Rule 611(a) only when they are "helpful to the jury" and "serve[] to aid the jury in ascertaining the truth." *Johnson*, 54 F.3d at 1158, 1160; *see also BP Expl. & Prod. Inc. v. Cashman Equip. Corp.*, No. H-13-3046, 2016 WL 1387907, at *5 (S.D. Tex. Apr. 8, 2016) ("Federal courts have great discretion in deciding whether a demonstrative aid will be helpful *or will cause confusion or prejudice*." (emphasis added)). Rule 611(a) exhibits also must satisfy Federal Rule of Evidence 403. *Id.* at 1159. "A chart [or exhibit] which for any reason presents an unfair [or inaccurate] picture can be a potent weapon for harm, and permitting the jury to consider it is error." *Mgmt. Sys. Assocs., Inc.*

*v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1168 (4th Cir. 1985) (quoting *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir.1977)) (alterations in original).

Of course, if evidence is not relevant in the first instance, the court need not engage in the Rule 403 balancing exercise. *United States v. Ausby,* 436 F. Supp. 3d 134, 156 (D.D.C. 2019) (excluding evidence that "has no independent probative value and is simply irrelevant").

For the reasons explained below, many of these exhibits should be excluded in whole or in part either as irrelevant or under Rule 403 because they are inaccurate, misleading, and inflammatory.

**I.      The government's summary exhibits include inaccurate definitions of the key billing codes and a misleading analysis that is based on the inaccurate code definitions.**

**a.      Summary exhibits that include inaccurate E/M code descriptions must be excluded.**

Central to this case is whether Dr. Elfenbein knowingly and with intent to defraud caused the submission of claims for Evaluation and Management ("E/M") services alongside COVID-19 tests, when the E/M claims were not supported by the services provided by the DEC providers who saw the patients. The starting point in determining the accuracy of the claims is the definition of each of the E/M codes at issue—yet eight of the government's summary exhibits include definitions that are either wholly inaccurate or so abbreviated as to be misleading. The common problem in the exhibits' code descriptions is their emphasis on the time a provider spends during an office visit. The code descriptions in the exhibits have been rewritten to suggest that use of each E/M code requires that the provider spent a specified amount of time with the patient, when in fact the codes may be used without regard to the duration of a visit.

Federal health care programs and commercial insurers require that claims for medical services be submitted with "CPT" codes—codes maintained by the CPT Editorial Panel and

published by the American Medical Association ("AMA") in its CPT manual.[2] At the heart of this case are the CPT codes used to bill for E/M services provided during office visits. In 2020, the CPT Manual established five levels of E/M codes for office visits. A code was assigned to each level, and separate codes applied to office visits with new patients—codes 99201-99205—and with established visits (99211-99215). To select the appropriate level code, the CPT Manual instructed that E/M coding descriptions "recognize seven components, six of which are used in defining the levels of E/M services." *See* Ex. A at 6 (2020 CPT Manual excerpt). The six components were: (1) history; (2) examination; (3) medical decision making; (4) counseling; (5) coordination of care; and (6) nature of presenting problem. *Id*. The first three components were identified as the "key" components for selecting the E/M level, and the next three were "contributory factors"—although two of the contributory factors, counseling and coordination of care, were "not required . . . [to] be provided at every patient encounter." *Id*. The Manual made clear that time could not be used to select the E/M level, with one exception. For "visits that consist predominantly of counseling or coordination of care," *id.* at 9, the seventh component—time— was determinative of the E/M level, *id*. at 10. Even when time did dictate the E/M level, however, the 2020 CPT Manual cautioned that "the specific times expressed in the visit code descriptors are averages and, therefore, represent a range of times that may be higher or lower depending on the actual clinical circumstances." *Id*. at 7.

---

[2] Pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Congress required the Secretary of Health and Human Services (HHS) to select code sets for data elements in health care claims to enable the electronic exchange of health information. *See* 42 U.S.C. § 1320d-2(c)(1). The Secretary selected the CPT code set and the Health Care Financing Administration Common Procedure Coding System ("HCPCS") for health care services. 45 C.F.R. §§ 162.1002(a)(4) & (c). The codes for the E/M services at issue in this case are CPT codes.

For example, the 2020 description for an evaluation of a new patient coded at 99204 included three key components: (1) a comprehensive history; (2) a comprehensive examination; and (3) medical decision making of moderate complexity. *See* Ex. A at 12. The description of 99204 included only the "typical" face-to-face time with patients, not a *required* time. *Id*. at 12 ("Typically, 45 minutes are spent face-to-face with the patient and/or family."). More importantly for the circumstances here, the CPT Manual clearly states that time was *not* to be considered *at all* in selecting the level of E/M services *except* when "counseling and/or coordination of care dominate[d] (more than 50%) of the encounter," *id*. at 10. If counseling and coordination of care do not dominate an encounter—as is true in a typical encounter and the patient visits at issue here— the other factors are determinative. The Manual plainly states, under the heading "Select the Appropriate Level of E/M Services Based on the Following," that for visits with new patients, *id.* at 10 ¶ 1, and established patients, *id.* at 10 ¶ 2, the level is determined based on the history, examination, and medical decision making. Only when counseling and coordination of care dominate an encounter is time "the key or controlling factor to qualify for a particular level of E/M Services."[3]

The AMA completely revamped the E/M code descriptions and guidance effective January 1, 2021, in the 2021 edition of the CPT Manual.[4] The 2021 Manual not only included revised E/M code descriptions, but it changed the guidance regarding selection of code levels. The Manual allowed providers—for the first time—to select codes based *either* on medical decision making or

---

[3] These general rules apply to selection of the level of both new and established patient encounters. The definition of each level of new patient (99201–99205) and established patient (99211–99215) encounter includes a "typical" duration. *See id.* at 11–13.

