UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    v.                                            CASE NO. 1:22-CR-00146-JKB

RON K. ELFENBEIN,

        **Defendant.**

_____/

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE GOVERNMENT'S SUMMARY EXHIBITS

The United States of America, through undersigned counsel, hereby opposes and responds to Defendant's motion *in limine* to exclude the Government's summary exhibits, ECF 37. For the reasons stated below, the Court should deny Defendant's motion.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

On January 11, 2023, Defendant was charged in a Superseding Indictment with five counts of execution of a health care fraud scheme, in violation of 18 U.S.C. § 1347. *See* ECF 29. For approximately one and a half years, Defendant caused Medicare and other insurers to be fraudulently billed approximately $30 million, of which approximately $10 million was paid.

The Superseding Indictment alleges that Defendant was an owner and the medical director of Drs ERgent Care, an urgent care clinic in Maryland that provided drive-through COVID-19 testing. In addition to billing individuals' insurance for COVID-19 tests, Defendant required that

---

[1] This Section outlines what the Government expects the evidence will show at trial. The Government expects to prove its case through, among other evidence, the testimony of former employees of the Defendant's urgent care clinic, individuals who obtained COVID-19 tests at the Defendant's clinic, a Medicare program witness, a CareFirst Blue Cross Blue Shield witness, a summary witness, other witnesses, and documents, including e-mails, Medicare records, billing data, and summary exhibits.

the COVID-19 tests and reporting of results be bundled with more lucrative, but medically unnecessary, evaluation and management services that were not provided as represented. That is, the insurance carrier of nearly every patient who came to Defendant's clinic for a COVID-19 test was also billed for an evaluation and management visit of purportedly 30 or more minutes in duration or involving moderate or high levels of medical decision making. Rather than providing such evaluation and management visits, Defendant instructed providers that patients were there only to be tested, that the providers were not there to address complex medical issues, and that patients should be seen in five minutes or less. Defendant nevertheless instructed the providers to bill for high-level office visits.

## LEGAL STANDARD

Federal Rules of Evidence 1006 and 611(a) set forth the standards for admissible charts and summaries. Rule 1006 provides that the proponent of evidence

> may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. "The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). "To comply with this Rule, therefore, a chart summarizing evidence must be an *accurate* compilation of the voluminous records sought to be summarized." *Id.* (emphasis in original). Rule 1006 does not require that the underlying evidence be introduced into evidence, and therefore "the chart itself is admitted as evidence in order to give the jury evidence of the underlying documents." *Id.* (citing *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 190 (4th Cir. 1994)).

> Succinctly stated, the following elements must be satisfied to permit admission under Rule 1006: (1) the summarized material must be 'voluminous' and not conveniently subject to examination in court; (2) the summary or chart must be an accurate compilation of the voluminous records; (3) the records summarized must be otherwise admissible into evidence; and (4) the underlying documents must be made available to the opposing party for examination and copying.

*United States v. Ging-Hwang Tsoa*, 2013 WL 6145664, at *4 (E.D. Va. Nov. 20, 2013) (citing *Janati*, 374 F.3d at 272; *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997)).

Rule 611(a) has been interpreted to provide an alternate avenue for introduction of charts and summaries for voluminous documents already in evidence. Fed. R. Evid. 611(a); *see United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995); *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). Rule 611(a) permits summary charts "to facilitate the presentation and comprehension of evidence already in the record." *United States v. Simmons*, 11 F.4th 239, 262 (4th Cir. 2021). In the Fourth Circuit, Rule 611(a) summary charts may be admitted into evidence. *See Johnson*, 54 F.3d at 1159 (holding summary charts may be admitted into evidence under Rule 611(a)); *Simmons*, 11 F.4th at 262 n.12 (holding that *Johnson* governs, rather than *Janati*, and summary charts may be admitted into evidence under Rule 611(a)).

To meet the relevance standard, "evidence need only be 'worth consideration by the jury,' or have a 'plus value.'" *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997)). Relevant evidence may be excluded if its probative value is "substantially outweighed by a danger of" unfair prejudice, confusing the issues, or misleading the jury, among other bases for exclusion. Fed. R. Evid. 403. "Once it is recognized that evidence is probative of an element of the crime charged, 'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015). "Under Rule 403, 'damage to a defendant's case is not a basis for excluding probative evidence' because '[e]vidence that is highly

probative invariably will be prejudicial to the defense.'" *United States v. Patrick*, 2019 WL 5304211, *2 (W.D. Va. Oct. 21, 2019) (quoting *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998)). "Unfair prejudice exists 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence.'" *Id.* (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)).

