

Martin Himeles
Zuckerman Spaeder LLP
mhimeles@zuckerman.com
410.949.1144

July 5, 2023

**BY HAND DELIVERY**

The Honorable James K. Bredar, Chief United States District Judge
c/o Clerk's Office
U.S. District Court for the District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201

    Re:    *United States v. Ron Elfenbein*, 1:22-cr-00146-JKB

Dear Chief Judge Bredar:

    The pretrial conference in the above matter is scheduled for tomorrow at 1:30 p.m. We are writing to highlight two matters that recently have come to our attention, and which we would ask that the Court address at the conference.

    On June 13, 2023, shortly before motions *in limine* were due, the government produced 60 transcripts of prior testimony of its principal expert witness, Stephen Quindoza, consistent with its discovery obligations. After completing and filing our motions *in limine*, we began to review Mr. Quindoza's prior testimony, and it raises significant concerns. First, the testimony suggests that Mr. Quindoza, a frequent government witness in health care fraud cases, may be asked to testify to conclusions of law, or may volunteer such conclusions even if not asked. Second, Mr. Quindoza's prior testimony raises concerns that the jury will be presented with testimony concerning the reckless disregard standard applicable in civil False Claims Act cases, which has no application in this case and would risk confusing the jury to Dr. Elfenbein's detriment.

**I.    Mr. Quindoza must be precluded from offering legal conclusions.**

    Mr. Quindoza has testified for the government in health care fraud and other criminal cases involving Medicare well over one hundred times. In most almost every case, one purpose of his testimony is to explain what Medicare is, how it works, and what rules apply to physicians and other health care providers when they bill for services provided to Medicare beneficiaries. Such

testimony can be entirely proper in helping the jury understand the complex regulatory background against which Medicare claims are submitted, but it cannot include testimony concerning legal conclusions or dispositive legal issues. In Mr. Quindoza's prior testimony, however, he has often been asked to testify to legal conclusions, and even when not asked, he is quick to offer such testimony. Because Mr. Quindoza's legal conclusions would usurp both the Court's function in instructing the jury concerning the law and the jury's function in applying the law to the facts, this Court should prohibit Mr. Quindoza from offering such testimony.

"Expert testimony that states a legal conclusion or concerns dispositive legal issues is generally inadmissible." *United States v. Blair*, No. CR ELH-19-00410, 2021 WL 5040334, at *9 (D. Md. Oct. 29, 2021) (citing *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622, (1988)). An exception to this rule may be appropriate where a case involves "specialized . . . legal regimes" and "complex concepts," but only if the court determines that any "arguabl[e] . . . legal conclusion[s]" would assist the jury. *United States v. Offill,* 666 F.3d 168, 175 (4th Cir. 2011). "[I]t does not help the jury for an expert to give testimony that states a legal standard or draws a legal conclusion by applying law to the facts . . . because it supplies the jury with no information other than the witness's view of how the verdict should read." *Id*. (internal citations and quotation marks omitted). Moreover, courts must ensure that proposed expert testimony does not "take away from the jury its responsibility to determine the facts and, ultimately, whether the defendants are liable." *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CV CCB-13-617, 2016 WL 524279, at *5 (D. Md. Feb. 10, 2016).

When Mr. Quindoza testifies, he is invariably asked to explain the requirements for providers enrolling in Medicare, including the requirement that they certify that they will not submit false claims, and the defendant's certification to that effect. Such testimony may be permissible, but Mr. Quindoza frequently does not stop by explaining what Medicare requires providers to sign and what the defendant signed; he testifies that the provider, rather than the billing company or other person who submits claims, is "responsible for" or "obligated to" ensure that claims are not false. But a provider's "responsibilities" and "obligations" are matters of law, and responsibility for false claims in the civil context is far different than criminal responsibility. *Cf. Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977) (expert witness's testimony interpreting the contract term "best efforts" was improper).

Yet Mr. Quindoza routinely offers such testimony. In one case, Mr. Quindoza testified that a certification the defendant was required to sign as part of his Medicare enrollment meant that he was obligated to learn a broad range of regulations, unspecified CMS guidance, and even the policies of unidentified CMS contractors, and could not claim ignorance of the Medicare rules of regulations:

> Q. Sir, we won't walk through the entirety of this paragraph but you
> -- can you please explain to the jury what it says, generally?

