# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

  v.                                      CASE NO. 1:22-CR-00146-JKB

RON ELFENBEIN,

                   Defendant.

_____/


## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL


GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

EREK L. BARRON
UNITED STATES ATTORNEY

Matthew P. Phelps
Assistant United States Attorney

D. Keith Clouser
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
david.clouser@usdoj.gov

COUNSEL FOR THE UNITED STATES

# TABLE OF CONTENTS

PROCEDURAL AND FACTUAL BACKGROUND .................................................................... 1

I.     THE COURT SHOULD DENY DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUITTAL .................................................................................................................... 2

     1.     Defense expert, Hugh Hill, MD, told the jury everything it needed
to know about whether the Defendant's providers were providing
a Level 4 service. ............................................................................... 4

     2.     The code is written in English and the Defendant's instructions do not
meet the definition of a Level 4. ....................................................... 5

     3.     Expert testimony that is based on inaccurate, vague, and misleading
medical records has no value. ............................................................ 7

     4.     Hybrid expert witnesses and fact witnesses testified that Dr. Elfenbein's
practitioners were not providing a Level 4 service. .......................... 9

     5.     Evidence of the defendant's intent is relevant to falsity. ............... 12

     6.     The patients who testified about the charged counts reported brief
encounters that were consistent with the Defendant's instructions and
inconsistent with Level 4 visits. ..................................................... 13

II.    THE COURT SHOULD DENY DEFENDANTS MOTION FOR A NEW TRIAL ....... 15

     A.     The Weight of the Evidence Supports the Jury's Verdict ...................... 15

          1.     The Testimony Of The Government's Witnesses Was Credible, And
Established The Defendant's Guilt Beyond A Reasonable Doubt. ......... 16

          2.     The Defendant's Testimony Was Not Credible. ...................................... 22

     B.     The Court's Evidentiary Rulings Were Correct .................................... 26

          1.     The Defendant's Three Proposed Email Exhibits Were
Properly Excluded ................................................................................. 27

          2.     The Court Properly Admitted The Testimony Of A.H. ........................... 33

     C.     The Court's *Voir Dire* Process Did Not Violate Defendant's Sixth Amendment
Rights ...................................................................................................... 38

CONCLUSION .................................................................................................................. 40

## INDEX OF EXHIBITS

| Exhibit Number | Description |
| --- | --- |
| Exhibit 1 .............. | July 17, 2023 Trial Transcript (Day 1) |
| Exhibit 2 .............. | July 18, 2023 Trial Transcript (Day 2) |
| Exhibit 3 .............. | July 19, 2023 Trial Transcript (Day 3) |
| Exhibit 4 .............. | July 20, 2023 Trial Transcript (Day 4) |
| Exhibit 5 .............. | July 24, 2023 Trial Transcript (Day 5) |
| Exhibit 6 .............. | July 25, 2023 Trial Transcript (Day 6) |
| Exhibit 7 .............. | July 26, 2023 Trial Transcript (Day 7) |
| Exhibit 8 .............. | July 27, 2023 Trial Transcript (Day 8) |
| Exhibit 9 .............. | July 31, 2023 Trial Transcript (Day 9) |
| Exhibit 10 ............ | August 1, 2023 Trial Transcript (Day 10) |
| Exhibit 11 ............ | August 2, 2023 Trial Transcript (Day 11) |
| Exhibit 12 ............ | Government's Trial Exhibit 137 |
| Exhibit 13 ............ | Excerpt from Government's Trial Exhibit 402 |
| Exhibit 14 ............ | Excerpt from Government's Trial Exhibit 402 |
| Exhibit 15 ............ | Excerpt from Government's Trial Exhibit 402 |
| Exhibit 16 ............ | Excerpt from Government's Trial Exhibit 402 |
| Exhibit 17 ............ | Government's Trial Exhibit 403 |
| Exhibit 18 ............ | Government's Trial Exhibit 404 |
| Exhibit 19 ............ | Government's Trial Exhibit 407 |
| Exhibit 20 ............ | Government's Trial Exhibit 408 |
| Exhibit 21 ............ | Government's Trial Exhibit 409 |
| Exhibit 22 ............ | Government's Trial Exhibit 410 |
| Exhibit 23 ............ | Government's Trial Exhibit 413 |
| Exhibit 24 ............ | Government's Trial Exhibit 414 |
| Exhibit 25 ............ | Government's Trial Exhibit 415 |
| Exhibit 26 ............ | Government's Trial Exhibit 501 |
| Exhibit 27 ............ | Government's Trial Exhibit 502 |
| Exhibit 28 ............ | Government's Trial Exhibit 601 |
| Exhibit 29 ............ | Government's Trial Exhibit 605 |
| Exhibit 30 ............ | Government's Trial Exhibit 606 |

| Exhibit Number | Description |
| --- | --- |
| Exhibit 31 ............ | Government's Trial Exhibit 607 |
| Exhibit 32 ............ | Government's Trial Exhibit 608 |
| Exhibit 33 ............ | Government's Trial Exhibit 609 |
| Exhibit 34 ............ | Government's Trial Exhibit 614 |
| Exhibit 35 ............ | Government's Trial Exhibit 617 |
| Exhibit 36 ............ | Government's Trial Exhibit 626 |
| Exhibit 37 ............ | Government's Trial Exhibit 628 |
| Exhibit 38 ............ | Government's Trial Exhibit 629 |
| Exhibit 39 ............ | Government's Trial Exhibit 631 |
| Exhibit 40 ............ | Government's Trial Exhibit 635 |
| Exhibit 41 ............ | Government's Trial Exhibit 638 |
| Exhibit 42 ............ | Government's Trial Exhibit 643 |
| Exhibit 43 ............ | Government's Trial Exhibit 644 |
| Exhibit 44 ............ | Government's Trial Exhibit 645 |
| Exhibit 45 ............ | Government's Trial Exhibit 646 |
| Exhibit 46 ............ | Government's Trial Exhibit 647 |
| Exhibit 47 ............ | Government's Trial Exhibit 654 |
| Exhibit 48 ............ | Government's Trial Exhibit 658 |
| Exhibit 49 ............ | Government's Trial Exhibit 938 |
| Exhibit 50 ............ | Defendant's Trial Exhibit 51 |
| Exhibit 51 ............ | Defendant's Trial Exhibit 214 |
| Exhibit 52 ............ | Defendant's Trial Exhibit 219 |
| Exhibit 53 ............ | Defendant's Trial Exhibit 255 |

The United States of America, through undersigned counsel, hereby opposes and responds to Defendant's Motion For Judgment Of Acquittal Or, In The Alternative, For A New Trial, ECF 78. For the reasons stated below, the Court should deny Defendant's motion.

## PROCEDURAL AND FACTUAL BACKGROUND

On January 11, 2023, Defendant was charged in a Superseding Indictment with five counts of execution of a health care fraud scheme, in violation of 18 U.S.C. § 1347. *See* ECF 29. The Superseding Indictment alleges that Defendant was an owner and the medical director of Drs ERgent Care, an urgent care clinic in Maryland that provided drive-through COVID-19 testing. In addition to billing individuals' insurance for COVID-19 tests, Defendant required that the COVID-19 tests and reporting of results be bundled with more lucrative evaluation and management services that were not provided as represented. That is, the insurance carrier of nearly every patient who came to Defendant's clinic for a COVID-19 test was also billed for an evaluation and management visit of purportedly 30 or more minutes in duration or involving moderate or high levels of medical decision making. Rather than providing such evaluation and management visits, Defendant instructed providers that patients were there only to be tested, that the providers were not there to address complex medical issues, and that patients should be seen in five minutes or less. Defendant nevertheless instructed the providers to bill for high-level office visits.

On August 4, 2023, following a three-week jury trial during which the government presented twelve witnesses and introduced more than 120 exhibits and the defense presented several witness including the Defendant and additional exhibits, Defendant was convicted of all five counts of health care fraud. Defendant filed a motion for judgment of acquittal or, in the alternative, for a new trial on August 18, 2023. *See* ECF 78.

# I.   THE COURT SHOULD DENY DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

## A.   Rule 29 Standard

Federal Rule of Criminal Procedure 29 permits a defendant to move for a judgment of acquittal, or renew such motion, after a guilty verdict. Fed. R. Crim. P. 29(c). In evaluating a Rule 29 motion, a jury's verdict commands the respect of the reviewing court, *United States v. Siegelman*, 640 F.3d 1159, 1164 (11th Cir. 2011) (noting that jurors are asked to sit through "long days" of testimony and "pore over countless documents to decide what happened"), and their judgment is entitled to great deference. *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004); *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) ("We apply a particularly deferential standard when determining if a jury verdict rests on sufficient evidence"). The task of a defendant who challenges the sufficiency of the evidence is accordingly a daunting one. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003); *United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999) (a defendant making a sufficiency of the evidence challenge bears a heavy burden and faces a nearly insurmountable hurdle"); *United States v. Zambrano*, 776 F.2d 1091, 1094 (2d Cir. 1985) (such challenges are "seldom successful").

The jury's verdict must be sustained if there is substantial evidence in the record to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Wilson*, 198 F.3d 467, 469 (4th Cir. 1999). In determining whether the evidence in the record is substantial, the court must view the evidence in the light most favorable to the government, drawing all reasonable inferences from the evidence in its favor. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008); *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006); *Hicks*, 368 F.3d at 804; *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (the government is granted "the benefit of all reasonable inferences from the facts proven to those sought to be established"). A judgment of

acquittal should be granted only if "there is *no* interpretation of the evidence that would allow a reasonable jury to find the defendant guilty . . . ." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999) (emphasis added); *Moye*, 454 F.3d at 394 (conviction can be reversed based upon insufficiency of the evidence only where the government's failure is clear); *United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984). If *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the jury's verdict must be sustained. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Tresvant*, 677 F.2d at 1021. Where the evidence supports differing reasonable interpretations, it is the jury's responsibility to determine which interpretation to accept. *Moye*, 454 F.3d at 394; *Wilson*, 118 F.3d at 234. And in particular, intent to defraud may be inferred from the totality of the circumstances, and need not be proven by direct evidence. *Harvey*, 532 F.3d at 334.