[4] Although the indictment alleges that the scheme to defraud lasted from March, 2020 to February, 2022, each of the five counts alleges that the scheme was executed by the submission of a claim in 2021.

on time for *any* visit, without regard to whether it was dominated by counseling and/or coordination of care. *See* Ex. B at 7 (2021 CPT Manual excerpt). Critically, though, the Manual never *required* that providers select codes based on time. Rather, coding based on time was permitted as an alternative to coding based on medical decision making, at the provider's discretion. *See* Ex. B at 14 ("Select the appropriate level of E/M services based on the following: 1. The level of the [medical decision making] as defined for each service, **or** 2. The total time for E/M services performed on the date of the encounter.") (emphasis added). For example, code 99204 is described in the 2021 Manual as follows:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making.
>
> *When using time* for code selection, 45–59 minutes of total time is spent on the date of encounter.

*Id*. at 19 (emphasis added). In other words, in 2021, an encounter coded 99204 should last 45–59 minutes *only if* the provider chooses to code based on time. The description of each of the other E/M codes includes the same formulation. *Id.* at 18–20.

Four of Ms. Robinson's proposed summary exhibits include inaccurate and misleading E/M code descriptions. On exhibits titled "Drs ERgent Care Office Visit Procedure Codes (Billed) March 1, 2020–February 28, 2022" (GX124); "Drs ERgent Care Procedure Codes Billed for Greater than $1M March 1, 2020–February 28, 2022" (GX129); "Counts 4 and 5," (GX133); and "Claim Detail for Select Beneficiaries For Date of Service 4/19/2021 and 4/22/2021," (GX134), Ms. Robinson includes the following shortened and misleading code descriptions:

- 99204: "New patient office or other outpatient visit, 45-59 minutes." *See* Exs. GX124, GX129, GX133, GX134.

- 99214: "Established patient office or other outpatient visit, 30-39 minutes." *Id*.

- 99213: "Established patient office or other outpatient visit, 20-29 minutes." *See* Exs. GX124, GX129.

- 99212: "Established patient office or other outpatient visit, 10-19 minutes." *Id.*

- 99205: "New patient office or other outpatient visit, 60-74 minutes." *Id.*

- 99203: "New patient office or other outpatient visit, 30-44 minutes." *See* Ex. GX124.

- 99215: "Established patient office or other outpatient visit, 40-54 minutes." *Id.*

- 99202: "New patient office or other outpatient visit, total time 15-29 minutes." *Id.*

None of these are accurate summaries of either the 2020 or the 2021 E/M codes. As an initial matter, the time *ranges* that Ms. Robinson includes in the demonstratives do not appear at all in the 2020 CPT manual and are thus irrelevant to any claims submitted that year. For example, a 2020 visit coded 99214 based on time—which was only permissible if counseling and/or coordination dominated—need not last "30-39 minutes," as Ms. Robinson's exhibits suggest. *See* GX124, GX129. The only time guideline provided in the 2020 Manual is the "typical[] . . . face-to-face" time of 25 minutes. *See* Ex. A at 13. Accordingly, it is simply wrong to assert that the listed time ranges are included in the code descriptions for the entire two-year period for which the exhibits purport to summarize data.

Nor do Ms. Robinson's descriptions accurately reflect the 2021 E/M code guidelines. As explained above, time dictates the appropriate code only when a provider chooses to code based on time. Ms. Robinson's descriptions suggest, for example, that an office visit with an established patient lasting less than 30 minutes can *never* be coded at 99214. Not so. Under the 2021 E/M code descriptions, a provider may code at 99214 (or any other E/M level), without regard to time, when she conducts an office visit with an established patient that involves "a medically appropriate history and/or examination and moderate level of medical decision making." *See* Ex. B at 19. So

long as the visit satisfies those requirements, regardless of how long it took, a provider may appropriately code it as 99214. Ms. Robinson's truncated descriptions, which reflect only one of a provider's two choices about how to code, are thus misleading at best.[5]

Four of Mr. Quindoza's proposed summary exhibits include similar errors. Like Ms. Robinson, he describes various E/M codes using only the time ranges provided in the 2021 CPT manual. For example, on four of his exhibits, Mr. Quindoza inaccurately describes code 99204 as "New patient office visit; 45-59 minutes." *See* Exs. GX102 ("Medicare Claims Data Summary Drs Ergent Care"); GX104 ("Medicare Claims Data Summary Drs Ergent Care Location: Earleigh Heights Volunteer Fire Co"); GX105 ("Medicare Claims Data Summary Drs Ergent Care Location: FCMCG BWI"); GX106 ("Medicare Claims Data Summary Drs Ergent Care Location: Odenton Volunteer Fire Department"). Use of these exhibits at trial would leave the jury with the misimpression that an office visit with a new patient *must* last 45–59 minutes for a provider to appropriately code it as 99204 when in fact, a provider could bill a shorter visit as a 99204 if it involved "a medically appropriate history and/or examination and moderate level of medical decision making." *See* Ex. B at 19.