## ARGUMENT

Defendant's motion to exclude the Government's proposed summary exhibits should be denied because the charts and summaries are accurate, relevant, and admissible. First, the Government's summary exhibits accurately summarize the underlying data. Second, the summary exhibits that include both the allegedly fraudulent billing and other billing by Drs ERgent Care are clear and accurate, and they appropriately explain precisely what is captured in the exhibit. Third, the inclusion of amounts billed by Drs ERgent Care is highly relevant as prima facie evidence of the intended loss caused by Defendant's fraudulent conduct. Finally, the Government's chart reflecting Defendant's personal tax returns is relevant to Defendant's motive and intent, and does not risk any unfair prejudice.[2]

**I.     The Government's Proposed Summary Exhibits Accurately Summarize The Underlying Data And Are Not Unfairly Prejudicial.**

Defendant's argument that certain of the Government's charts and summaries rely on inaccurate descriptions of the evaluation and management Current Procedural Terminology ("CPT") codes is flawed. For example, Defendant contends that GX102, which summarizes Medicare claims data for the claims at issue in Counts 1-3, uses inaccurate descriptions. However,

---

[2] Defendant does not challenge that the summarized material is voluminous and not conveniently subject to examination in court, that the records summarized are otherwise admissible into evidence, or that the underlying documents were timely made available to Defendant.

4

that summary chart accurately summarizes the underlying claims data. An excerpt from the Medicare claims data[3] makes this clear:

| Bene CME Name Last | Bene CME Name First | CL-Place of Svc Physn Org Name | CL-Procedure Cd | CL-Procedure Cd Long Desc | CH-Diag Cd Principal | CH-Diag Cd Principal Des | CLF-Amt Billed | CLF-Amt Paid | CHD-Claim Submission Date | RPx-Rendering Prov NPICS Name Single Derived |
|---|---|---|---|---|---|---|---|---|---|---|
| R | W | EARLEIGH HEIGHTS VOLUNTEER FIRE CO | 99204 | New patient office or other outpatient visit, 45-59 minutes | Z20822 | Contact with and (suspected) exposure to COVID-19 | $354.22 | $181.82 | 5/3/2021 | ELFENBEIN, RON |
| R | W | EARLEIGH HEIGHTS VOLUNTEER FIRE CO | 87426 | Detection test by immunoassay technique for severe acute respiratory syndrome coronavirus | Z20822 | Contact with and (suspected) exposure to COVID-19 | $200.00 | $45.23 | 5/3/2021 | ELFENBEIN, RON |
| H | A | EARLEIGH HEIGHTS VOLUNTEER FIRE CO | 99204 | New patient office or other outpatient visit, 45-59 minutes | Z20822 | Contact with and (suspected) exposure to COVID-19 | $354.22 | $181.82 | 3/29/2021 | ELFENBEIN, RON |
| M | D | EARLEIGH HEIGHTS VOLUNTEER FIRE CO | 99204 | New patient office or other outpatient visit, 45-59 minutes | Z20822 | Contact with and (suspected) exposure to COVID-19 | $354.22 | $181.82 | 5/12/2021 | ELFENBEIN, RON |
| M | D | EARLEIGH HEIGHTS VOLUNTEER FIRE CO | 87426 | Detection test by immunoassay technique for severe acute respiratory syndrome coronavirus | Z20822 | Contact with and (suspected) exposure to COVID-19 | $200.00 | $45.23 | 5/12/2021 | ELFENBEIN, RON |

In the field "CL-Procedure Cd Long Desc," the underlying Medicare claims data for these claims states "New patient office or other outpatient visit, 45-59 minutes." The time references on the summary chart to which Defendant appears to object is precisely the language that is contained in the underlying Medicare claims data:

**Medicare Claims Data Summary**
**Drs Ergent Care**

| Count | Medicare Beneficiary | Date of Service | Code & Description | Amount Billed | Submit Date | Claim Number |
|---|---|---|---|---|---|---|
| 1 | AH | 3/25/2021 | 99204 – New patient office visit; 45 - 59 minutes | $354.22 | 3/29/2021 | 691021088249240 |
| 2 | WR | 4/23/2021 | 99204 – New patient office visit; 45 - 59 minutes | $354.22 | 5/3/2021 | 691021123406780 |
| 3 | DM | 5/10/2021 | 99204 – New patient office visit; 45 - 59 minutes | $354.22 | 5/12/2021 | 691021132127230 |

Moreover, these records are the very claims the Government alleges constitute executions of the scheme to commit health care fraud in the Superseding Indictment. ECF 29 at 12-13.