> A. It says that they will understand the rules and regulations of the Medicare program and that they -- he will also follow them.
>
> Q. And what rules and regulations of the Medicare program are encompassed here?
>
> A. Federal regulations, state, CMS guidance in their manuals, policies issued by the contractors, anti-kickback statutes, and the Stark law.
>
> Q. Everything we have been talking about for the last hour?
>
> A. Yes, sir.
>
> Q. And at the beginning, it says, "I am familiar with" and agree to abide by. What's the significance of "I am familiar with"?
>
> A. That means he will learn them and understand them and also follow them.
>
> Q. Can a provider who participates in Medicare claim ignorance of the Medicare rules and regulations?
>
> A. No.

*United States v. Kaplowitz*, (S.D. Fl. Jan. 28, 2015) at Tr. 227:5-25. Mr. Quindoza thus construed a statement of familiarity with the rules and regulations of the Medicare program and an agreement to follow them as establishing familiarity with every policy and all guidance—of both CMS and its contractors—and as further obligating the provider to study all future statutes, regulations, policies and guidance. On that basis, he announced that there is an irrebuttable presumption that providers have such knowledge. This obligation does not merely apply to knowledge of legal requirements of Medicare. The CMS guidance and policies of Medicare include factual matters, such as Medicare's and its contractors' policies and guidance concerning the meaning and use of CPT codes. Such an aggressive interpretation of the certification reflects Mr. Quindoza's legal conclusion, and in a criminal case, it does away with the government's burden to prove knowledge, intent, and willfulness.

> Mr. Quindoza often gives testimony like this:
>
> Q. At the end of the day, though, who is responsible for the truthfulness of the claim?

> A. The practice.
>
> Q. The doctor?
>
> A. Yes, sir.
>
> Q. Not the billing company?
>
> A. That is correct.

*United States v. Moss* (M.D. GA. May 9, 2019) at Tr. 20:19-25. The jury is left to believe that the provider is strictly liable for billing errors, without regard to his knowledge of them.

Lawyers who attempt to correct the misimpressions caused by Mr. Quindoza's testimony are met with even broader assertions that providers have an obligation to have as much knowledge as he has, after forty years of experience, as in the following testimony on cross-examination:

> Q. Well, what you just testified to is pretty complicated, isn't it? Maybe not to you; you're in it every day. But if you're not somebody of your background, a layperson, or a young doctor or a doctor that's busy wouldn't be as well versed as you are, would they?
>
> [ . . . ]
>
> THE WITNESS: They may not be, but they sign that application, and they said they will understand it and they will follow it, so they are obligated to know.
>
> Q. Sir, my question to you was: Would you expect a young doctor or a layperson or a busy doctor would be as well versed in it as you. And your answer is?
>
> A. I would expect a layperson not to understand it. I would expect a young doctor to go find the information. I would expect an experienced doctor to understand the rules as it applies to the claims they submit, because that's what they said they would do.
>
> Q. Okay. Sir, my question a third time to you is: Would you expect any of those three categories to be as well versed in the Medicare rules and regs as you are?
>
> A. They should be, because they agreed to it.

*United States v. Kumar* (S.D. Fl. Feb. 7, 2019) at Tr. 65:1-24.

In all of these ways, Mr. Quindoza's testimony routinely veers into expressions of his own legal conclusions concerning what violates the law. Such testimony "supplies the jury with no information other than the witness's view of how the verdict should read." *Offill*, 666 F.3d at 175.

That is not to say that Mr. Quindoza's explanation of the Medicare program has no role in the trial. The government is certainly entitled to offer his testimony, free of legal conclusions, concerning the nature of the program, the provider enrollment process, the way claims are adjudicated, and the applicable billing rules, including his understanding of the requirements for the CPT codes at issue. His separate testimony concerning summaries of Medicare claims data may be permissible as well, provided the summaries are accurate—a subject addressed in our Motion *in Limine*. But the government cannot invite him to express his own legal conclusions, such as that Dr. Elfenbein was "responsible for" errors even if he did not make them and was not aware of them, or that Dr. Elfenbein was obligated to understand complex and convoluted guidance and cannot rely on his good faith understanding of billing requirements if it differs from the government's contentions. Such testimony will not help the jury, but rather, it will usurp the jury's role of applying the law, as reflected in the Court's instructions, to the facts.