### B. The Government did not need an expert audit to show that Level 4 was incorrect.

The Defendant claims he is entitled to an acquittal because the Government did not offer expert testimony that the Defendant's Level 4 billings for the charged patient encounters were false. Although the Defendant offered his own expert, Michael Miscoe, his opinions were based on an audit of inaccurate, vague, and misleading medical records that did not accurately reflect the interactions between patients and providers at Defendant's clinic. The Government, by contrast, adduced evidence that the Level 4 billing was false based on what actually occurred during these patient encounters. As explained below, the Government offered evidence of falsity through the Defendant's own instructions, through testimony from the patients, through testimony from the Defendant's employees, and through the sheer volume of the Defendant's mass-testing operation. In addition, the inaccurate, vague, and misleading nature of the medical records demonstrated that the Defendant's providers were not offering a Level 4 service to their patients.

3

**1.    Defense expert, Hugh Hill, MD, told the jury everything it needed to know about whether the Defendant's providers were providing a Level 4 service.**

Defense expert, Hugh Hill, MD ("Dr. Hill"), was an emergency room physician at Johns Hopkins Bayview, and he testified about the level of care and decision-making needed for patients during the pandemic.  Dr. Hill's testimony showed that the Defendant's providers could not have provided a Level 4 service to their patients.

The trial evidence showed that the Defendant's providers could see more than 100 hundred patients in one day.  One email from the Defendant stated that two providers saw 350 patients in one day.  Exhibit 41 (Gov't Trial Ex. 638).  Before Dr. Hill testified on Monday, July 31st, defense witness Steven Carroll testified that he saw as many as 170 patients in one day.  Exhibit 9 (7/31/23 Tr.) at 15.  Dr. Hill responded in disbelief when he was confronted with these facts.  *See id.* at 106.  Dr. Hill testified as follows:

> Q.    And you're aware that Dr. Elfenbein's providers could see in excess of 150 patients in a day?
>
> A.    I doubt if they were seeing that many personally.  I do know that the statistics on this say that a small percentage of providers can see 5o to 60 patients in a day, depending on the circumstances.
>
> Q.    So you don't actually believe that they actually – that a single provider actually saw 150 patients in a day?
>
> A.    I do not.
>
> Q.    Why not?
>
> A.    Because it seems like that's an excessive burden. …
>
> . . .
>
> Q.    That one nurse practitioner, you would not expect that nurse practitioner to see 150 patients in a day, would you?
>
> A.    I would not.

Q.      Okay.  Why not?

A.      Because that's too many to have time for, even if you're
working, you know, a 24-hour shift.

*Id.* at 106-07.  But the evidence showed that is exactly what Defendant was telling insurance companies that his providers were doing—conducting moderate complexity, level 4 office visits on hundreds of patients a day at drive-through COVID-19 testing sites.  *See, e.g.*, Exhibit 41 (Gov't Trial Ex. 638) ("Our volumes continue to explode.  Jimmy and Crystal yesterday s[aw] over 350 people.  It was amazing."), Exhibit 42 (Gov't Trial Ex. 643) ("EH opened this week and we are already seeing over 150[.]").  Defendant even offered bonuses to providers who saw more than 100 people in a day.  Exhibit 43 (Gov't Trial Ex. 644) ("Additionally and this is in perpetuity, we will pay $5/patient for every patient you see over 100."); Exhibit 44 (Gov't Trial Ex. 645) ("If you see more then 100 patients you get 1 hour of paid time to chart.  If you see more than 150 patients you get 1 more hour to chart.").  Dr. Hill's testimony, without more, shows that the Defendant's Level 4 billing scheme was false.

### 2.      The code is written in English and the Defendant's instructions do not meet the definition of a Level 4.

Defense counsel told the jury during closing argument that the jury should not use common sense to evaluate this case.  That is because the Defendant's billing instructions were not consistent with a common-sense reading of the CPT Code and its accompanying resources.

For example, the 2020 CPT code for 99204 required "moderate complexity" decision making and, "typically," the visit was expected to last 45 minutes.  ECF 78, Ex. 3 (2020 CPT Manual) at 13.  The 2021 CPT code for 99204 required a "moderate level" of medical decision making.  ECF 78, Ex. 4 (2021 CPT Manual) at 19.  By contrast, the Defendant told his providers that "[w]e are not there to solve complex medical issues, etc… Just to test them." and "we want them in and out of the tent in under 5 minutes total."  Exhibit 47 (Gov't Trial Ex. 654).  Both the

2020 and 2021 CPT Codes for 99202 (Level 2) required "straightforward" medical decision-making. *See* ECF 78, Ex. 3 at 13, Ex. 4 at 18. Dr. Elfenbein told one of his providers, "the patients are all here for one reason . . . . simple and straightforward-to get tested[.]" Exhibit 45 (Gov't Trial Ex. 646). A common-sense application of the CPT Code to the defendant's billing instructions shows that Level 4 billing was false.

The CPT Coding resources cited by the defense also showed that the defendant's billing instructions were false. Both the Novitas and AMA scoring sheets provide for moderate complexity decision making when treating an "undiagnosed new problem with uncertain prognosis." The example offered in both the Novitas scoring sheet and in the 2021 CPT Code is "lump in breast." To justify his coding instructions, Dr. Elfenbein had to equate a healthy, asymptomatic, vaccinated person who just needed a test for an administrative reason with a patient who had a lump in their breast. *See* Exhibit 11 (8/2/23 Tr.) at 126-27. Similarly, Dr. Elfenbein testified that a patient who had been diagnosed with COVID-19 and needed a test to return to work had an "undiagnosed new problem."[1] *Id.* at 171.

The Defendant's explanations were not credible. His explanations were pretext for billing a level 4 when, in fact, the Defendant knew he was churning through patients like a "herd of cattle." *See* Exhibit 48 (Gov't Trial Ex. 658) (provider stating "I feel there is constant pressure of moving a herd of cattle through a pass at 60 heads *per minute*!!")

---

[1] The defense further argues that the ICD 10 diagnosis code for exposure to COVID-19 mandated a finding that a patient had an "undiagnosed new problem." *See* ECF 78 at 26-27. This mandate does not appear anywhere. The only people to suggest such a "mandate" are the defendant and his expert. As explained in several places herein, the defendant's theory that every patient who showed up for testing had an "undiagnosed new problem of uncertain prognosis" was not credible.

**3. Expert testimony that is based on inaccurate, vague, and misleading medical records has no value.**

The evidence showed that the medical records—which were templates created by the Defendant—were inaccurate, vague, and misleading. Neither the Government nor the Defendant could not have obtained a reliable expert opinion based on these records, and the jury agreed.

The trial evidence showed that the medical records were inaccurate. Patient A.H. disagreed with significant portions of her records. Exhibit 3 (7/19/23 Tr.) at 108-110. Patient W.R.'s record is an in-person record with a full physical exam even though the visit took place by video and the "physical exam" consisted of Patient S.T. leaning back in her seat so that Provider Kathy Wrona could see W.R. on the screen across the car. *See* Exhibit 19 (Trial Ex. 407)[2] at 6-9; Exhibit 5 (7/24/23 Tr.) at 99-102. D.M.'s medical record indicated that she was negative for COVID-19 but later the record stated she was positive. Exhibit 18 (Trial Ex. 404) at 4-6. The medical records often stated that a patient was exposed to person with COVID-19 when hand-written registration documents completed by the patient indicated that they were not exposed.

The medical records were also vague. Defendant's templated language for the medical records contained generic descriptions of patient encounters that did not inform what treatment, if any, was provided to a particular patient. The Government showed that the same care plan was used for multiple patients, each of whom had a different presentation. *See, e.g.*, Exhibit 13 (Excerpt from Gov't Trial Ex. 402) at 5; Exhibit 14 (Excerpt from Gov't Trial Ex. 402) at 4; Exhibit 15 (Excerpt from Gov't Trial Ex. 402) at 3; Exhibit 16 (Excerpt from Gov't Trial Exhibit 402) at 5. Two of the patients were sick, one needed a test to travel, and one needed a test prior to

---

[2] Although redacted versions of each of the patient records was discussed in open court during trial, the government has applied additional redactions to these records for purposes of this filing to remove patient identifying information including full names.

undergoing surgery. *Id.* Every care plan contained generic phrases like "patient to follow current CDC guidelines," "advised patient to monitor AM and PM temps," "Tylenol prn fever and bodyaches," "Full PPE was worn," "All questions asked and answered." *Id.*

Finally, the medical records were misleading. The Government introduced multiple emails written by the Defendant where he implored his providers to document "SOMETHING" about why the patient is there to be tested. *See*, *e.g.*, Exhibit 29 (Gov't Trail Ex. 605); Exhibit 31 (Gov't Trial Ex. 607); Exhibit 33 (Gov't Trial Ex. 609). Deborah Needle testified that these emails were "concerning" because "it implies that we need to find something to document even if it's not there." Exhibit 5 (7/24/23 Tr.) at 143. This is likely why the template was drafted to state that a patient was exposed to COVID-19 when, in fact, many patients were seen for administrative reasons such as for work or travel.