Indeed, one of Mr. Quindoza's exhibits lists separately the first three counts, for which Medicare was the payer, with the inaccurate code descriptions, an especially misleading suggestion that the claims singled out as those counts of the indictment were false if the visits did not take 45-59 minutes. *See* GX102. One of Ms. Robinson's exhibits similarly lists the remaining two counts,

---

[5] Ms. Robinson's summary exhibits list "R6388_Medicare.xlsx" as the source for the procedure code descriptions. *See* GX124, GX129. This is an Excel file containing three spreadsheets with Medicare claims data that the government produced in discovery. The source of the code descriptions is not specified in the spreadsheet, but whatever the source, the three spreadsheets contain as many as 160 columns and tens of thousands of rows. The use of shortened code descriptions to fit them in a single column of such a spreadsheet is no justification for their use in summary exhibits that will mislead the jury.

for which CareFirst was the payer, with inaccurate code descriptions that suggest the claims in those two counts were false if the visits did not take the specified amount of time. *See* GX133. Taken together, these two exhibits would mislead the jury concerning all five counts of the indictment.

Using similar code descriptions—noting that the patient is either "new" or "established," followed by a time range—Mr. Quindoza also inaccurately describes codes 99203, 99205, 99213, 99214. *See* GX104 (inaccurate descriptions of codes 99204, 99205, 99212, and 99214); GX105 (inaccurate descriptions of codes 99203, 99204, 99205, 99213, and 99214).

These misleading descriptions are no small matter. The government will question witnesses concerning the duration of patient encounters at DEC, as it has done in countless witness interviews, according to interview memoranda produced in discovery. Such questioning, coupled with exhibits that incorrectly suggest that the definitions of the applicable CPT codes *required* that the encounters lasted specified durations, can only mislead the jury to believe that, for example, a 2021 claim that used the code 99204 for a patient encounter that lasted less than 45 minutes was false. In fact, the CPT Manual makes clear that use of that code is entirely appropriate for a shorter visit if there is "a medically appropriate history and/or examination and moderate level of medical decision making."

The government is aware of the correct code descriptions and the 2021 changes in the descriptions. The superseding indictment quotes the descriptions from both 2020 and 2021 for codes 99204 and 99214. *See* ¶¶ 26-27. Mr. Quindoza includes longer code descriptions that are not misleading in one exhibit, which lists Medicare's reimbursement amount for each code. *See* GX118. One non-misleading exhibit, however, cannot cure eight other misleading ones. GX118

demonstrates how easily the government could have included the complete and accurate code descriptions, had it so chosen.

Summary exhibits that present inaccurate information should be excluded, *see Janati*, 374 F.3d at 272, as should those based on "incorrect premises" or "faulty assumptions," *see Mgmt. Sys. Assocs., Inc.*, 762 F.2d at 1176. Accordingly, four of Mr. Quindoza's exhibits and four of Ms. Robinson's exhibits should be excluded based on their inaccurate and misleading E/M code descriptions. *See* Addendum.

> **b.    A summary exhibit that assumes Dr. Elfenbein and his providers coded based on time illustrates the problems that will be caused if the government is permitted to use inaccurate code descriptions, and it too must be excluded.**

The misleading effect of the government's inaccurate code descriptions is laid bare in Ms. Robinson's proposed summary exhibit titled, "Rendering Providers Billed Total Office Visits Exceeding 24 Hours in a Day," which must be excluded as misleading and prejudicial. *See* GX123. This demonstrative purports to show the number of times Dr. Elfenbein and other providers submitted claims for office visits occurring on a single day that would have cumulatively taken longer than 24 hours. Ms. Robinson includes the following examples:

| Provider | No. of Occurrences | Examples | | |
|---|---|---|---|---|
| | | Service Date | No. of Days | Time in Hours |
| Elfenbein, Ron | 462 | 12/20/2021 | 16.0 | 384.1 |
| Brothers, James | 170 | 12/18/2020 | 9.5 | 227.7 |
| Randall, Crystal | 112 | 01/02/2021 | 4.7 | 112.8 |
| Needle, Deborah | 31 | 11/06/2020 | 3.4 | 81.6 |
| 18 Others | 60 | | | |
| TOTAL | 835 | | | |

GX123.

Of course, 16 days of office visits cannot be completed in 24 hours, and the clear implication from this exhibit is that most of those claims must have been fraudulent. Ms. Robinson's calculations, however, rest on a false premise: that each time Dr. Elfenbein and the other providers selected an E/M code for an encounter, they represented that the visit took a specific amount of time. Put differently, the exhibit would be accurate only if the providers were *required* to code every office visit based on time.

Ms. Robinson's sources—three large datasets—provide no support for this incorrect premise. *See* GX123 ("Source Files: Drs ERgent Care AR report 2020.csv, Drs ERgent Care AR report 21.csv, Drs ERgent Care AR report 22.csv").[6] These datasets contain no indication of the length of the visit, nor do they reveal what coding approach the provider used. Indeed, in small print at the bottom of the demonstrative, Ms. Robinson notes that "[t]he lower end of the *time ranges* were used for each procedure code and connected to the relevant procedure code description for the service date." *See* GX123 (emphasis added). As discussed above, however, in 2020, the duration of an office visit *could not be used* in selecting the E/M code unless counseling and/or coordination of care dominated, and in 2021, time determined the E/M code only when the provider *chose* to code based on time.[7] Moreover, the 2020 CPT manual did not include "time ranges," only one "average" time, yet Ms. Robinson's footnote suggests that she used the 2021 time ranges for 2020 claims. In any event, it is clear that Ms. Robinson assigned each office visit

---

[6] These massive datasets, produced by the government in discovery, include certain data for claims with dates of service from January 2020 through December 2022.

[7] It is also worth noting that the 2020 and 2021 CPT manuals included different definitions of how to calculate "time" for purposes of coding, in those situations where time was relevant. In 2020, only "face-to-face" time with the patient and/or family counted. *See* Ex. A at 8. In 2021, however, non-face-to-face time, such as time spent "documenting clinical information in the electronic or other health record, counts as well. *See* Ex. B at 8.

a duration based on the false premise that every visit was coded based on time, and then created an exhibit illustrating the absurdity of her own premise.