Each of the summary charts to which Defendant objects on this ground, GX102, GX104, GX105, GX106, GX124, GX129, GX133, and GX134, all accurately reflect the underlying data on which they are based. Because these summary exhibits are offered "to prove the contents of"

---

[3] The Beneficiary Names in this excerpt have been anonymized for inclusion in this filing.

the voluminous claims data, it is not only appropriate but necessary that they accurately reflect the contents of the claims data—which the Government's charts do. *See* Fed. R. Evid. 1006.

Defendant also argues that by including the time component, which is pulled directly from the claims data itself, the summary charts are unfairly prejudicial. Defendant contends that because he purportedly did not select the CPT codes at issue based on time, it is prejudicial for the summary charts to include the time component. However, although a provider was not required to consider the duration of an evaluation and management visit in order to justify selecting a specific CPT code, the time component is one of the factors a provider may consider in determining which CPT code is appropriate for the service provided. That is made clear in the descriptions of the evaluation and management codes in the American Medical Association's ("AMA") CPT manual. *See* ECF 37-2 at 14 (2020 CPT Codes); ECF 37-3 at 21 (2021 CPT Codes). For example, the AMA manual provides a description of the 2020 version of CPT code 99204, including that "[u]sually, the presenting problem(s) are of moderate to high severity. *Typically, 45 minutes are spent face-to-face with the patient and/or family*." ECF 37-2 at 14 (emphasis added). Similarly, the AMA manual defines the 2021 version of CPT code 99204 as: "Office or other outpatient visit for the evaluation and management of a new patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. *When using time for code selection, 45-59 minutes of total time is spent on the date of the encounter.*" ECF 37-3 at 21 (emphasis added). The 2021 manual further notes that "[t]he inclusion of time in the definition of the levels of E/M services has been implicit in prior editions of the CPT codebook. The inclusion

of time as an explicit factor beginning in CPT 1992 was done to assist in selecting the most appropriate level of E/M services." *Id.* at 8.[4]

Defendant's argument that including time as a relevant factor is prejudicial because Defendant did not base his decision to bill these CPT codes based on time not only assumes that it is true that time was not one of Defendant's considerations when instructing providers to bill for the CPT codes, it also incorrectly suggests that time is not relevant to show just how far from accurate his billing was. Where Defendant is instructing his providers that patients should be seen in under five minutes, and to bill CPT code 99204, it is highly relevant and probative to Defendant's intent that the CPT code's description indicates that typically 45 or more minutes is spent with the patient to justify billing at that level. *See* ECF 37-3 at 8 ("The inclusion of time as an explicit factor beginning in CPT 1992 was done to assist in selecting the most appropriate level of E/M services."). Any prejudice is far outweighed by the probative value of the charts that accurately reflect the underlying claims data. Moreover, Defendant is entitled to cross-examine the witness on the perceived limitations of the chart. *See United States v. Katsipis*, 598 F. App'x 162, 164-65 (4th Cir. 2015) (rejecting argument under Rule 403 where a summary chart "did not account for all of the confounding variables" because the defendant "had ample opportunity, on cross examination, to highlight the limitations of the chart").

---

[4] Defendant inaccurately states that "time was *not* to be considered *at all* in selecting the level of E/M services *except* when 'counseling and/or coordination of care dominate[d] (more than 50%) of the encounter[.]'" ECF 37 at 6. Although the manual states that time "shall be considered the key or controlling factor to qualify for a particular level of E/M services" where counseling and/or coordination of care dominates (more than 50%) the encounter[,]" the manual does not state that time is not considered at all where counseling and/or coordination of care does not dominate. ECF 37-2 at 12. Instead, it simply identifies other factors that must be met or exceeded. *See id.* Indeed, the manual explains that "face-to-face time associated with the services described by any E/M code is a valid proxy for the total work done before, during, and after the visit." *Id.* at 10.