We do not know whether the prosecutors in this case, like those who tried most of the cases in which Mr. Quindoza has testified, will ask improper questions that elicit such testimony. But based on the questions asked of Mr. Quindoza in other cases—and his testimony even when not asked—we believe it is important to address this issue now and ensure that Mr. Quindoza will not testify to these improper legal conclusions. Further, we would ask that, prior to his testimony, the Court caution Mr. Quindoza not to express legal conclusions or testify concerning Dr. Elfenbein's or any provider's obligation to understand CMS's and its contractors' policies and guidance, or to understand the governing rules and regulations. Likewise, Mr. Quindoza should be cautioned not to suggest that Dr. Elfenbein is presumed to know what the billing company, or other providers who worked for Drs ERgent Care, were thinking or doing. The government cannot meet its burden by substituting Mr. Quindoza's presumption for actual knowledge.

II. **Mr. Quindoza should be precluded from testifying about "recklessness," and the Court should ensure that the jury is not confused as to the relevant scienter standard here.**

Review of Mr. Quindoza's prior testimony also suggests that he may offer testimony about "reckless disregard" of the accuracy of claims, a scienter standard that has no place in this criminal case. The Court should prohibit Mr. Quindoza from doing so.

According to the government's expert disclosure, Mr. Quindoza will explain that "[t]o participate in Medicare, providers and suppliers are required to submit an application in which they agree to abide by the laws, policies, procedures, rules, and regulations governing

reimbursement." Such testimony refers to the Medicare enrollment form, CMS Form 855B. By signing the form, providers agree 1) not to "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and 2) not to "submit claims with deliberate ignorance *or reckless disregard* of their truth or falsity." Sup. Ind. ¶ 10 (quoting CMS Form 855B) (emphasis added). The agreement tracks the scienter requirement in the civil provisions of the False Claims Act, which confers liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A). The statute defines "knowing" as meaning:

> that a person, with respect to information—
>
> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information.

*Id.* at § 3729(b)(1)(A). Mr. Quindoza's testimony typically almost always includes, and sometimes highlights, the reference to "reckless disregard."

To establish a criminal violation of 18 U.S.C. § 1347, however, the government must prove that a defendant acted knowingly, willfully, and with intent to defraud. Mere recklessness does not suffice, as the parties' Joint Proposed Jury Instructions and the Court's standard instructions reflect. ECF No. 34 (Instruction Nos. 15 (Knowingly), 16 (Willfully), 17 (Intentionally), 43 (Intent to Defraud)). Testimony about a "recklessness" standard—even one to which Dr. Elfenbein, like every Medicare provider, was required to agree—would not be helpful to the jury and would likely confuse them as to the state of mind required for health care fraud. *See Offill*, 666 F.3d at 175 ("The touchstone of [Rule 702] is whether the testimony will assist the jury."). To the extent the government wishes to offer in evidence Form 855B and have Mr. Quindoza testify about it or read portions of it aloud to the jury, the reference to "reckless disregard" should be redacted and Mr. Quindoza should be required not to mention it.

Similarly, the Court should ensure that the jury is not otherwise presented with a conflicting and incorrect scienter standard. The superseding indictment alleges that that Dr. Elfenbein "submitted and caused the submission of enrollment documents to Medicare for Drs ERgent Care, in which he attested he would 'not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [] will not submit claims with deliberate ignorance **or reckless disregard** of their truth or falsity.'" Sup. Ind. ¶ 30(b) (emphasis added). This language, lifted from the civil false claim statue, is not an accurate statement of the scienter required in a criminal health care fraud case, where the government must prove that the defendant acted knowingly, willfully, and with intent to defraud.

"[T]here is ample precedent for redacting an indictment to exclude a mens rea element not required by the applicable statute." *United States v. Peralta*, 930 F. Supp. 1523, 1528 (S.D. Fla. 1996) (citing cases), *aff'd*, 31 F. App'x 201 (11th Cir. 2001). Dr. Elfenbein does not contest that he signed the Medicare enrollment form, nor does he contest that the form includes the quoted language. He does, however, request that the Court omit the three words in bold font from any reading of the Superseding Indictment.[1] Recklessness is not the scienter standard in this case, and mentioning it can only foster jury confusion. Courts should not read unredacted indictments to the jury if undue prejudice would result. *See United States v. Coleman*, 552 F.3d 853, 859–60 (D.C. Cir. 2009).

We look forward to addressing these and other matters at this week's pretrial conference.

Respectfully,

*/s/ Martin S. Himeles, Jr.*
Martin S. Himeles, Jr.

cc: Gregg L. Bernstein, Esq.
Samantha A Miller, Esq.
Matthew Phelps, AUSA
D. Keith Clouser, USDOJ

---

[1] The Joint Proposed Jury instructions suggest that the Court read paragraphs 25-31 of the superseding indictment. ECF No. 34 (Instruction No. 11). These paragraphs include one reference to "reckless disregard," in paragraph 30(b).