The call-back records are perhaps the best examples of the misleading records. Here is the medical record related to a phone call that A.H. testified "couldn't have been more than one minute":

> This patient is called today by me to check on them and discuss their COVID PCR results with them. We spoke at length over the phone about their PCR results and what that means for them. We also discussed their overall health and well being. They had the rapid and PCR tests performed when they were seen in person. Rapid results were immediately available to them on the day of testing. The PCR result is being discussed with them today, as it is a send out and takes >24 hours to be resulted. I am also checking in on them to ensure they are doing well. In excess of 32 minutes since they were last seen by us, in person, was spent in total on such things as: coordinating their care, arranging for testing, testing, processing their samples, resulting their samples, charting, communicating with the patient, communicating with the lab, answering questions, discussing options the patient has moving forward/continued quarantine and isolation/therapeutic options, etc..
> The patient is advised to follow-up with their PCP or to call/return to clinic for ANY and all questions. They are advised to call 911 should they develop any worrisome symptoms such as (but not limited to) SOB, high fever, intractable N/V. Pt was given chance to ask any questions and all were answered.

Exhibit 17 (Gov't Ex. 403) at 6; Exhibit 3 (7/19/23 Tr.) at 111. This misleading, vague medical gibberish becomes even more absurd in light of the repeated usage of this language. Patient S.T. received one phone call to report the results for her family, but the medical records claim that S.T.

and each of her triplets spoke "at length" with the provider and that "[i]n excess of 32 minutes" was spent on various issues for each patient. *See* Exhibit 20 (Gov't Trial Ex. 408) at 6; Exhibit 21 (Gov't Trial Ex. 409) at 6; Exhibit 22 (Gov't Trial Ex. 410) at 12; and Exhibit 23 (Gov't Trial Ex. 413) at 31.

### 4. Hybrid expert and fact witnesses testified that Dr. Elfenbein's practitioners were not providing a Level 4 service.

Fact witnesses who possess training and skill beyond that of a lay person, but who are not otherwise designated as experts, are often considered "hybrid" experts. *See, e.g., Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*, 2019 WL 2359441, *1 (D. Md. June 4, 2019) (describing hybrid expert/fact witnesses as giving testimony "arising out of personal observations made in the normal course of duty.") (internal quotation marks omitted). Several witnesses with such training and skill testified at trial, including Cathy Raymond, Courtney Sinagra (as a representative of CareFirst), Steven Carroll, and Suzanna Silva.

Cathy Raymond was a Certified Professional Coder who worked for the Defendant from 2017 until she quit in protest in October 2020. *See* Exhibit 4 (7/20/23 Tr.) at 79, 85. She testified that she told the Defendant that she was seeing unsupported level 4 and level 5 office visits. *See id.* at 84. During cross-examination, the defense highlighted that Raymond did not specifically address the Defendant's use of Level 4 billing, but Raymond clarified that while she may not have used the words "Level 4," she raised issues with the "pattern" of billing, and that pattern included Level 4 and Level 5. *See* Exhibit 5 (7/24/23 Tr.) at 55, 90.

The Defendant reduces Raymond's concerns to "documentation" concerns, suggesting that her concerns were just a matter of paperwork and not a concern about medical decision making. Raymond's concerns, however, go to the heart of the Government's fraud theory. Raymond saw systemic billing of Level 4 and Level 5 office visits that were not supported by the medical records.

The obvious explanation for her observations was that the Defendant's providers were each churning through more than 100 patients per day.

The Government also called Courtney Sinagra, as a representative of CareFirst Blue Cross/Blue Shield to testify about two audits of First Call performed by CareFirst. CareFirst's second audit was performed by a Certified Professional Coder and a Registered Nurse. *See* Exhibit 27 (Gov't Trial Ex. 502) at 2; Exhibit 53 (Def. Trial Ex. 255). Courtney Sinagra was also a Certified Professional Coder and she testified on behalf of CareFirst that, as to the second audit in particular, none of the 89 patient records reviewed met the Level 4 billing criteria. Exhibit 6 (7/25/23 Tr.) at 21, 56-57. The medical records reviewed by CareFirst during the second audit were similar to the medical records for the charged encounters; they contained inaccuracies and generic care plans that gave no meaningful insight into the care provided to the patient. *See, e.g.*, Exhibit 13 (Excerpt from Gov't Trial Ex. 402) at 5; Exhibit 14 (Excerpt from Gov't Trial Ex. 402) at 4; Exhibit 15 (Excerpt from Gov't Trial Ex. 402) at 3; Exhibit 16 (Excerpt from Gov't Trial Exhibit 402) at 5. The jury was entitled to rely on Ms. Sinagra's testimony and on the CareFirst audit to conclude that the five charged encounters were false.

Two providers called by the defense, Steven Carroll and Suzanna Silva, also had billing training and admitted that using Level 4 for every patient visit was not appropriate. Carroll, for example, admitted that Defendant's "in and out of the tent in under 5 minutes" instruction did not describe a level 4 encounter. Exhibit 9 (7/31/23 Tr.) at 40-41. The Government also cross-examined Carroll with this own treatment records for a patient who came to First Call regularly to be tested for work. He testified as follows:

> Q.    And why did the patient come to FirstCall?
>
> A.    Needs a test for work.
>
> Q.    How'd you code the office visit?

A.     99214.

Q.     And is the care plan identical to the last care plan we just saw?

A.     Yes.

Q.     Do you think that's a level 4 decision making, Mr. Carroll?

A.     No.

Q.     This visit should not have been a level 4.

A.     No.

*Id.* at 43.

Suzanna Silva testified that she received training on medical billing at her previous employer, and she testified that she—not the defendant—decided how to code her office visits.[3] Exhibit 10 (8/1/23 Tr.) at 105-06.  She testified that when she saw patients in-person at the FedEx Field location, she coded the office visit as a level 3: "if the patient circumstance was extremely straightforward, such as they simple needed a test for travel or work and were having absolutely no symptoms, I didn't need to take time consulting with them, helping them with any concerns, then I might code those as a level 3." *Id.* at 110.  Ms. Silva added that she "may have billed more 3s at Earleigh Heights given that my exam was more limited." *Id.*  Defendant, in contrast, instructed one of his providers that Level 3 was "never" appropriate.  Exhibit 39 (Gov't Trial Ex. 631).

Fact witnesses also supplied evidence that the billing was false.  Deborah Needle, another provider at First Call, testified that she had some familiarity of medical billing, and that she did not think it was appropriate to bill all asymptomatic patients as a level 4 and all symptomatic

---

[3] Silva also joined the practice 18 months after the pandemic began.

patients as a level 5. *See* Exhibit 5 (7/24/23 Tr.) at 139 ("I didn't feel that an asymptomatic patient warranted a level 4.") Needle also provided key testimony about the Defendant's billing scheme. When Needle initially confronted the Defendant and expressed disagreement, he told her to "do what [she] felt was appropriate." *Id.* at 151. Yet, "that same day [Defendant] sends out an e-mail again with the guidelines of level 4s and 5s." *Id.*

David Turner, the owner and President of BlueFish Medical, also provided evidence that Dr. Elfenbein's billings were false. Centennial Medical Group was the management company for the Defendant's medical practice and also for a much larger medical practice led by Dr. Rajeev Dua. Dr. Dua's practice also provided COVID-19 testing services in Maryland. BlueFish provided services to both Dr. Dua's practice and Defendant's practice, and Turner testified that Dr. Dua's E/M coding practices "were more conservative." Exhibit 3 (7/19/23 Tr.) at 181. The jury could have relied on this testimony to determine that the five charged patient encounters were false.

### 5. Evidence of the defendant's intent is relevant to falsity.

The jury could also have also determined that the claims for the five charged encounters were false because the defendant intended to submit false claims. In other words, when evaluating falsity, the jury was not limited to the four corners of the medical records. The jury could reasonably infer that the claims were false because the evidence of the Defendant's intent showed that he intended to submit false claims. Evidence of the defendant's intent is more-thoroughly discussed in the response to the Motion for a New Trial, but the Government showed at trial, among other things, that: (1) the defendant acted with a financial motive; (2) the defendant's claim to have used the Novitas and AMA scoring sheets was uncorroborated by any witness, email, or document; (3) the Defendant disregarded billing recommendations from his business partner and his Certified Professional Coder; and (4) when confronted by Cathy Raymond or Deborah Needle

he either told them to bill what they felt was appropriate only to follow up with an email directing his level 4 billing or her ignored them. *See* Exhibit 28 (Gov't Trial Ex. 601) ("there has to be a way to bill higher level"); Exhibit 11 (8/2/23 Tr.) at 187 ("Q. And we don't see any e-mails where you use the phrase 'new undiagnosed problem with uncertain prognosis'? We haven't seen any of those e-mails, have we? . . . A. I don't think so."); Exhibit 32 (Gov't Trial Ex. 608) ("let's try it"); Exhibit 5 (7/24/23 Tr.) (Needle testifying that she "felt like [she] was being avoided."); Exhibit 4 (7/20/23 Tr.) at 84 (Raymond testifying "After the first time I raised a concern, he acknowledged my concern and he had backed off . . . However, a couple weeks later, he was back at it[.]").

### 6. The patients who testified about the charged counts reported brief encounters that were consistent with the Defendant's instructions and inconsistent with Level 4 visits.

The grand jury charged the Defendant with five separate executions of his scheme, four of which related to patients who testified at trial. Four of the patients testified at trial, and one of the patients, S.T., testified about the fifth patient, W.R., who was her father. Each patient had different circumstances that brought them to First Call, but they all recounted the same perfunctory encounter that did not rise to a level 4 service.