The summary exhibit is grossly misleading. It asserts that—based on E/M code alone—one can infer the duration of an office visit, even though in 2020 it would have been improper to code based on time in most cases, and in 2021 it was entirely up to the provider whether to code based on time or medical decision making. The exhibit title leaves no doubt that the government intends to argue that on 835 separate occasions, "Rendering Providers Billed Total Office Visits Exceeding 24 Hours in a Day." That is flatly inconsistent with the CPT Manual's code definitions and guidance. A summary exhibit based on "incorrect premises" and "erroneous assumptions"—especially ones that go to the "heart" of the issues in the case—must be excluded. *See Mgmt. Sys. Assocs., Inc.*, 762 F.2d at 1176.

Indeed, the potential for prejudice here is especially clear. The exhibit is intended to be impactful, and if the government were permitted to show it to the jury, it would be. The exhibit sets up a straw man argument that the claims can only be accurate if there are 384 hours in a day. But the exhibit's premise, that the E/M codes are false unless the visits took the amount of time that would be applicable if the providers chose to code them based on time—in every instance—is a fiction—and no revision can make the exhibit accurate. Nothing in the claims suggests, let alone establishes, that the visits took any particular amount of time. The government cannot attempt to meet its burden of proof by using Ms. Robinson to present a misleading theory of Dr. Elfenbein's guilt based on a false premise masquerading as a "summary"—of hundreds of thousands of cells of data that are far too voluminous for the jury to evaluate independently. An exhibit this prejudicial and misleading cannot be shown to the jury.

II.     **Summary exhibits aggregating allegedly fraudulent claims with those not alleged to be fraudulent should be excluded.**

The government seeks to introduce several summary exhibits that present aggregate information about *all* claims submitted from March 2020 through February 2022, regardless of their nature. This case concerns allegedly fraudulent claims related to COVID-19. During the relevant period, however, DEC continued to see patients for reasons wholly unrelated to COVID-19. The government does not allege fraud with respect to those services. Indeed, the superseding indictment does not even allege that *all* COVID-19-related claims were fraudulent. It alleges only that claims for E/M services in conjunction with COVID-19 tests were fraudulent—and not that it was improper to submit any claim for E/M services, but only that the wrong E/M code level was selected for billing. *See* Sup. Ind. ¶¶ 30–31. There is no allegation that claims for the tests themselves, for example, were fraudulent. Aggregate numbers that include all claims—both those the government alleges were fraudulent and those concerning which the government makes no such allegation—have little, if any, probative value in a case involving only a subset of all the claims submitted, but they risk confusing the issues and misleading the jury about the universe of claims alleged to have been part of the scheme. Such a misleading approach would prejudice Dr. Elfenbein by inflating the number of claims and the dollar amounts that appear to be within the scope of the alleged fraud.

Several of Ms. Robinson's summary exhibits and one of Mr. Quindoza's present such overinclusive information. The first of Ms. Robinson's problematic exhibits is "Drs ERgent Care Claims Submitted March 1, 2020 to February 28, 2022." *See* Ex. GX119. Ms. Robinson's sources, cited at the bottom of the slide, are the same three datasets employed in most of her other summary exhibits. *See id.* ("Source Files: Drs ERgent Care AR report 2020.csv, Drs ERgent Care AR report 21.csv, Drs ERgent Care AR report 22.csv"). These datasets include *all* claims submitted during

the relevant period, not just those the government alleges were fraudulent. The aggregate figures on the demonstrative are thus inflated and represent significantly more than is at issue in this case. Indeed, the Superseding Indictment alleges that DEC was paid approximately $10 million on the allegedly fraudulent claims, *see Sup*. Ind. ¶ 30(i); Ms. Robinson's exhibit displays in large font the "Paid Amount" as $24,009,610, *see* GX119. The summary serves no permissible purpose; rather, it presents to the jury totals of more than $78 million billed and $24 million paid for claims but obscures the fact that most of these claims are not alleged to have been fraudulent. Its effect can only be to confuse and inflame jurors by presenting large numbers that have no relevance.[8]

This summary exhibit also presents cumulative information. *See* Fed. R. Evid. 403. Another of Ms. Robinson's exhibits, titled "Drs ERgent Care Procedure Codes Billed for Greater than $1M March 1, 2020 to February 28, 2022," contains the same aggregate figures, *see* GX129, but in a contextualized and less prejudicial manner. GX129, unlike, GX119, separates out the total claims by procedure code, making it clear which claims are at issue and which claims are not. *Compare* GX119 *with* GX129.

---

[8] Moreover, the way in which Ms. Robinson's summary exhibits were presented to the defense suggests that it will be the first exhibit shown to the jury during Ms. Robinson's testimony. The government initially provided the defense with a single PDF, with this as the first page, and on June 23, 2023 provided its numbered trial exhibits, with GX119 numbered as Ms. Robinson's first exhibit.

| No. of Claim Lines | No. of Beneficiaries | Billed Amount | Paid Amount |
|---|---|---|---|
| 343,764 | 95,353 | $78,052,137 | $24,009,610 |