The Government notes that it plans to revise GX124, GX129, GX133, and GX134 to remove the procedure code descriptions from these four charts. Each of these charts summarizes data produced from Defendant's billing platform, NextGen, which does not include a CPT code description field. Instead, as explained in the charts, Marylee Robinson pulled the descriptions for the CPT codes from Medicare claims data. However, the Government will limit these charts to summarizing only the NextGen data. In addition, the Government does not intend to introduce GX123.

For the remainder of the charts to which the Defendant has moved on this ground, the Government respectfully requests the Court deny the Defendant's motion. Defendant is eager to obscure the time element of the coding for obvious reasons—the evidence will show that the vast majority of patients who presented for COVID-19 tests at Defendant's drive-through testing sites were seen for five minutes or less as Defendant instructed. The time element for the codes is contained in the claims data itself, and the summary charts accurately reflect that data. It is not unfairly prejudicial for the Government to present its case using the evidence of the claims submitted by Defendant to Medicare and other insurers.

**II.     The Government's Summary Charts Properly Describe Which Claims Are At Issue.**

The Court should also reject Defendant's assertion that certain of the Government's summary charts are misleading and prejudicial because they include fraudulent and purportedly non-fraudulent claims. The charts and summaries about which Defendant complains accurately summarize the underlying data, are clear as to the claims being included or excluded on any particular chart, and provide the jury necessary and helpful context to understand Defendant's conduct in this case.

For example, the first chart to which Defendant objects on this ground is GX119, a chart that sets out all claims submitted by Drs ERgent Care between March 1, 2020, and February 28, 2022, as reflected in the underlying billing data.

| | Drs ERgent Care Claims Submitted March 1, 2020 to February 28, 2022 | | |
|---|---|---|---|
| No. of Claim Lines | No. of Beneficiaries | Billed Amount | Paid Amount |
| 343,764 | 95,353 | $78,052,137 | $24,009,610 |

Nothing about this chart indicates or suggests that all of the claims are fraudulent. Instead, this chart provides context for the jury to understand the total amount of business Drs ERgent Care was purportedly doing. The Government has no intention of suggesting that the amount at issue in this case is $78 million. Rather, as the Superseding Indictment makes clear, the Government asserts that approximately $30 million billed by Defendant is fraudulent. ECF 29 at 12. However, as the Fourth Circuit noted in *Bajoghli*, evidence of transactions and conduct not charged may be relevant to providing the existence of and the boundaries of a conspiracy or scheme. 785 F.3d at 963. This exhibit, as well as others, will show that Drs ERgent Care had limited business unrelated to COVID-19 testing.

Allowing the jury to understand the total number of claims submitted and billed, as reflected in the underlying data, will contextualize the amount of billing that *is* at issue in this case. COVID-19 testing, and the bundling of those tests with fraudulent claims for level 4 evaluation and management office visits, accounted for the majority of Drs ERgent Care billing—approximately $52 million of the $78 million billed by Drs ERgent Care between March 1, 2020

9

and February 28, 2022. This is not a case in which the fraud involved a small part of a large business. The context provided by showing the jury the total amounts billed by Drs ERgent Care versus the amounts billed in connection with COVID-19 testing highlights Defendant's motive and intent, as nearly two-thirds of the company's billing was associated with the scheme. Moreover, as Defendant points out in his motion, ECF 37 at 15-16, & n.9, GX129, to which Defendant does not object on this ground, includes the same totals for all claims. Defendant's contention that the jury will be unfairly confused and inflamed by the presentation of this information in two charts rather than a single chart is wrong. Breaking the information down into component pieces to aid the jury is precisely the purpose of summary exhibits. *See Ging-Hwang Tsoa*, 2013 WL 6145664 at *5 (rejecting contention that chart is inadmissible because it omits information the defendant deems relevant because that "would circumvent the very purpose of Rule 1006, which is to provide a *summary*" (emphasis in original)).