A.H. testified that the person who swabbed her nose only asked a few questions but did not provide any substantive care. *See* Exhibit 3 (7/19/23 Tr.) at 106. S.T., who was vaccinated and asymptomatic, testified that the examination and discussion for her and her three children lasted a combined 10 minutes, even though Defendant's company billed their insurance company for Level 4 visits for all of them. Exhibit 5 (7/24/23 Tr.) at 99-102. S.T. testified that W.R.'s visit, at which S.T. was present, lasted less than five minutes and the provider's exam of W.R. consisted of S.T. leaning back in the driver's seat of her car so the provider on the screen could see W.R. in the passenger seat across the car. *Id.* at 108-09. D.M., who was vaccinated and asymptomatic,

testified that she spoke to a provider on a screen for about five minutes. *See* Exhibit 4 (7/20/23 Tr.) at 68-70. J.J., who was experiencing symptoms and had a history of asthma, testified that she spoke to a provider for 2 minutes. *See* Exhibit 6 (7/25/23 Tr.) at 6, 12

Their collective experience mirrored the Defendant's instructions to his providers to see patients in under five minutes, that these were "simple and straightforward" encounters, and that providers were not to solve complex medical issues. *See* Exhibit 45 (Gov't Trial Ex. 646); Exhibit 46 (Gov't Trial Ex. 647). The defendant's statement that "[p]atients just want to get tested and go home" was largely correct. *See* Exhibit 45 (Gov't Trial Ex. 646). S.T. had three young children and wanted the convenience of a drive-thru. *See* Exhibit 5 (7/24/23 Tr.) at 98. J.J. testified that she did not go to First Call to see a doctor, she went there to get a COVID-19 test. *See* Exhibit 6 (7/25/23 Tr.) at 20. ("Q. Ms. Jones, were you going to Earleigh Heights to see a doctor? A. No. Q. What were you going to Earleigh Heights for? A. To get tested for COVID.")

The Defendant commonly refers to the medical records as evidence that medical decisions must have been made by the provider. *See*, *e.g.*, ECF No. 78 at 22. But the template medical records, which were vague, misleading, and inaccurate, and which were "100% done for you," do not prove that medical decision making was actually rendered by the provider. *See* Exhibit 48 (Gov't Trial Ex. 658) ("the template I built for this is 100% done for you. How much simpler can that get?") Even Mr. Miscoe admitted that medical decision making is the "cognitive labor a provider puts into the encounter." No such cognitive labor was expended by the providers here.

The Defendant also points to each patient's "limited recollection" of the encounter. *See*, *e.g.*, ECF No. 78 at 21. Their recollections were limited because the encounters were so brief. Presumably, if the patient had met with an oncologist about a lump in their breast, then they would have a better memory of it.

The Defendant also argues that he is entitled to an acquittal as to patient A.H. because A.H. testified that she never saw a provider, and the Defendant never instructed his providers to test patients without seeing them. The Defendant implemented a scheme to bill for level 4 office visits that he knew were not occurring, and that was just has much true for A.H. as it was for any of the other charged patient encounters. Further, that his providers may have seen a patient so quickly that the patient did not perceive it as a provider encounter is a foreseeable consequence of the Defendant's instructions. *See, e.g.*, Exhibit 35 (Gov't Trial Ex. 617) ("[E]ntire patient encounter and chart took 20 seconds").

## II. THE COURT SHOULD DENY DEFENDANT'S MOTION FOR A NEW TRIAL

The Court should reject the Defendant's Motion for a New Trial because the weight of the evidence supports the jury's verdict, the evidentiary rulings by the Court were consistent with the law and the facts of the case, and conducting *voir dire* without public spectators does not violate the Defendant's Sixth Amendment right to a public trial. Federal Rule of Criminal Procedure 33 permits a defendant to move for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). For these reasons, the Defendant's motion should be denied.

### A. The Weight of the Evidence Supports the Jury's Verdict

As explained above, the evidence presented at trial was more than sufficient for a reasonable juror to conclude the defendant committed each count of conviction. The Fourth Circuit has explained that to determine whether a new trial is warranted based on the weight of the evidence, "the court examines the evidence as a whole to determine whether it 'preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'" *United States v. Rafiekian*, 68 F.4th 177, 189 (4th Cir. 2023). "District courts should grant new trials based on the weight of the evidence only in 'rare' instances." *Rafiekian*, 68 F.4th at 186.

"Merely believing that the case could have come out the other way is not enough to warrant a new trial." *Rafiekian*, 68 F.4th at 186. "A district court should grant a new trial based on the weight of the evidence 'only when the evidence weighs heavily against the verdict." *United States v. Saint Louis*, 889 F.3d 145, 157 (4th Cir. 2018); *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997) ("[D]istrict court should exercise its discretion to grant a new trial 'sparingly'"). Because "'determining witness credibility and weighing conflicting evidence are the responsibility of the factfinder,' [] 'the standard for jettisoning a jury verdict in favor of a new trial' is 'demanding.'" *Rafiekian*, 68 F.4th at 186-87 (quoting *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985) and *United States v. Millender*, 970 F.3d 523, 532 (4th Cir. 2020)) (internal citations and some quotation marks omitted).

No new trial is warranted here. The evidence presented at trial, taken as a whole, establishes that Defendant engaged in a scheme to defraud Medicare and other insurers by billing those insurers for high-level office visits that did not occur as represented for every patient who came to the Defendant's clinic for a COVID-19 test. The Defendant decided on the level of office visit he was going to bill before the patient ever presented for service, without regard to the patient's health or reason for testing. This was a one-size-fits-all billing scheme.

The evidence demonstrates that the claims submitted by Defendant's company for level 4 office visits for COVID-19 testing patients was false and fraudulent, and that Defendant knew and intended that these claims were false.

> **1.** **The Testimony Of The Government's Witnesses Was Credible, And Established The Defendant's Guilt Beyond A Reasonable Doubt.**

As discussed above in Section I, the Government introduced ample evidence from which the jury found the Defendant guilty beyond a reasonable doubt. This included testimony from Defendant's former employees, testimony from a representative of the third-party billing company

used by Defendant to submit claims, testimony from representatives of Medicare and CareFirst, and testimony from patients who went to Defendant's COVID-19 drive-through testing site for COVID-19 tests. In addition, the government presented documentary evidence, including claims data, medical records, and e-mails showing the scheme. This evidence demonstrated that the claims submitted at Defendant's direction were false, that Defendant knew they were false, and that Defendant intended to submit false claims to obtain higher reimbursement.

The evidence presented by the Government was credible and consistent, and strongly supported the verdict rendered by the jury. In contrast, the Defendant's testimony was not credible, and the Defendant's expert, Michael Miscoe, rendered an opinion that was based on inaccurate medical records and defies logic. The evidence presented does not "preponderate sufficiently heavily against the verdict," and the Defendant's motion for a new trial should be denied.

### a) Defendant Implemented a Scheme To Defraud

The evidence presented at trial established that Defendant implemented a plan to bill for Level 4 visits for every COVID-19 test with an additional level 4 visit. Defendant did so by instructing his providers repeatedly to code all COVID-19 testing patients with additional Level 4 office visits, and creating templated medical records that included the Level 4 codes. In email after email, starting as early as April 25, 2020, the Defendant instructed his employees that *every* asymptomatic COVID-19 testing patient should be billed at level 4. *See* Exhibit 29 (Gov't Trial Ex. 605), Exhibit 30 (Gov't Trial Ex. 606), Exhibit 31 (Gov't Trial Ex. 607), Exhibit 34 (Gov't Trial Ex. 614), Exhibit 36 (Gov't Trial Ex. 626), Exhibit 37 (Gov't Trial Ex. 628), Exhibit 38 (Gov't Trial Ex. 629), Exhibit 39 (Gov't Trial Ex. 631), Exhibit 40 (Gov't Trial Ex. 635), Exhibit 47 (Gov't Trial Ex. 654); *see also* Exhibit 5 (7/24/23 Tr.) at 138-39 (Provider Needle testifying that Defendant instructed her to bill all COVID-19 patients for Level 4 E/M visit). The evidence also confirmed that Defendant prepared templated medical records and instructed providers to use

the templates. For example, in an email to one of his providers, Defendant stated that "the template [he] built for this is 100% done for you. How much simpler can that get?" Exhibit 48 (Gov't Trial Ex. 658).

And the employees followed Defendant's instructions. The Defendant was the medical director of the clinic. *See, e.g.*, Exhibit 48 (Gov't Trial Ex. 658) (Defendant's email stating "I am medical director and will change the process when I feel it best—that is my prerogative and responsibility."). The testimony from the providers confirms that they relied on Defendant's instructions, and coded COVID-19 testing patients for an additional level 4 office visit. *See, e.g.*, Exhibit 9 (7/31/23 Tr.) at 27 (Provider Carroll testifying that the Defendant instructed him by email to bill COVID-19 test patients at level 4, and he followed that instruction); Exhibit 7 (7/26/23 Tr.) at 36 (Provider Wrona testifying that she relied on the emails from Defendant and the templated CPT coding). The claims data corroborates their testimony. *See, e.g.*, Exhibit 12 (Gov't Trial Ex. 137) (summary chart showing nearly every COVID-19 test was billed with Level 4 office visit). Nearly every patient who received a COVID-19 test at Defendant's clinic was billed on that same day for a level 4 office visit. *Id.*

The evidence also showed that Defendant decided on his scheme to bill every asymptomatic COVID-19 testing patient for an additional Level 4 office visit early in the pandemic in order to increase the amount of money he would get from insurers. For example, as early as March 18, 2020, Defendant's former biller, Cathy Raymond, suggested using level 1 evaluation and management coding for COVID-19 testing patients. Exhibit 28 (Gov't Trial Ex. 601) (suggesting 99201 code). Defendant responded that "[t]here has to be a way to bill higher level on these" to increase reimbursement. *Id.* The Government also introduced several emails in which Defendant confirmed that reimbursement rates were the motive for billing Level 4 visits. For

example, Defendant repeatedly confirmed that evaluation and management coding was the "bread and butter" of how they get paid, *See, e.g.*, Exhibit 37 (Gov't Trial Ex. 628), Exhibit 40 (Gov't Trial Ex. 635), and "a 99202 pays way less than a 99204." Exhibit 40 (Gov't Trial Ex. 635). Defendant was telling his providers to raise the level of coding because "[t]he difference in coding of one level can be over a hundred dollars, so it is not inconsequential." Exhibit 39 (Gov't Trial Ex. 631).