GX119

**Drs ERgent Care Procedure Codes Billed for Greater than $1M March 1, 2020 to February 28, 2022**

| Procedure Code | Procedure Code Description | Start Date | End Date | No. of Claim Lines | No. of Beneficiaries | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 99204 | New patient office or other outpatient visit, 45-59 minutes | 03/01/2020 | 02/28/2022 | 74,291 | 70,977 | $ 26,289,390 | $ 8,961,879 |
| 87426 | Detection test…severe acute respiratory syndrome coronavirus | 10/23/2020 | 2/28/2022 | 44,209 | 35,642 | 8,838,306 | 1,584,303 |
| 87428 | Detection test…coronavirus and influenza | 12/07/2020 | 02/28/2022 | 28,072 | 23,862 | 8,079,020 | 1,360,437 |
| 99214 | Established patient office or other outpatient visit, 30-39 minutes | 03/01/2020 | 02/28/2022 | 30,552 | 19,318 | 7,063,975 | 2,498,163 |
| S9083 | Global fee urgent care centers | 03/01/2020 | 02/28/2022 | 28,637 | 13,832 | 6,038,587 | 3,294,579 |
| U0002 | 2019-ncov coronavirus, sars-cov-2/2019-ncov (covid-19)… | 04/02/2020 | 12/23/2021 | 22,558 | 15,283 | 3,729,723 | 759,460 |
| 99213 | Established patient office or other outpatient visit, 20-29 minutes | 03/01/2020 | 02/28/2022 | 23,223 | 19,261 | 3,618,197 | 1,412,298 |
| 87635 | Amplified…detection…coronavirus 2 (Covid-19) antigen | 03/15/2020 | 02/28/2022 | 24,820 | 22,094 | 2,540,649 | 911,112 |
| 99358 | Prolonged patient service without direct patient contact first hour | 05/05/2020 | 02/28/2022 | 9,868 | 8,862 | 1,972,914 | 885,369 |
| 99212 | Established patient office or other outpatient visit, 10-19 minutes | 03/21/2020 | 02/28/2022 | 15,022 | 13,028 | 1,938,605 | 378,806 |
| 99205 | New patient office or other outpatient visit, 60-74 minutes | 04/03/2020 | 02/28/2022 | 3,228 | 3,188 | 1,433,599 | 367,554 |
| U0003 | Infectious agent…coronavirus 2 (sars-cov-2)… | 04/03/2020 | 01/12/2022 | 5,872 | 5,033 | 1,027,578 | 239,968 |
| Other | 290 Codes/Descriptions | 03/01/2020 | 02/28/2022 | 33,412 | 19,856 | 5,481,594 | 1,355,682 |
| **Total** | | 03/01/2020 | 02/28/2022 | 343,764 | 95,353 | $ 78,052,137 | $ 24,009,610 |

Source Files: Drs ERgent Care AR report 2020.csv, Drs ERgent Care AR report 21.csv, Drs ERgent Care AR report 22.csv. Procedure code descriptions from R6388_Medicare.xlsx.
Notes: Total number of beneficiaries is not additive. It is possible for a patient to be associated with multiple procedures. Procedure code descriptions based on latest claim date.

GX129

Where the government has already separated the relevant claims from the irrelevant ones and plans to present that information to the jury,[9] there is no need for the government to present a *separate* exhibit emphasizing an inflated and misleading universe of claims.

Ms. Robinson repeats her aggregation error, to misleading and confusing effect, in two other summary exhibits. Relying on the same overinclusive datasets, Ms. Robinson sorts claims by payer type, *see* GX120, and ranks the "top" providers by billed amount, *see* GX130. These exhibits, however, do not control for irrelevant claims, despite the government's ability to do so. *See, e.g.*, GX129 (separating claims at issue from claims not at issue). It is more confusing and

---

[9] Dr. Elfenbein objects to GX129 on the separate grounds that it includes "billed amount[s]," *see* Part III *infra*, and because it includes inaccurate E/M code descriptions, *see* Part I.a. *supra*. Dr. Elfenbein does not object to this exhibit on aggregation grounds. *See* Addendum.

misleading than helpful, for example, to present the jury with aggregate figures showing $29 million billed to and $9.5 million paid by commercial insurers when only a subset is alleged to have been fraudulent. *See* GX120. The same is true for an exhibit ranking "top providers" based on an inflated universe of claims. *See* GX130.

Using a different, but similarly overinclusive dataset comprised of all Medicare claims, Mr. Quindoza also seeks to present a summary exhibit ranking the "top" providers under the heading "Top 15 Rendering Providers." *See* GX115. This exhibit, too, risks confusing the jury about the universe of allegedly fraudulent claims, as it suggests that all Medicare claims during the relevant period are at issue.

Relatedly, another of Ms. Robinson's summary exhibits aggregates data about claims that the government does not allege were fraudulent and presents them in a misleading and prejudicial manner. An exhibit titled, "Drs ERgent Care Office Visits Billed with a COVID Test Same Day March 1, 2020 to February 28, 2022," has two components: "Level 4 Office Visit Bundles" at the top, and "Additional Visit Codes (Within 2-4 Days of Level 4 Bundle)" at the bottom. *See* GX128. The top part of this exhibit, concerning "Level 4 Office Visit Bundles," aggregates the amounts billed for tests and the amounts billed for office visits (E/M codes) that occurred on the same day as the tests. It creates the appearance that more than $50 million was billed and more than $15 million was paid for office visits, when in fact those amounts include claims for tests as well as E/M visits. The government does not, of course, allege that DEC should not have billed for COVID-19 tests. But the title of the exhibit, "Office Visits Billed with a COVID Test Same Day," misleadingly suggests that the data concern *office visits* that were selected because the patient was tested on the same day—not that the amounts billed and paid for the *tests* were included in the

totals. And even if the title were changed, the exhibit would remain misleading unless it separated the amount billed for tests and for E/M visits.[10]