Defendant also objects to three other charts that sort all claims by payor and by rendering provider. Once again, nothing in these charts states or suggests that all the claims reflected in the chart are fraudulent—indeed, each clearly indicates that it reflects *all* claims submitted by Drs ERgent Care. These charts instead provide helpful context to the jury to show which payors Drs ERgent Care submitted the majority of claims to, and which providers purportedly provided the services billed by Drs ERgent Care. These data points, drawn directly and accurately from the underlying claims data, will help the jury understand the underlying data and contextualize testimony from other witnesses. *See Ging-Hwang Tsoa*, 2013 WL 6145664 at *6 (rejecting defendant's argument that a chart is suggestive where "[t]he chart is composed of objective facts organized in a coherent manner[,]" explaining that "[w]hile Defendant may not like the information conveyed, that does not render the summary improper").

Defendant's objection to charts that incorporate both claims for evaluation and management visits and claims for COVID-19 tests should also be rejected. For example, Defendant objects to GX126 because it purportedly aggregates at-issue and non-at-issue claims:



These charts are both accurate and clear. Contrary to Defendant's assertion, this chart *does* separate the claims for evaluation and management office visits and the claims for COVID-19 tests, as reflected in the different colors in the chart. To the extent Defendant is asserting that amounts billed and paid for the COVID-19 tests themselves are irrelevant, simply because the Government does not contend that they were fraudulent, Defendant's argument takes a far too narrow view of relevance. Here, the Government's allegation is that the fraud scheme in which Defendant engaged involved bundling claims for COVID-19 tests with claims for evaluation and management visits. This again provides critical context to the jury—it shows that Defendant's company was *already being paid* for conducting the COVID-19 tests—and the inclusion of fraudulent claims for unnecessary level 4 evaluation and management office visits was in addition to the more than $21 million Drs ERgent Care billed for the COVID-19 tests themselves. The fact

that Defendant billed for both claims, and was paid on both claims, is direct evidence of the scheme as alleged.

To the extent that Defendant's objection is that the chart does not include the sub-totals for each portion, the Government will agree to add clarifying brackets showing the subtotals for the COVID-19 tests and the level 4 evaluation and management visits, as shown below:



Defendant raises a further objection to GX128, which presents the claims submitted by Drs ERgent Care for bundled office visits and COVID-19 tests, and for additional visit codes within two to four days following the bundled COVID-19 test and office visits. First, with respect to the bundled claims, the chart indicates that the bundled office visits, billed amounts, and paid amounts, relate to the *bundled* set of claims for both testing and evaluation and management. Again, this is relevant to showing the volume of Drs ERgent Care COVID-19 testing business, which the jury is entitled to compare to Drs ERgent Care's other billing.

**Drs ERgent Care Office Visits Billed with a COVID Test Same Day**
**March 1, 2020 to February 28, 2022**

**Level 4 Office Visit Bundles**

| No. of Bundled Office Visits | Billed Amount | Paid Amount |
|---|---|---|
| 97,719 | $52,372,363 | $15,136,642 |

**Additional Visit Codes (Within 2-4 Days of Level 4 Bundle)**

| No. of Claim Lines | Billed Amount | Paid Amount |
|---|---|---|
| 41,650 | $6,533,641 | $2,228,432 |

Nevertheless, the Government will adjust subheading on the chart to read "Level 4 Office Visits Plus Covid Test Bundles," and the column heading on the billed and paid amounts to read "Billed Amount for Bundled Tests and Visits" and "Paid Amount for Bundled Tests and Visits[,]" to resolve Defendant's objection.

Defendant also objects to the second portion of that same chart:

**Additional Visit Codes (Within 2-4 Days of Level 4 Bundle)**

| No. of Claim Lines | Billed Amount | Paid Amount |
|---|---|---|
| 41,650 | $6,533,641 | $2,228,432 |

Defendant contends that this portion of the chart "further inflates the amount the slide suggests were fraudulent." ECF 37 at 18. That is incorrect. This portion of the slide shows that, as alleged in the indictment, Defendant "through Drs. ERgent Care, offered COVID-19 testing, but required that the COVID-19 tests *and the reporting of results* be bundled[.]" ECF 29 at 11. These "Additional Visit Codes" reflect the claims submitted in connection with the reporting of results for COVID-19 tests. The evidence will show that Defendant instructed providers to tell every patient that they would receive a subsequent visit, typically by video or phone, to report their test