By instructing his providers to code every COVID-19 testing patient for a level 4 office visit in addition to the COVID-19 test, Defendant was telling Medicare and other insurers that every patient was receiving an "office or other outpatient visit for the evaluation and management of a [new or existing] patient, which requires a medically appropriate history and/or examination and *moderate level of medical decision making*." *See* ECF 78, Ex. 4 at 19 (2021 CPT Code Manual) (also introduced as Gov't Trial Ex. 903).[4] As discussed above in Section I, the evidence presented at trial established that the services being provided at Defendant's direction were not moderate complexity office visits. The Government presented evidence of the E/M code definition, and what services were being represented by the Level 4 E/M codes. The Government presented testimony from patients and providers who testified the services provided were not Level 4 E/M visits. The Government presented testimony from CareFirst regarding its audits of Defendant's billing, in which multiple certified professional coders concluded the services

---

[4] In 2020, the guidelines for CPT codes 99204 and 99214 similarly involved medical decision making of moderate complexity. *See* ECF 78, Ex. 3 at 13 (2020 CPT Code Manual) (also introduced as Gov't Trial Exhibit 902). In the 2020 guidelines, the CPT manual provides "typical" times—for 99204, "typically, 45 minutes are spent face-to-face with the patient and/or family" and for 99215, "typically, 25 minutes are spent face-to-face with the patient and/or family." *Id.* at 13-14. The CPT manual states that "[t]he inclusion of time as an explicit factor beginning in CPT 1992 is done to assist in selecting the most appropriate level of E/M services." *Id.* at 8.

provided by Defendant's company were not Level 4 E/M visits. And the Government presented emails from the Defendant instructing his providers to provide services inconsistent with Level 4 E/M visits. All of this evidence strongly supports the jury's determination that the claims submitted by Defendant's company were false.

### b) Defendant's Acted Knowingly and Willfully

The evidence showed that Defendant acted knowingly and willfully in pursuing this scheme to defraud. As discussed above, the evidence presented at trial established that Defendant was the person who decided what codes to bill, and was telling his providers to bill for moderate complexity, Level 4 E/M visits. *See* Exhibit 29 (Gov't Trial Ex. 605), Exhibit 30 (Gov't Trial Ex. 606), Exhibit 31 (Gov't Trial Ex. 607), Exhibit 34 (Gov't Trial Ex. 614), Exhibit 36 (Gov't Trial Ex. 626), Exhibit 37 (Gov't Trial Ex. 628), Exhibit 38 (Gov't Trial Ex. 629), Exhibit 39 (Gov't Trial Ex. 631), Exhibit 40 (Gov't Trial Ex. 635), Exhibit 47 (Gov't Trial Ex. 654); *see also* Exhibit 5 (7/24/23 Tr.) at 138-39 (Provider Needle testifying that Defendant instructed her to bill all COVID-19 patients for Level 4 E/M visit). At the same time, Defendant was telling his providers that they were "not there to solve complex medical issues, etc… Just to test them." Exhibit 46 (Gov't Trial Ex. 647). The patient "is there for one reason only-to be tested. Goal is to get them seen and out quickly (we want them in and out of the tent in under 5 minutes total)." *Id.* "Speed here is key." Exhibit 45 (Gov't Trial Ex. 646). "The patients are all here for one reason…. simple and straightforward-to get tested." *Id.*

Multiple employees, including Defendant's at-the-time certified professional coder, raised concerns about the level of coding Defendant was instructing providers to use for COVID-19 testing patients. For example, Cathy Raymond was Defendant's biller, and a certified professional coder that had worked for Defendant for several years prior to the COVID-19 pandemic. *See* Exhibit 4 (7/20/23 Tr.) at 79. Raymond testified that during the pandemic, for the first time,

Defendant was instructing patients on what codes to bill for patients. *Id.* at 83-84. Raymond testified that she raised concerns about the coding instructions to Defendant multiple times, verbally and in writing. *Id.* at 84. The concern she raised was with the pattern of over-coding she was seeing—that every COVID-19 testing patient was being billed for level 4 and level 5 office visits. Exhibit 5 (7/24/23 Tr.) at 20-23, 55 ("The pattern included that level 4, though."); *Id.* at 90 ("[T]here was a consistent pattern of level 4s and level 5s being billed but without the appropriate documentation level to support it."). Raymond testified that Defendant ignored her concerns, and continued to instruct providers to bill COVID-19 testing patients for level 4 and level 5 office visits in addition to COVID-19 tests. *See* Exhibit 4 (7/20/23 Tr.) 84-86; Exhibit 5 (7/24/23 Tr.) at 11-12. Ultimately, Raymond testified, she reported her concerns to the government and resigned from her position because "the situation that was going on with the over coding was not a situation that [she] could stay in." Exhibit 5 (7/24/23 Tr.) at 11, 16-17.

Provider Deborah Needle, a nurse practitioner who worked for Defendant's clinic, testified that Defendant gave instructions on how to code COVID-19 testing patients, and that his instruction was to code all COVID-19 testing patients at level 4 at the very least. *See id.* at 138-139. Needle did not agree with those instructions. *Id.* at 139. Needle testified that she raised her concerns about the coding level with Defendant, and he responded by reiterating his instruction that all COVID-19 testing patients should be billed for an additional level 4 office visit at a minimum. *Id.* at 139-140. Needle testified that Defendant was "never available" to answer her concerns, and she "felt like [she] was being avoided." *Id.* at 146.

Defendant's company was audited twice during the scheme. Exhibit 26 (Gov't Trial Ex. 501), Exhibit 53 (Def. Trial Ex. 255); Exhibit 6 (7/25/23 Tr.) at 28. In both audits, CareFirst determined that the Defendant's company was billing for services not provided as represented.

Exhibit 26 (Gov't Trial Ex. 501), Exhibit 53 (Def. Trial Ex. 255); Exhibit 6 (7/25/23 Tr.) at 33-34, 53-57. These audit results were communicated to the Defendant's company. *See* Exhibit 26 (Gov't Trial Ex. 501), Exhibit 53 (Def. Trial Ex. 255); Exhibit 6 (7/25/23 Tr.) at 33 (first audit report sent to Defendant's company address).

The evidence presented at trial strongly supports the jury's determination that the Defendant acted knowingly and willfully.

### 2. The Defendant's Testimony Was Not Credible.

Defendant's contention that every patient encounter in which a patient received a COVID-19 test at his clinic qualified to be coded at level 4 is not supported by the evidence and is not credible. Defendant and his expert, Michael Miscoe, testified that every patient encounter involving a rapid and PCR COVID-19 test *automatically* qualifies for level 4 coding. Exhibit 10 (8/1/23 Tr.) at 63 (Michael Miscoe testimony: "Q. Your opinion is that every patient who got a COVID test and got two tests with one reviewed, regardless of status, regardless of diagnosis, regardless of risk, necessarily involved the second-highest level of medical decision making, right? A. That's the way it scores out."); Exhibit 11 (8/2/23 Tr.) at 182 (Defendant testimony: "Q. Is there moderate decision making with respect to every patient who walks in the door during the pandemic? A. According to the chart, yes. Q. So everywhere in this country during the pandemic, as soon as [the] patient walks in the door, regardless of what they're there for, because they existed in society, they at least get that new problem with uncertain prognosis? A. If they're getting two tests for COVID and it's in 2021, yes.").

There is not a shred of evidence that corroborates that opinion. In fact, the evidence showed precisely the opposite. Guidance issued during the pandemic (and on which Defendant and his

expert purported to rely in part)[5] made clear that COVID-19 testing in and of itself did *not* automatically qualify every encounter as level 4. *See, e.g.,* Exhibit 51 (Def. Trial Ex. 214) (CMS Transmittal: "Physician's and NPPs must use CPT code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection  provided by clinical staff . . . incident to the physician's or NPP's services."), Exhibit 52 (Def. Trial Ex. 219) (CMS Interim Final Rule: "For the duration of the COVID-19 PHE, we are therefore finalizing on an interim basis that when the services described by CPT code 99211 for a level 1 E/M visit are furnished for the purpose of a COVID-19 assessment and specimen collection, the code can be billed for both new and established patients. *We believe this policy will support expanded access to COVID-19 testing, and provide appropriate payment for COVID-19 test-related services furnished by physician and other practitioners."*) (emphasis added).  The contention that every individual who received a COVID-19 test *always* qualified for a Level 4 evaluation and management visit does not pass the smell test.  For example, as Defendant's expert was forced to concede, such an interpretation would necessarily mean that it would not matter if the provider saw the patient for 20 seconds.  *See* Exhibit 10 (8/1/23 Tr.) at 33-35 (Defendant's expert suggesting a 20 second encounter could be Level 4), 50 ("Q. [] So your opinion that your expressing to the jury today is, if a medical assistant at a drive-through COVID testing site does a swab, and does a symptom and exposure assessment, if the provider is on a screen for 20 seconds or 40 seconds just to look at that patient, it all of a

---

[5] Defendant could not decide whether he did or did not search for relevant CPT code guidance when he was purportedly determining the coding level.  *Compare* Exhibit 11 (8/2/23 Tr.) at 132 (Defendant Direct Testimony that "there was a new table that was being put out by the American Medical Association, along with the CPT guidelines" and Defendant "conduct[ed] an analysis" using that chart) and 136 (Defendant Direct Testimony that he "started to Google other sources") *with* Exhibit 11 (8/2/23 Tr.) at 161-162 (Defendant Cross Testimony that "I looked for a lot of things.  I don't remember specific looking for the AMA guidelines on coding.") and 168 (Defendant Cross Testimony that he doesn't specifically recall guidance from the AMA).

sudden goes from a level 1 visit as instructed by CMS to a moderate complexity office visit, the second-highest level of office visit[?]  A. As soon as the provider gets involved.  I mean, that's just the way the medical decision making scores.  I didn't write the rules.").