Moreover, the bottom part of the slide, listing amounts billed and paid for "additional visit codes," further inflates the amounts that the slide suggests were fraudulent. In small print at the bottom of the exhibit, Ms. Robinson notes that "[t]he following procedure codes were included as additional visit codes: 99212, 99213, 99358, 99423, and 99441." *Id*. These E/M codes, however, do not represent office visits of the type alleged to be fraudulent in this case. *See* Sup. Ind. ¶ 30(i) (alleging that Dr. Elfenbein submitted fraudulent claims "for moderate complexity E/M Services in conjunction with COVID-19 tests"). None of the listed additional visit codes represents office visits of "moderate complexity," as defined by the CPT Manuals. *See* Ex. A at 12–13, 33, 39–40; Ex. B at 19, 41, 49–51. The government has not charged that claims submitted under these "additional visit codes" were fraudulent. Ms. Robinson's display of these irrelevant claims alongside the "Level 4 Office Visit Bundles"—which are the central claims in this case— misleadingly suggests that the additional office visit codes were fraudulent. *See* GX128. Under the government's own description of the alleged scheme, however, there is no such connection. Sup. Ind. ¶¶ 30–31. *See United States v. Crinel*, Criminal Action No. 15-61, 2017 WL 490635, at *8 (E.D. La. Feb. 7, 2017) (excluding summary exhibit that drew unfair comparison between two sets of data).

As a whole, GX128 is confusing, misleading, and prejudicial. It aggregates relevant and irrelevant claims and assigns false significance to claims not alleged to be fraudulent. The top part of the exhibit invites the jury to draw the inaccurate conclusion that DEC billed more than $50 million for Level 4 office visits alone, when in fact that total includes amounts billed for tests, and

---

[10] Another of Ms. Robinson's exhibits, GX132, suffers from the same deficiency. *See* Addendum.

the bottom part suggests that the "Additional Visit Codes" were also fraudulent. Far from a "summary," the exhibit invites unnecessary and unfair inferences. It should be excluded.

### III.  "Amounts billed" have far greater prejudicial effect than probative value and should not be presented to the jury.

Many of Ms. Robinson and Mr. Quindoza's summary exhibits include a column for the aggregate "billed amount" for all or a subset of claims. The billed amount, however, is not the amount DEC was paid on the claims, or expected to be paid. All, or almost all, of the claims at issue were submitted to payers that reimbursed based on their own fee schedules that set reimbursement rates in advance. The "sticker price" of a service thus has little meaning to either the provider or the payer, even it if is listed on a claim for reimbursement. The actual amount that a provider expects to receive, and the payer expects to pay, is the amount on the payer's fee schedule for each CPT code, which for these claims is the "paid" or "allowed" amount—*i.e.*, the amount that the payer agreed, in advance, to reimburse. *See, e.g.*, GX118 (listing E/M codes alongside their allowed amounts).

For example, Medicare Part B, HRSA (a federal program that reimbursed providers for COVID-19-related services provided to uninsured patients), and CareFirst, which collectively received the majority of DEC claims during the relevant period, reimbursed providers based on fee schedules. *See* 42 U.S.C.A. § 1395w-4 (Medicare); Ex. C at p. 4 (2016 CareFirst Participation Agreement). Medicare's predetermined reimbursement rates are published annually. *See* 42 U.S.C.A. § 1395w-4(b); 42 U.S.C.A. § 1395*l*(a); *see also* Fee Schedules-General Information, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/medicare-fee-for-service-payment/feeschedulegeninfo (last visited Jun. 26, 2023) ("This comprehensive listing of fee maximums is used to reimburse a physician and/or other providers on a fee-for-service basis."). Regardless of what is listed on the claim, Medicare will never reimburse at a higher rate than what

is published on its fee schedule. *See* 42 U.S.C.A. § 1395w-4(a). During the relevant period, HRSA followed the Medicare fee schedule. *See* Ex. D at 5 (Terms and Conditions for Participation in the HRSA COVID-19 Claims Reimbursement). CareFirst publishes its reimbursement rates on its own fee schedule. *See* Ex. C (2016 CareFirst Participation Agreement) at p. 4.[11] The amount listed on the fee schedule is the "maximum fee allowed." *Id.*; *see also* Provider Portal User's Guide-Fee Schedule, CareFirst  https://provider.carefirst.com/providers/pop-up/provider-portal-users-guide-fee-schedules.page (last visited Jun. 26, 2023).  Any charge higher than the allowable amount is irrelevant to the payer.

Rather, the substantial difference between the amounts billed and the amounts paid are a feature of the way health care is paid for in this country. The universal practice among government health care programs and commercial health insurers is to reimburse the lesser of the amount charged and the amount allowed, based on each payer's fee schedule. *See, e.g.*, *See* 42 U.S.C.A. § 1395w-4(a). Health care providers cannot change their "sticker prices" depending on a patient's insurer—that would raise both practical and legal concerns. *Cf. United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1398 (2023) (pharmacy discount program that impacted the "usual and customary" price charged to patients gave rise to False Claims Act claims). As a result, providers typically list prices high enough to ensure that they will be paid the full amount on each insurer's fee schedule. A Johns Hopkins study of amounts charged by more than 400,000 physicians found that median physician charges were 2.5 times higher than the amount paid by Medicare. *See* Ex. E ("Variation in the Ratio of Physician Charges to Medicare Payments by

---

[11] "Payment for Complying Physician Services will be made on a fee-for-services basis at the lesser of the Physician's usual and customary charge or the maximum fee allowed by Corporation for such services, less Member copayments, if any. The Fee Schedule may be altered from time to time, but in any event, not more often than every six (6) months."