13

results regardless of whether the patient tested positive or negative for COVID-19. The evidence will also show that Defendant rejected the option of providing results to patients by email or text message in order to bill for these subsequent visits. This chart accurately shows the number of claims for evaluation and management and other visits contained in the underlying claims data that occurred two to four days after a COVID-19 test was administered, reflecting the claims alleged in the indictment as being bundled with the reporting of results. There is no risk of unfair prejudice in providing the jury information about the other billing practices alleged in the indictment, even if they are not the subject of specific executions. "Unfair prejudice 'speaks to the capacity of some of some concededly relevant evidence to lure the factfinder into declaring guilt *on a ground different from proof specific to the offense charged.*'" *Bajoghli*, 785 F.3d at 966 (quoting *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009)). No such concern is present here. Defendant's motion to exclude should be denied.

**III.    The Government's Charts and Summaries Correctly Include Billed Amounts Because That Is Prima Facie Evidence Of Loss Amount At Issue.**

The amounts Defendant caused to be submitted to Medicare and other insurers is relevant, highly probative of Defendant's intended loss, and not unfairly prejudicial. Defendant's objections to several of the Government's summary charts on the basis that billed amounts are unfairly prejudicial should be rejected. Defendant contends that because the insurers did not pay Defendant the amounts claimed by Drs ERgent Care, using billed amounts will confuse the jury. Defendant is charged with knowingly and willfully executing and attempting to execute a scheme to defraud health care benefit programs by submitting false and fraudulent claims. ECF 29 at 9. Those false and fraudulent claims for reimbursement were submitted for the amounts *billed* to the health care benefit programs. That the billed amounts were higher than the amounts those programs paid

Defendant does not negate the admissibility of the billed amount—the claims at issue are those the Defendant caused to be submitted.

Moreover, for purposes of calculating loss in a health care fraud case—that is, the amount the Government contends Defendant's scheme sought to defraud Medicare and other insurers—the appropriate calculation is based on the intended loss. *See United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003) (citing U.S.S.G. § 2B1.1 commentary) (district court did not err in relying on amount defendant billed Medicare and Medicaid as prima facie evidence of the amount of loss defendant intended to cause); *United States v. Osuji*, 495 F. App'x 333, 335 (4th Cir. 2012) (citing U.S.S.G. § 2B1.1 commentary) ("[A] district judge may rely on the amount that a defendant billed to Medicare 'as prima facie evidence of the amount of loss he intended to cause.'"); *see also Townsend v. United States*, 2018 WL 5045224, *5 n.2 (W.D.N.C. Oct. 17, 2018) ("In health care fraud cases, the 'aggregate dollar amount of fraudulent bills submitted to the Government health care program [is] prima facie evidence of the amount of the intended loss'"). Here, prima facie evidence of the intended loss is the billed amount. *Miller*, 316 F.3d at 504. As the Fourth Circuit has held, intended loss includes the entire amount fraudulently billed to an insurance program absent evidence of the Defendant's subjective intent about the intended loss. *See United States v. Harlan*, 714 F. App'x 220, 225 (4th Cir. 2017) (concluding district court did not err in calculating loss as total amount billed to Medicaid "[b]ecause [defendant] failed to rebut the presumption that she intended to defraud Medicaid of the aggregate amount billed"); *Osuji*, 495 F. App'x at 335; *Miller*, 316 F.3d at 501-502 & 505 (adopting majority view that intended loss is not limited to loss actually possible or likely to occur, and affirming district court's calculation of intended loss as the amount billed to Medicare and Medicaid).

Defendant is entitled to introduce evidence of Defendant's subjective intent regarding amounts billed and paid, but that does not preclude the Government from introducing evidence of the prima facie amount of loss Defendant intended to cause. The Government is entitled to introduce evidence of the fraud it alleges—that is, that Defendant engaged in a scheme to defraud Medicare and other insurers by submitting more than $30 million in fraudulent claims. Just because that number is higher than the amount Defendant successfully *received* from the fraud does not mean that the billed amounts are not highly probative and appropriate.

Defendant's argument that the jury may wrongly believe that patients were charged for the difference between the amounts billed and amounts paid is similarly inapt. Nothing in the charts makes that suggestion, and to the extent Defendant seeks to confirm that patients were not charged for that difference, Defendant is entitled to introduce evidence to that effect. Nor does such a concern rise to the level of unfair prejudice—the billed amounts are the amounts Defendant's company billed to insurers—much less unfair prejudice that substantially outweighs the significant probative value. Defendant's arguments on this ground should be rejected.