Moreover, Defendant's testimony was directly contradicted by the testimony of other fact witnesses and was inconsistent with his own emails.  For example, Defendant testified that Cathy Raymond never expressed any concerns with Defendant about coding levels.  Exhibit 11 (8/2/23 Tr.) at 49 ("Q. Did she ever express any concerns to you about coding levels?  A. No, she did not.").  In contrast, Ms. Raymond testified that she repeatedly raised concerns about the pattern of coding at Defendant's company.  Exhibit 4 (7/20/23 Tr.) at 84-86.  That "pattern" of coding included billing COVID-19 testing patients for Level 4 E/M visits.  Exhibit 5 (7/24/23 Tr.) at 20-23, 55 ("The pattern included that level 4, though."); *Id.* at 90.  Dr. Elfenbein also testified that Deborah Needle never expressed any concerns with Defendant about his billing instructions.  Exhibit 11 (8/2/23 Tr.) at 161 ("Q. And Deborah Needle expressed the same concern about your billing instructions, correct?  A. She did not.  Q. So she did not express concerns with your billing instructions?  A. Not to me, she did not.").  Again, in contrast, Ms. Needle testified that she did raise her concerns with the Defendant.  Exhibit 5 (7/24/23 Tr.) at 139-140 ("Q. Did you ever tell Dr. Elfenbein that you disagreed with his instructions?  A. I told him that I had questions and concerns, yes.  Q. And what exactly did you tell him?  A. I told him that I felt like the codes didn't – I felt that the level was higher than it should be, and I was looking for some clarification because I was concerned.").

Defendant also testified that he used the AMA's medical decision making chart and the Novitas calculator to conclude that every COVID-19 testing patient should be coded with a Level 4 E/M visit.  Exhibit 11 (8/2/23 Tr.) at 134-137.  But no email or other evidence corroborates

Defendant's testimony that he looked at this chart at the time. And evidence presented conflicts with Defendant's testimony that he used these charts. On cross-examination, Defendant was confronted with his own email indicating that sometimes Defendant's company did not perform two tests—and in those circumstances even under Defendant's purported calculation he could not have billed a Level 4 visit. *Id.* at 171-72; Exhibit 49 (Gov't Trial Ex. 938). But the claims data shows that the Defendant did not change the coding in those circumstances. *See* Exhibit 12 (Gov't Trial Ex. 137); Exhibit 8 (7/27/23 Tr.) at 16-19. He did not ever change the coding. That evidence calls into serious question the veracity of Defendant's testimony.

In *United States v. Janati*, the Fourth Circuit affirmed conviction for health care fraud in similar circumstances. *See* 237 F. App'x 843, 847 (4th Cir. 2007). In that case, defendants were convicted of health care fraud for, among other things, "upcod[ing] office visits, meaning that when they billed insurers, they represented that an office visit was more involved or complex than it actually was, justifying a higher billing rate." *Id.* at 845. The evidence in that case showed that the defendants billed virtually all office visits using the highest code, CPT 99215, without regard to the seriousness of the patient's problem or the complexity of the visit." *Id.* There, the defendant claimed the coding was too vague to sustain the conviction. *Id.* The Court rejected the argument and affirmed conviction, explaining that the evidence "overwhelmingly demonstrates" that the defendants knowingly used improper coding "if for no other reason that the fact that they altered their forms to eliminate even the option of billing at a level lower than Code 99214." *Id.* at 847. In addition, the Court noted that the defendants previously billed differently, that they billed *every* visit at the highest level, that the government's expert testified that none of the charges came "even close" to warranting the billing level, and that the defendants continued to bill falsely "even after

being specifically warned by Medicare officials and other insurers that their billing was improper."

*Id.*

Here, the evidence is even more comprehensive. Although the Government did not present a hired expert to testify about the CPT codes used, two certified professional coders testified regarding opinions rendered *at the time* and communicated to the Defendant that these COVID-19 testing visits did not qualify as level 4 office visits. Providers testified that the services they were providing were not level 4 office visits. And Defendant caused his company to bill nearly *every* patient for level 4 office visits, "without regard to the seriousness of the patient's problem or the complexity of the visit." *See Janati*, 237 F. App'x at 845. The facts in *Janati* also did not occur during a pandemic. In other words, the patients seen by Janati were likely sick. Here, many of Defendant's patients were healthy, asymptomatic, and later in 2021, vaccinated.

The weight of the evidence establishes that the codes submitted by Defendant's company at Defendant's direction were false, that Defendant knew they were false, and that he intended to defraud Medicare and other insurers. The Defendant's motion for a new trial should be denied.

### B. The Court's Evidentiary Rulings Were Correct

The Court's evidentiary rulings on Defendant's three proposed exhibits and on the testimony of A.H. were consistent with the evidentiary rules on hearsay, and Defendant's arguments should be rejected. Federal Rule of Evidence 801 defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay statements made by a defendant, if offered by that defendant, are inadmissible unless they fit within a specific hearsay exception. *See United States v. Gearheart*, --- F. Supp. 3d ---, 2023 WL 4106252 (W.D. Va. June 21, 2023); *cf. United States v. Conto*, 2022 WL 228845, *1 (4th Cir. 2022) (Rule 106 does not "require the admission of self-serving, exculpatory statements made by

a party which are being sought for admission by that same party.") (internal quotation marks omitted).  The Rules of Evidence provide an exception to hearsay for statements made by the Defendant or his agent, *if offered against the Defendant*.  Fed. R. Evid. 801(d)(2).

In addition, evidentiary rulings are also subject to a harmless error analysis.  *United States v. Gordon*, 754 F. App'x 171, 177 (4th Cir. 2018) (citing *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011)).  "An 'error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.'"  *Id.* (quoting Fed. R. Crim. P. 52(a)).  "An error is harmless if it did not affect the verdict."  *Id.*  Thus, "if the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful."  *Id.* (quoting *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996)).  When applying a harmless error analysis, the Fourth Circuit has held that "'[e]vidence erroneously admitted will be deemed harmless if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"  *United States v. Hanna*, 353 F. App'x 806, 809 (4th Cir. 2009) (citing *United States v. Abu Ali*, 528 F.3d 210, 231 (4th Cir. 2008)).

### 1.     The Defendant's Three Proposed Email Exhibits Were Properly Excluded.

Each of the three proposed exhibits Defendant claims should have been admitted are inadmissible hearsay and were properly excluded.

Defendant argues that these emails fall within the hearsay exception for statements regarding a declarant's state of mind.  ECF 78 at 32-33.  Federal Rule of Evidence 803(3) provides an exception to the hearsay rule for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental

feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will."  Fed. R. Evid. 803(3).  "Rule 803(3) explicitly excludes hearsay statements about memories offered 'to prove the fact remembered.'"  *United States v. Liu*, 654 F. App'x 149, 155 (4th Cir. 2016) (rejecting argument that statements fit within 803(3) because they would have described state of mind "hours or days earlier, rather than a 'then-existing' state of mind").  "Where state of mind itself is in issue . . . the court must determine if the declarant's state of mind *at the time of the declaration* is relevant to the declarant's state of mind *at the time at issue*."  *United States v. Srivastava*, 411 F. App'x 671, 684 (4th Cir. 2011).  Of course, even if evidence falls within a hearsay exception, it must be relevant to be admissible.  Fed. R. Evid. 803.

Defendant's contention that these three emails were being offered to show Defendant's state of mind was properly rejected.  First, Defendant initially sought to introduce these emails as business records.  Second, the emails do not speak to Defendant's state of mind with respect to any relevant issue.  Third, Defendant cannot introduce his own, self-serving hearsay statements.

### a)      DX77

Defendant's proposed exhibit DX77 is an email dated December 18, 2021 (approximately 21 months after the pandemic began, and long after Defendant hatched the scheme) that is a post-mortem look back on the pandemic.  ECF 78, Ex. 9. The Defendant's contention that the email reflects Defendant's motive for billing COVID-19 testing patients for level 4 office visits is wrong. Nothing in the email addresses billing or coding.  Instead, it is a motivational speech to his employees.  Such general character evidence is not admissible under Rule 404(a)(1).  Even if the email could be read to suggest that Defendant's decision to offer COVID-19 tests to patients at his mass testing sites was motivated by a desire to help people, that says nothing about the Defendant's

motive for billing every one of those patients for an additional, Level 4 office visit that was not performed as represented.