Specialty & Region," JAMA (Jan. 17, 2017, Vol. 317, Number 3)); *see also* Ex. F (L. Adler, et al., "Provider Charges Relative to Medicare rates, 2017-2017," USC-Brookings Schaeffer on Health Policy, Dec. 5, 2019). An insurer does not pay any more if the charge is ten times its allowable charge than if the charge equals the allowable—something that every provider understands.

But individuals who do not work in healthcare do not understand the way providers are paid for their services. Widely reported cases of surprise bills from out-of-network providers that burden patients have understandably alarmed the public. *See, e.g.,* Ex. G (H. Meyer, "A surprise-billing loophole? Her pregnancy led to a six-figure hospital bill," NPR.org, Feb. 28, 2023); Ex. H (S. Fiorini, "The High Cost of U.S. Healthcare is on Voters' Minds," Gallup, Oct. 20, 2022). To be sure, in rare circumstances—for claims submitted by out-of-network providers to commercial payers—the difference between the allowed amount and the billed amount may be charged to a patient. Importantly, though, none of those circumstances impacted patients seeking COVID-related services at DEC. *See* Ex. I (Press Release: Attorney General Frosh Warns Providers Against Billing Patients for COVID-19 Testing [and related office visits]).[12]

Presenting the jury with the higher, irrelevant billed amounts risks not only confusing the issues, but unfairly prejudicing Dr. Elfenbein. The jury may naturally assume that the billed amount reflects what DEC attempted to recoup from the payers, which is not accurate. Dispelling

---

[12] In March 2020, Congress passed the Families First Coronavirus Repose Act (FFCRA), which prohibited providers from imposing cost sharing for COVID-19 testing and related office visits. *See* FFCRA §§ 6001, 6002, 6003, 6006 (Pub. L. No. 116-127, Mar. 18, 2020); *see also* Ex. J (AMA, "Issue brief: Balance billing for COVID-19 testing and care - federal and state restrictions"). Uninsured patients, who are typically at the highest risk of receiving a balance bill, were not impacted at all, as the HRSA Uninsured program specifically prohibited balance billing. *See* Ex. D at 5 (Terms and Conditions for Participation in the HRSA COVID-19 Claims Reimbursement). Moreover, even outside of the COVID-19 context, providers like DEC that participate in Medicare and accept assignment agree to accept the Medicare fee as payment in full and are therefore prohibited from balance billing. *See* Ex. K ("Does your provider accept Medicare as full payment?" Medicare.gov).

this misimpression would require testimony and evidence on the intricacies of cost sharing, which is confusing and—at best—of marginal relevance. *Cf. United States v. Cooper*, 286 F. Supp. 2d 1283, 1290 (D. Kan. 2003) ("[T]he potential for jury confusion is enhanced when [issues extrinsic to the allegedly fraudulent scheme] are added to an already overflowing pot of wide-ranging allegations of Medicare fraud and business improprieties and of the arguably complex issues involving Medicare billing and related rules and regulations."); *United States ex rel. Bahnsen v. Bos. Scientific Neuromodulation Corp.*, Civil Action No. 11-1210, 2017 WL 6402633, at *4 (D.N.J. Dec. 15, 2017) (excluding "tangentially relevant" evidence that could lead the jury to draw a "reasonabl[e] (though improper[]) "conclusion about the interplay of Medicare requirements and FDA approval).

Even worse, the jury may conclude that the difference between the "billed" and "paid" amounts was borne by patients. As explained above, this did not happen. And even if it had, Dr. Elfenbein is charged with defrauding health care benefit programs—*i.e.,* the payers. The most these payers could have been defrauded on any given claim was the allowed amount. Any marginal probative value in showing the jury what may have been charged to patients—or, in this case, was *not* charged to patients—is vastly outweighed by the potential for inflaming the jury. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, No. CIV.A. 3:95CV00015, 2000 WL 1456338, at *2 (W.D. Va. Aug. 14, 2000) (excluding exhibits on asbestos contamination because "[h]ealth hazards are not at issue in this case, and using the evidence in this manner only would serve to inflame the passions of the jury, and to confuse the issues").

The government is well aware of the relevant amounts—the allowed or paid amounts. Indeed, all but four proposed summary exhibits that include the aggregate billed amounts for large

groups of claims also includes the paid amount.[13] The only conceivable reason for the government to want the jury to see the aggregate billed amounts for all claims or a large subset of claims as well is to inflame the jury with the highest dollar amounts possible. It would be unnecessary and prejudicial for the government to show the jury the higher aggregate billed amounts, as they have no bearing on the actual amounts obtained—or even sought—though allegedly fraudulent means. Accordingly, 10 of Ms. Robinson's summary exhibits, *see* GX119, GX120, GX122, GX124, GX127, GX128, GX129, GX130, GX131, GX132, and 11 of Mr. Quindoza's, *see* GX101, GX103, GX104, GX105, GX106, GX110, GX111, GX112, GX113, GX114, GX115, cannot be shown to the jury unless the billed amounts are deleted.