### IV. The Governments Chart Summarizing Portions of Defendant's Tax Return Records Are Accurate, Probative, And Are Not Unfairly Prejudicial.

The Superseding Indictment alleges that Defendant engaged in the fraudulent conduct because of, among other reasons, a profit motive. ECF 29 at 10. Defendant's tax records highlight that profit motive and are relevant evidence of Defendant's intent.

Defendant argues that showing his dramatic increase in income during the conspiracy period is unfairly inflammatory because the jury may "infer that Dr. Elfenbein's increased profits can be tied entirely to the alleged fraud." ECF 37 at 24. However, the Government is entitled to present, and the jury is entitled to know, that Defendant's income increased during the time period the Government alleges Defendant was causing false and fraudulent claims to be submitted.

Defendant fails to show that the risk of unfair prejudice substantially outweighs the probative value of the evidence, as required for exclusion under Rule 403. Fed. R. Evid. 403; *see Bajoghli*, 785 F.3d at 966. Here, the probative value is significant—the exhibit shows that Defendant's reported income increased fourteen-fold between 2018 and 2021, with the bulk of the increase between 2020 and 2021, due almost entirely to Dr. Elfenbein's business and partnership income:



This evidence is highly probative of Defendant's motive for engaging in the allegedly fraudulent conduct for which he has been charged. *See Bajoghli*, 785 F.3d at 966 ("[E]vidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud."). And, as the pattern jury instructions make clear, "the presence or absence of motive is a circumstance that [the jury] may consider as bearing on the intent of a defendant." Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS: CRIMINAL (2022), Instruction 6-18.

In contrast, the risk of prejudice is modest. Defendant argues that by showing this increase, the jury would be misled and inflamed because Defendant had a high income. *See* ECF 37 at 24 (citing *United States v. Jackson-Randolf*, 282 F.3d 369, 378 (6th Cir. 2002) for the proposition that

introduction of extreme or extravagant wealth "would appeal solely to class prejudice"). However, although this chart shows a significant increase in income from 2018 to 2021, it does not purport to reflect "extreme or extravagant wealth" or otherwise suggest extravagant spending. And while Defendant's total income was always greater than zero, the chart shows that his businesses operated at a loss before he engaged in the fraud scheme.

Defendant also argues that comparing his pre-2020 income with his post-2020 income is misleading because in January 2020, Drs ERgent Care merged with a larger urgent care company. However, the chart shows a dramatic increase from 2020 to 2021, the year during which the vast majority of fraudulent billing occurred. If, as Defendant contends, the merger was the source of the increase, the totals between 2020 and 2021 would not reflect such a stark increase. Rather, the chart suggests precisely the inference the jury is entitled to draw—that Defendant's income dramatically increased at least in part as a result of his fraudulent conduct.

Defendant also argues that the tax return chart is misleading because it includes his total income, rather than excluding various sources of income. However, Defendant's objection is better resolved by cross-examination, rather than exclusion of the exhibit. For example, if Defendant is asserting that the income purportedly derived from other businesses changes the import of the chart, the Defendant would be entitled to cross-examine the summary witness on that point. *See United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) (rejecting argument that the Government "cherry-picked individual records, unfairly spinning the facts" because that argument "ignores the role of a trial, where each side selects the evidence to be presented to the jury[;]" "in creating the charts, the government applied criteria to help present its theory of the case, and those criteria were detailed to the jury. The defendants were thus free to cross-examine the government's witness about the soundness of the selection[.]"). The Government's exhibit

accurately reflects two aspects of the tax records—income from wages and income from businesses and partnerships—which is relevant to show that Defendant's income increased primarily from his business and partnership interests rather than his wages. Therefore, the Defendant's motion to exclude should be rejected.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny Defendant's motion *in limine* to exclude the Government's summary exhibits in its entirety.

Respectfully Submitted,

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
Matthew P. Phelps
Assistant United States Attorney

D. Keith Clouser
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
david.clouser@usdoj.gov

COUNSEL FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 29, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: <u>/s/ Matthew Phelps</u>