Moreover, the vast majority of the email has nothing to do with Defendant's state of mind. The very first paragraph of the email highlights that: "I know this week and last has been CRAZY. Volumes are unexpected and obviously unpredictable. I want to first off thank you for all your hard work under extraordinary and incredibly difficult circumstances. We on the management side have done and continue to do whatever we can to alleviate provider burden and make it as easy as possible for everyone." *See* ECF 78, Ex. 9. The second paragraph that Defendant highlights in his motion similarly includes statements of purported fact unrelated to Defendant's state of mind: "We opened the doors to Gambrills in 2016. We saw more patients at all our combined sites this past week alone then we did in the entirety of 2018. Yesterday, not counting E-visits we saw almost 1,000 people (including E-visits we were well over 1400)." *Id.* Other examples abound: "Some of you are new grads and you are being inundated by a tidal wave of people-many of them sick and many angry and frustrated." *Id.* These do not reflect Defendant's state of mind.

Finally, as the Defendant noted in his motion, the Court provided an alternative to DX77—the Defendant could be asked about his motivations for billing level 4 office visits on the stand. Defendant's contention that this email provides "crucial corroboration of [Defendant's] testimony about his state of mind at the time" cannot be squared with the fact that Defendant decided to bill every COVID-19 testing patient for a level 4 office visit in early 2020, and this email is dated December 2021. The Court's ruling excluding this exhibit was correct, and Defendant's motion should be denied.

### b) DX60

Defendant's proposed exhibit 60 was properly excluded as irrelevant and inadmissible hearsay. ECF 78, Ex. 7. It describes a one-off circumstance in February 2021, almost a year after Defendant determined that every COVID-19 testing patient was to be billed for a level 4 office visit, in which a patient returned for a re-swab as a result of some undisclosed issue with the PCR swab.[6] That Defendant expressed concern about billing for a *second* Level 4 E/M visit for the same patient is not relevant to whether Defendant had intent to defraud with respect to billing for level 4 office visits in the first instance. There was no allegation that the scheme involved charging patients for a second Level 4 E/M visit when there was an issue with a previous swab.

The second portion of the email addresses another one-off situation in which a patient left the line and did not receive any test or services at all. This is not relevant to the scheme or Defendant's state of mind. The Government did not contend that Defendant was billing for patients who never came to get tested, or that patients who were billed did not receive tests and briefly see a provider. Instead, the Defendant was charged with billing for services that were not provided as represented—that is, patients who came for COVID-19 tests were seen briefly by providers, in a perfunctory manner, and billed for a level 4 office visit. The circumstance described in the Defendant's proposed exhibit 60 is irrelevant to the charges in this case.

Moreover, it contains hearsay statements, both by Defendant and others, that are not subject to an exception. For example, in the top email in the chain, Defendant says "as of now there is an EM code of 99204." ECF 78, Ex. 7. That is an out of court statement that is offered for the truth

---

[6] Claims data reflects that this patient had an encounter on January 25, 2021, at which she was charged for a COVID test and a level 4 office visit. This email relates to a *return* visit this patient made on January 28, 2021, to get re-swabbed. Thus, the e-mail is *not* relevant to the decision to bill every patient who came for a COVID-19 test for an additional level 4 office visit.

about what was included in the billing.  Lower in the chain, Defendant again is describing information purportedly contained in a chart.

The Court correctly excluded this proposed exhibit.

### c) DX66

Defendant's proposed exhibit 66 is dated March 13, 2021, addressing circumstances unrelated to billing COVID-19 testing patients for level 4 office visits.  ECF 78, Ex. 8.  Instead, the email addresses whether a provider was allowed to bill for infusion medication and critical care time when providing infusions.  This evidence is irrelevant to the charged criminal scheme. The defendant offered the email to bolster his character, suggesting that he did not commit fraud with respect to infusion billing.  But that is not an exception to hearsay—nor is it appropriate use of character evidence.  The Defendant is permitted to testify that when he saw issues with coding, he raised concerns about fraudulent billing, but he may not introduce self-serving hearsay not subject to any exception.

Moreover, the email contains self-serving hearsay offered by the defendant that is not subject to any exception.  For example, the email states: "I have spent a lot of time speaking to billers, coders, Connor, Erin, the state and the feds."  ECF 78, Ex. 8.  The Court properly excluded this document.

### d)     If the Court improperly excluded the evidence, then the error was harmless.

Even assuming, *arguendo*, that the Court improperly excluded Defendants proposed exhibits DX77, DX60, and DX66, the error was harmless.  As discussed above, the evidence presented at trial of Defendant's intent was substantial.  The exclusion of three emails, two of which occurred months after the coding decisions were made and the scheme was put into motion by Defendant, and none of which address the coding decisions at issue in this case, "did not affect

the verdict." *See Gordon*, 754 F. App'x at 177. Moreover, Defendant did introduce at trial emails that covered the same ground. For example, admitted exhibit DX51 covers much of the same ground as Defendant's proposed exhibit DX66, but in the context of the COVID-19 testing at issue in the case rather than with respect to infusions. *Compare* Exhibit 50 (Def. Trial Ex. 51) ("the MA can only pull template over AFTER you have made contact with the patient. . . Doing so beforehand generates too much a possibility of accidental fraudulent billing . . .") *with* ECF 78, Ex. 8 ("I know you are trying to help . . . . but lots of unintended consequences . . . By adding in the medication (the BAM), that is committing fraud[,] for example."). In addition, like Defendant's proposed exhibit DX60, DX51 addresses not billing for encounters that did not occur. *Compare* Exhibit 50 (Def. Trial Ex. 51) ("Doing so beforehand generates too much a possibility of accidental fraudulent billing and too much work on the back end to delete all the encounters that are filled out (and indistinguishable form ones that were actually seen/connected) but not real encounters.") *with* ECF 78, Ex. 7 ("Ok for Sweeney…Andre, delete that encounter please. Please keep a log of who you see to avoid things like this. Had you accidentally billed that chart it would be fraudulent billing.").

With respect to Defendant's proposed exhibit DX77, which Defendant asserted was intended to show that Defendant was "motivated to help patients, not to make money[,]" ECF 78 at 34, other admitted emails contain the same sentiment. *See, e.g.*, Exhibit 31 (Gov't Trial Ex. 607) ("Hope this finds everyone well. First off, GREAT work everyone. These are tough times and you guys are rocking it. I am in awe of you guys and the work everyone is doing-truly! We are the only game in town . . . truly TAKING CARE of people[.]"); Exhibit 41 (Gov't Trial Ex. 638) ("Our volumes continue to explode. Jimmy and Crystal yesterday s[aw] over 350 people. It was amazing."); *id*. ("Thank you all for your continued dedication and hard work. As always,

ANY questions, let me know.  Stay safe and thank you truly for all the hard work and dedication you bring every day!").

The exclusion of Defendant's proposed exhibits DX77, DX60, and DX66 "could not reasonably be said to have substantially swayed the jury's judgment," and therefore "is not harmful.'" *See Gordon*, 754 F. App'x at 177 (quoting *Cooper*, 103 F.3d at 370).  In light of the extensive evidence of intent, and the fact that other emails were admitted that included similar language in relevant context, the Court can conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."  *See Hanna*, 353 F. App'x at 809 (internal quotation marks omitted).  The Defendant testified for several hours over two days.  There is no reason to believe that these three emails would have impacted the jury's assessment of the defendant's mental state after hearing him testify.

### 2.    The Court Properly Admitted The Testimony Of A.H.

The Court properly permitted beneficiary witness A.H. to testify regarding her recollection of a phone call with an individual who she understood to be an agent of the Defendant.  Federal Rule of Evidence 801(d) provides that a statement is not hearsay if "offered against the opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"  Fed. R. Evid. 801(d)(2)(D).  Thus, an employee of Defendant's company, speaking on a matter within the scope of that employment, is admissible non-hearsay if offered against the Defendant.  *See United States v. Poulin*, 461 F. App'x 272, 282 (4th Cir. 2012) (citing *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982) ("This exclusion applies whenever an employee makes a statement 'about a matter within the scope of her employment,' even if she is not authorized to speak on the matter.").

First, the testimony about which Defendant objects was not given in the presence of the jury. *See* ECF 78 at 41 (citing 7/19/23 Tr. 119:11-120:21 (foundational testimony outside the presence of the jury)). Defendant objects to the statement "this is how we bill," which was testified to by A.H. during foundational testimony outside the presence of the jury. *See* Exhibit 3 (7/19/23 Tr.) at 119-120. Nevertheless, the government assumes Defendant intended to raise its objection to the testimony that was before the jury, in which A.H. stated:

> Q. [A.H.] when you spoke to this person on the phone, what did they tell you?
>
> A. They told me that that's just what we do.

*Id.* at 122. This testimony was properly admitted for the reasons stated by the Court on the record, and as discussed below. *See id.* at 121-122.

During A.H.'s testimony, she testified that in response to receiving a notice from Medicare about the services billed to Medciare for her COVID-19 test, A.H. called the number on the explanation for Drs ERgent Care that was listed on her explanation of benefits. A.H. testified that "[s]omeone answered the phone, and I explained who I was, gave them my name. I told them that I'd received a summary notice that showed that they had billed and been paid [for] services provided by Dr. Elfenbein, whom I had never met, had never seen, neither have I seen him nor anyone else at Drs ERgent Care, and that they have to have made a mistake." *Id.* at 115. A.H. testified about what the individual on the phone said in response, an objection was interposed and the Court excused the jury. *Id.* at 116-118. Outside the presence of the jury, additional questioning was conducted by government counsel to lay foundation for the testimony under Fed. R. Evidence 801(d)(2)(D). A.H. testified:

> Q. [A.H.], who did you call that day?
>
> A. I called the phone number on the explanation of Medicare benefits.