## IV. The Exhibit summarizing Dr. Elfenbein's tax returns should be excluded.

Through Ms. Robinson, the government seeks to introduce an exhibit that purports to summarize Dr. Elfenbein's tax returns. *See* Ex. GX135. This "summary," which compares four years of Dr. Elfenbein's income, is inflammatory and of marginal relevance. *See* Fed. R. Evid. 403. The exhibit shows a rise in Dr. Elfenbein's income from 2019 to 2020, and a steep rise from 2020 to 2021. It is not contested in this case, however, that DEC—and thus Dr. Elfenbein—saw increased profits during 2020 and 2021. Unsurprisingly, in a community reeling from a global pandemic, the services of urgent care centers were in higher demand. The income produced by any urgent care center that expanded its testing capacity, even opening new locations to fill the dire public health need that the government was unable to meet, would have increased its profits, and

---

[13] Two of Ms. Robinson's proposed summary exhibits that aggregate large groups of claims include only the billed amount. *See* Exs. GX127, GX132. Of those four, one, GX127, is a companion to GX126, which presents the same information in the same form but uses the paid rather than the billed amount. The difference between those two exhibits illustrates the prejudice of using billed amounts. For level 4 office visits for which there was a COVID-19 test on the same day, the alleged amount billed was roughly $52 million, *see* GX127, but the amount paid was only $15 million.

the income of its owners would likewise have increased even if its billing practices were unassailable.

In the context of this healthcare fraud prosecution, however, presenting the jury with these rising income figures would be inflammatory. The jury may infer that Dr. Elfenbein's increased profits can be tied entirely to the alleged fraud. That is flatly untrue. The government does not contend that all (or even most) of Dr. Elfenbein's earnings during the relevant period were obtained fraudulently. Suggesting otherwise to the jury is misleading and prejudicial. *Cf. United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002) ("The problem with a general rule of permitting evidence of an affluent lifestyle to show 'motive' for committing a crime is that it ignores the real possibility that the extreme or extravagant wealth or spending was made possible by legitimate means and, if so, the introduction of such evidence would appeal solely to class prejudice.").

Moreover, absent relevant context, the comparison between Dr. Elfenbein's pre-2020 and 2020-2021 income is neither fair nor useful. His pre-2020 business income, unlike his business income in 2020-2021, was reduced by startup expenses for DEC. In addition, as the government is aware, DEC merged with a larger urgent care company in early 2020. A comparison of Dr. Elfenbein's income in the two years before the merger and the two years after is thus a comparison between apples and oranges. *See Crinel*, 2017 WL 490635, at *8 (chart comparing raw numbers of provider referrals across "ostensibly" equal periods of time was inadmissible because referrals did not start until partway through the earlier period, rendering the comparison misleading).

The summary of Dr. Elfenbein's tax returns suffers from an additional problem. It is presented as a bar chart that shows his total income from wages and his total "business and partnership income." It therefore includes income from his practice as an emergency medicine

physician, which surely has no relevance, and income from other entities engaged in real estate and other businesses that were unrelated to DEC. But the exhibit aggregates all Dr. Elfenbein's business and partnership income, making it impossible to determine how much of his income was from DEC.[14]

As with the government's efforts to display "amounts billed" alongside or instead of the actual amounts paid, the government's efforts to inflame the jury with Dr. Elfenbein's decontextualized income figures should be rejected.

## CONCLUSION

In total, 26 of the government's 35 proposed summary exhibits must be excluded, or in some cases substantially revised. *See* Addendum. Many exhibits emphasize the time element of CPT coding in a way that is misleading in some cases and wholly incorrect in others. Other exhibits are confusing and misleading as to the universe of relevant claims in this case. And more than half of the exhibits use irrelevant and inflammatory "billed amounts" despite the government's knowledge of the actual amounts at issue.

The government's exhibits are all the more problematic because they are presented as summaries, and in the case of Mr. Quindoza's exhibits, explicitly labeled as summaries. A Rule 1006 exhibit "must be an objectively accurate summarization of the underlying documents, not a skewed selection of *some* of the documents to further the proponent's theory of the case." *United States v. Oloyede*, 933 F.3d 302, 310–11 (4th Cir. 2019) (emphasis in original). Even under Rule 611(a), which allows for summaries that "facilitate the presentation and comprehension of evidence already in the record," *id*. at 311, most of Ms. Robinson and Mr. Quindoza's exhibits do

---

[14] The government produced this exhibit Friday afternoon, June 23. Defense counsel have had one business day to review it, and we have not yet determined whether it is accurate, even taking it on its own terms. Dr. Elfenbein therefore reserves the right to object to the exhibit on other grounds.

not pass muster. "The dangers inherent in using a summary witness in a federal criminal prosecution to support the government's case-in-chief are plain and are only exacerbated in circumstances . . . where the witness [is] also testifying in the role of an expert." *United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995). For the reasons explained above, Dr. Elfenbein respectfully requests that the summary exhibits listed in the Addendum be excluded in their current form.

June 26, 2023
Baltimore, MD

Respectfully submitted,

*/s/ Martin S. Himeles, Jr.*
Martin S. Himeles, Jr. (Bar No. 03430)
Gregg L. Bernstein (Bar No. 01340)
Samantha A. Miller (Bar No. 21374)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street - Suite 2440
Baltimore, MD 21202-1031
Tel. No: (410) 332-0444
Fax No: (410) 659-0436
mhimeles@zuckerman.com
gbernstein@zuckerman.com
samiller@zuckerman.com

*Counsel for Defendant Ron Elfenbein*

**CERTIFICATE OF SERVICE**

I certify that on this 26th day of June 2023, a copy of the foregoing was served via

electronic mail to:

Matthew Phelps
Assistant United States Attorney
Office of the U.S. Attorney
36 S. Charles Street – 4th Floor
Baltimore, MD 21201
Matthew.Phelps@usdoj.gov

D. Keith Closer, Trial Attorney
U.S. Department of Justice
1400 New York Avenue, N.W. – 8th Floor
Washington, D.C. 20005
keith.clouser@usdoj.gov

*/s/ Martin S. Himeles, Jr.*
Martin S. Himeles, Jr.