Q. Okay. And did you have an understanding of who you were speaking with when you had that phone call?

A. It was whoever answered the phone. I don't know who that was.

Q. Did --

A. They gave me a first name, but I don't remember it.

Q. Okay. Could you explain the substance -- do you believe that you actually were speaking to a person who was affiliated with the company that rendered you service when you went to get your COVID test?

A. Yes, because -- would you ask me the question again, please?

Q. Sure. Did anybody on the phone tell you that you had called the wrong number?

A. No.

Q. Did anybody tell you that you were not actually one of their patients?

A. No, they did not.

Q. Did whoever you spoke to actually confirm that you were a patient of theirs?

A. No, they did not.

Q. Okay. Well, then, why do you think -- why do you think you were talking to somebody about the bill you were disputing?

A. Because the phone number was on the Medicare explanation of benefits.

Q. Okay. And what did you -- what did that person ultimately tell you?

A. What they said was, that's just what we do, when I told them that they had billed me for services that were not furnished and that I had received the COVID test on the date of the first service for which they claimed I received.

Q. They said, this is how we bill?

A. This is how we bill, yes.

Q. Okay. And the bill you got was from Drs ERgent Care, at least according to the notice?

A. Well, the explanation of Medicare benefits said it was Drs ERgent Care who filed the claim and was paid on behalf of and spoke to an individual she understood to be an employee of that company.

Dr. Elfenbein.

Q. And they didn't say you called the wrong number?

A. They did not say I called the wrong number.

*Id.* at 119-121. Defense counsel opted not to ask any *voir dire* questions of the witness at that time. *Id.* at 121. The foundation provided by A.H. was sufficient to establish that the statement was made by an agent of the defendant for purposes of admissibility. A.H. testified that she called the number associated with Drs ERgent Care listed on the explanation of benefits and spoke to an individual who answered the phone. *Id.* at 119. She testified that the individual did not indicate that she had the wrong number, or otherwise indicate that she was not speaking with someone associated with Drs ERgent Care. *Id.* at 120. A.H. testified that the individual responded substantively to her inquiry, saying "[t]his is how we bill." *Id.* at 20-21. In addition, the explanation of benefits indicates that services were provided by Drs Ergent Care LLC, and the provider who purportedly provided the services was the Defendant. Exhibit 24 (Gov't Trial Ex. 414), Exhibit 25 (Gov't Trial Ex. 415). Defendant was an owner and the Medical Director of Drs ERgent Care at the time of the phone call. Exhibit 10 (8/1/23 Tr.) at 119-120 (Defendant testimony that he was owner and medical director of Drs ERgent Care), Exhibit 2 (7/18/23 Tr.) at 83 (ownership disclosure to Medicare of Drs ERgent Care did not change).

This evidence is sufficient to establish foundation for admission of the hearsay statement under Rule 801(d)(2)(D). The Fourth Circuit in *Portsmouth* affirmed evidentiary rulings under Rule 801(d)(2)(D) in similar circumstances. 694 F.2d at 321. In that case, the district court

permitted a witness to testify about statements made to him by an individual who answered a phone at the Defendant's office. The Fourth Circuit explained: "First, [the witness] testified that he 'called [the defendant's] office.' Not only does this testimony authenticate the occurrence of the telephone call in accordance with the standard illustrated by Rule 901(b)(6),[] but the testimony also supports the inference that the one who answered the telephone was [defendant's] agent. One would usually and properly assume upon the dialing of a business office phone number that the person who answers is employed by and has the authority to speak for the business." *Portsmouth Paving*, 694 F.2d at 322. Although Defendant contends that other evidence suggests the number listed on the explanation of benefits was a fax number, A.H.'s testimony that she called the number listed for Drs ERgent Care and received an answer supports the finding that she spoke with an agent of Drs ERgent Care.[7] Further, her testimony that the individual on the phone did not indicate a wrong number had been called, or that she was not a patient of the company, and instead that the individual substantively responded supports the finding.

The testimony of A.H. was properly admitted under Federal Rule of Evidence 801(d)(2)(D). Moreover, in light of the extensive evidence about the coding practices at Defendant's company, and specifically the practice of coding and billing patients who receive a COVID-19 test at Defendant's company for an additional level 4 office visit—the same code contained in A.H.'s summary notice—any error in admitting the evidence is harmless. *See United States v. Gordon*, 754 F. App'x 171, 177 (4th Cir. 2018) ("An error is harmless if it did not affect the verdict.").

---

[7] Fax machines use phone lines and can have telephone receivers.

**C.      The Court's *Voir Dire* Process Did Not Violate Defendant's Sixth Amendment Rights.**

The Court's *voir dire* process, which followed the Court's standard practice, satisfies constitutional scrutiny.   While the Defendant enjoys the right to a public trial under the Sixth Amendment, which includes *voir dire*, "[t]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting the disclosure of sensitive information."  *Presley v. Georgia*, 558 U.S. 209, 213 (2010).   Here, the Court's determination to exclude members of the public from the courtroom during the individual Q&A portion of juror *voir dire* does not warrant a new trial.

"[N]ot every public-trial violation will in fact lead to a fundamentally unfair trial."  *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017).  In *Weaver*, the Supreme Court addressed the question of whether exclusion of the public during *voir dire* warranted relief where counsel did not object to the public-trial violation, *Id.* at 301-302, and held that "[a]lthough the petitioner's mother and her minister were indeed excluded from the courtroom for two days during jury selection, petitioner's trial was not conducted in secret or in a remote place.   []   The closure was limited to the jury *voir dire*; the courtroom remained open during the evidentiary phase of the trial; the closure decision was apparently made by court officers rather than the judge, there were many members of the venire who did not become jurors but who did observe the proceedings; and there was a record made of the proceedings that does not indicate any basis for concern, other than the closure itself."  *Weaver*, 582 U.S. at 304.

The Fourth Circuit similarly has affirmed closure of the courtroom and *in camera voir dire* of potential jurors.  In *In re South Carolina Press Ass'n*, the Fourth Circuit explained:

> As we stated in *In re Greensboro News Co.*, 727 F.2d 1320, 1325 (4th Cir.1984): "A careful and exhaustive *voir dire* is crucial to ensure that these defendants will be tried by an impartial jury which will render its verdict on the basis of evidence adduced at trial rather

than information from the newspapers or television." In *Greensboro News*, we also concluded that a trial judge's *in camera voir dire* of potential jurors in a criminal prosecution so as to ensure frank and forthcoming responses was not an unusual practice, "nor viewed with suspicion." *Id*. at 1323.

*In re South Carolina Press Ass'n*, 946 F.2d 1037, 1041 (4th Cir. 1991); *see also Woodson v. Hutchinson*, 52 F. App'x 195, 198-99 (4th Cir. 2002) (rejecting ineffective assistance of counsel claim for failure to object to closure of courtroom during *voir dire*, and confirming space considerations may be proper basis for closure during jury selection process).

Here, the Court's closure of the courtroom during *voir dire* was consistent with those interests—the closure of the courtroom encouraged "frank and forthcoming responses" from the jurors about their personal information, education and employment history, as well as medical histories pertinent to the case. The interest in obtaining frank and honest answers to such inquiry warranted closure of the courtroom. *See id*.; *cf. Weaver*, 582 U.S. at 298 ("It would be unconvincing to deem a trial fundamentally unfair just because a judge omitted to announce factual findings before making an otherwise valid decision to order the courtroom temporarily closed."). The Court explained on the record that "[g]enerally speaking, we treat the individual *voir dire* as being the equivalent of our former practice of brining the prospective juror to the bench. So all on the record, but not public. Accordingly, my preference would be to exclude from the courtroom anyone who is not a direct participant in the trial." Exhibit 1 (7/17/23 Tr.) at 31. This practice protects the Defendant's rights by encouraging the jurors answer candidly to follow-up *voir dire* questions posed by the Court and the parties.

Moreover, as the Defendant concedes in his motion, counsel for the Defendant "agreed that it was acceptable." ECF 78 at 44 (citing 7/17/23 Tr. 33:5-9). Nor can Defendant contend that it did not have time to lodge an objection to the process. *See* ECF 78 at 44 ("The acquiescence by defense counsel, *after the Court had stated how it would proceed*, does not cure this structural

error."). This process was *proposed by the parties* in its Joint Proposed *Voir Dire* filing. ECF 35 at 1 (parties' jointly proposed prefatory *voir dire* instruction: "After I have asked all of my questions, you will leave the Courtroom and wait in the hallway and vestibule areas, just outside the Courtroom door. Then you will be brought back to the Courtroom, one-by-one, to meet with me and to review the answers that you have provided on your answer sheet. Once you are back in the Courtroom, only court staff, the parties, the lawyers, and I will be present. No one else will hear the answers that you provide."). The Court adopted the parties' proposed process, notifying the parties weeks in advance of trial that it would follow that process. ECF 43-1 (July 6, 2023 *Voir Dire* Questions Court Intends To Employ At Trial). Defendant's contention that the process he jointly proposed, and to which he did not raise any objection, should be rejected.

Defendant has not shown that the closure of the courtroom during *voir dire* warrants a new trial, and his motion should be denied.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny Defendant's Motion for Judgment of Acquittal or, in the Alternative for a New Trial, ECF 78, in its entirety.

Respectfully Submitted,

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

EREK L. BARRON
UNITED STATES ATTORNEY

/s/
Matthew P. Phelps
Assistant United States Attorney

D. Keith Clouser
U.S. Department of Justice

Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
david.clouser@usdoj.gov

COUNSEL FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 1, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By:     _/s/ Matthew Phelps_