**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No. JKB-22-0146 |
| RON ELFENBEIN, | |
| *Defendant.* | |

**DEFENDANT RON ELFENBEIN'S REPLY IN SUPPORT OF MOTION FOR**
**JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

September 22, 2023

Gregg L. Bernstein (Bar No. 01340)
Martin S. Himeles, Jr. (Bar No. 03430)
Samantha A. Miller (Bar No. 21374)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street - Suite 2440
Baltimore, MD 21202-1031
Tel. No: (410) 332-0444
Fax No: (410) 659-0436
gbernstein@zuckerman.com
mhimeles@zuckerman.com
samiller@zuckerman.com

*Counsel for Defendant Ron Elfenbein*

# **TABLE OF CONTENTS**

ARGUMENT ....................................................................................................................... 1

I.    The government does not, and cannot, supply missing evidence that level 4 was
      the wrong code. ......................................................................................................... 1

      A.    The jury was not permitted to convict based solely on the government's chosen
            interpretation of the CPT code definitions. .................................................... 2

      B.    Post-trial designation of fact witnesses as "hybrid" expert witnesses is neither
            permissible nor curative of deficiencies in the government's case. ............................ 4

      C.    Evidence of the length of the provider visits does not establish that level 4
            was the wrong code. .................................................................................. 10

      D.    The government's effort to collapse the elements of falsity and scienter is
            unavailing. ............................................................................................... 12

II.   The government's overstatement of the evidence underscores why the verdict was
      manifestly unjust. .................................................................................................... 13

      A.    Routine features of current medical practice are not evidence of fraud. ................... 13

      B.    The evidence did not establish that the medical records were wholly
            inaccurate. .............................................................................................. 15

III.  The Court improperly excluded three key emails, and the government's cramped
      view of relevance and misunderstanding of hearsay do not establish otherwise. ................ 18

IV.   The government itself suspected that A.H.'s memory was faulty, and the Court
      should not have allowed A.H.'s specious and damaging hearsay testimony. ..................... 23

CONCLUSION ................................................................................................................. 25

i

In its Opposition (the "Opp.") to Defendant's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial (the "Motion"), the government may have identified evidence that casts Dr. Elfenbein in an unflattering light, but it fails to meaningfully address the fundamental issue raised in Defendant's Motion: whether there was sufficient evidence for the jury to find beyond a reasonable doubt that CPT codes 99204 and 99214 (i.e., level 4) were wrong as applied to the claims at issue. Without mentioning the sole expert witness it called, whose testimony was riddled with errors and displayed a lack of familiarity with critical regulatory changes during the pandemic, the government now argues simultaneously: (1) that it did not need expert testimony to prove falsity because the code definitions that its expert did not understand were "written in English"; (2) that its fact witnesses can be retroactively recast as hybrid expert and fact witnesses, notwithstanding its sustained objection to the cross-examination of one of them as an expert on the ground that she was not testifying as such; and (3) that evidence of Dr. Elfenbein's intent suffices to prove falsity, a separate element. The incoherence of these positions reveals why the verdict cannot stand.

For the reasons explained in the Motion, and for the additional reasons explained herein, Dr. Elfenbein is entitled to a judgment of acquittal. At the very least, the Court should order a new trial.

## ARGUMENT

### I. The government does not, and cannot, supply missing evidence that level 4 was the wrong code.

As the Second Circuit once observed, "making a proper Medicare claim [is] a battle against the bewitchment of [one's] intelligence by means of bureaucracy." *United States v. Siddiqi*, 959 F.2d 1167, 1168 (2d Cir. 1992) ("*Siddiqi I*") (ordering a new trial where the case "revolve[d] around the code number '96500'" and "no one . . . seem[ed] to know exactly what '96500'

means"). Here, the government chose not to contend with the inherent complexities of healthcare reimbursement. Instead, it built a case premised on disregarding the relevant rules in favor of its own simpler construct, found nowhere in any rule or guidance. The government did not prove at trial, and cannot explain now, what it believes a level 4 office visit requires. All the government offers are the CPT Manual code definitions, severed from the accompanying guidance and from binding regulatory authority, and the assertion—unsupported by expert testimony—that the medical decision making in the provider visits at issue was something less than "moderate." The government thus utterly failed to prove that Dr. Elfenbein utilized the wrong code, regardless of his intent.

### A. The jury was not permitted to convict based solely on the government's chosen interpretation of the CPT code definitions.

The government contends that the code definitions, alone, were sufficient to establish the requirements of a level 4 visit. *See* Opp. at 5, 19. This is simply untrue. Every witness— government and defense—who testified about CPT coding agreed that code selection is informed, and sometimes modified, by multiple sources. *See, e.g.,* 7/18/23 Tr. 191:10–22 (testimony of Stephen Quindoza) ("Q. . . . determining the complexity of medical decision making, that's not just something that a coder or a provider determines based on the words . . . correct? A. Correct."); 7/24/23 Tr. 37:18–38:23 (testimony of Cathy Raymond) (providers had to contend not only with the CPT Manual to determine an appropriate code, but also with "the audit tools that Novitas [the Medicare Administrative Contractor for the region] had put out").

Words like "moderate," and phrases like "undiagnosed new problem of uncertain prognosis," are plainly subject to multiple interpretations. The prosecution (and apparently the jury) did not approve of Dr. Elfenbein's interpretations, which were supported by other evidence

introduced at trial.[1] But when criminal liability attaches to the meaning of these words and phrases, the government must do more than assert that Dr. Elfenbein's interpretation failed a "smell test" of government lawyers' own design. *See Siddiqi I*, 959 F.2d at 1174 (the government cannot "ambush a defendant" with the "ambiguity" of healthcare billing codes); *cf. United States v. Krizek*, 859 F. Supp. 5, 10 (D.D.C. 1994), *supplemented*, 909 F. Supp. 32 (D.D.C. 1995), *aff'd in part and remanded*, 111 F.3d 934 (D.C. Cir. 1997) (declining to impose False Claims Act liability based on "a strained interpretation of the CPT codes," and observing that providers "should be given clear guidance as to what services are reimbursable"). This is especially true where uncontradicted expert testimony established that Dr. Elfenbein's interpretation was consistent with the applicable coding guidance. *See* 7/31/23 Tr. 173:11–174:6, 174:22–175:6 (testimony of Michael Miscoe). The government cannot ignore—or disclaim responsibility for refuting—guidance and regulatory authority it does not like merely because "the code is written in English." Opp. at 5.

Under the government's theory, the code definitions should be read in isolation and construed based on the government's own view of what reimbursement rules make sense. The

---

[1] Importantly, not a single witness testified that COVID-19 was *not* an undiagnosed new problem of uncertain prognosis. *See, e.g*., 7/25/23 Tr. 171:21–23 (Courtney Sinagra: COVID exposure "could be" considered "an undiagnosed problem of uncertain prognosis"). The government argues without evidence that the CPT codebook's example of an undiagnosed new problem of uncertain prognosis—a lump in the breast—proves that suspected COVID-19 does not qualify. *See* Opp. at 6, 14; *see also* 8/3/23 Tr. 17:17–21 (government's closing argument) ("Common sense says that a healthy, asymptomatic, vaccinated patient is not the same as a patient who comes to their doctor with a lump in the breast."). The uncontradicted expert opinion of Michael Miscoe, however, established otherwise. *See* 8/1/23 Tr. 69:7–12 ("Q. . . . As a coder, is a -- do you view a lump in a breast as comparable to an undiagnosed COVID patient? A. Well, it is. It's an undiagnosed new problem that you don't know what's going to happen with it, in terms of the risk of compromise of health or bodily function, without treatment."), 70:21–71:2 ("Q. Do many lumps in the breast turn out to be benign? A. In my analysis of medical charts over the years, in many cases they do. Q. And do COVID diagnoses, or in cases of suspected exposure, do many of those people turn out either not to get sick or to be mildly ill? A. Some do. Some don't.").

government's theory excludes controlling regulations and guidance that mandate the use of different rules that, in the government's view, make no sense. There is ample room to criticize the arcane rules and guidance established by the CPT editorial panel as overly complex, and the resulting reimbursement of providers as lacking common sense. Likewise, one might criticize the increased reimbursement of providers caused by CMS's relaxation of those rules during the pandemic. But criticizing Dr. Elfenbein for using CPT codes because they are inconsistent with common sense is no substitute for offering evidence proving that the codes did not meet the governing requirements. This the government failed to prove.

### B. Post-trial designation of fact witnesses as "hybrid" expert witnesses is neither permissible nor curative of deficiencies in the government's case.

The government failed to present any expert testimony that the services provided to patients at Doctors Ergent Care ("DEC") did not meet the requirements of a level 4 visit. Indeed, even for the counts in the superseding indictment, no expert witness testified that the services provided fell short of level 4 requirements. Recognizing this gaping hole in its case, the government now attempts to recast several fact witnesses as "hybrid expert and fact" witnesses so that it can contend that their testimony provided the missing proof that level 4 was the wrong code. Opp. at 9 (identifying Cathy Raymond, Courtney Sinagra, Steven Carroll, and Suzana Silva as "hybrid" witnesses). Even if such ex post facto expert designations were allowed (they are not), none of the "hybrid" witnesses established that level 4 was incorrect.

"[I]ndividuals who testify as expert and fact witnesses can cause jury confusion, and such a manner of proceeding is only 'acceptable where the district court t[akes] adequate steps . . . to make certain that [the witness's] dual role did not prejudice or confuse the jury.'" *United States v. Garcia*, 752 F.3d 382, 392 (4th Cir. 2014) (quoting *United States v. Baptiste,* 596 F.3d 214, 224 (4th Cir. 2010)) (internal quotation marks omitted).

> Such safeguards might include requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question.

*Id.* (further citations omitted). No such safeguards were implemented during the testimony of Ms. Sinagra or Ms. Raymond.

The government cites a civil case, *Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*, Civil No. JKB-17-00252, 2019 WL 2359441, at *1 (D. Md. June 4, 2019), for the proposition that hybrid witnesses need not be "designated as experts." Opp. at 9. That may be so, but even in a civil case, a party offering the testimony of a hybrid witness must say so in a written disclosure stating "'(i) the subject matter on which the witness is expected to present [expert testimony] evidence . . . and (ii) a summary of the facts and opinions to which the witness is expected to testify.'" *Adell Plastics*, 2019 WL 2359441, at *1 (quoting Fed. R. Civ. P. 26(a)(2)(C)) (alterations in original); *see also* Local Rule 104.10. Failure to make such disclosures "typically will result in mandatory exclusion." *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 253 (4th Cir. 2022).

With respect to Ms. Sinagra, the government's claim *now* that the jury was entitled to rely on her CPT coding expertise is breathtaking. *See* Opp. at 10. At trial, the government explicitly stated that Ms. Sinagra was not an expert witness, and successfully objected to any cross-examination on the applicable coding guidance:

> **MR. PHELPS:** Objection to the hypothetical.
>
> **THE COURT:** Basis?
>
> **MR. PHELPS:** Beyond the scope. *This witness is not being offered as an expert*. She's talking about what CareFirst did and he's offering a hypothetical.
>
> [. . .]

**THE COURT:** Nobody qualified her as an expert.

**MR. HIMELES:** Your Honor, she has testified as to the conclusions that CareFirst reached. Those are opinions, and she's testified that she oversaw these. If I'm not permitted to cross-examine her on the conclusions that CareFirst reached and the suggestion, which was very clear, that this was a lie on this document, then -- clearly I have to be permitted to examine her about that. And I will establish through the ICD-10 guidelines that this constitutes exposure.

**THE COURT:** Mr. Phelps?

**MR. PHELPS:** Your Honor, *this witness is not being offered for kind of an all-purpose sounding board on all policies and procedures and codes and guidance and press releases that were issued during the pandemic*. She testified about what CareFirst did. I didn't ask her a single question about a diagnosis code.

[. . .]

**THE COURT:** I agree with Mr. Phelps. . . Mr. Himeles, if you choose to present a defense, I'll look forward to hearing your witness testify about these very points, or *perhaps you'll want to recall this witness and put her into a different role than she's been cast in so far by the Government*. But it's too far now. Sustained.

7/25/23 Tr. 77:14–79:2 (emphasis added).[2]

By carefully circumscribing Ms. Sinagra's role, the government insulated her from cross-examination on any "expert opinions." In light of the government's position, the Court did not erect any safeguards to prevent confusion over Ms. Sinagra's supposed hybrid testimony. The

---

[2] In a single email sent prior to expert disclosures, the government described Stephen Quindoza, Michael Petron ("or another testifying expert from Stout Risius Ross, LLC"), and Courtney Sinagra as "expert/Hybrid/summary witnesses." *See* Ex. 1 (Nov. 4, 2022 email from government). To defense counsel's knowledge, this was the government's only use of the word "hybrid" in relation to any of its witnesses. In the government's December 9, 2022 formal expert disclosure, which supplanted its earlier email, it abandoned any plan to designate any of its witnesses as "hybrid." *See* Ex. 2 (United States' Disclosure of Anticipated Expert Witnesses and Additional Evidence (Dec. 9, 2022)). Mr. Quindoza was disclosed as the government's only expert witness, *id*. at 1–8; Mr. Petron (later replaced by Marylee Robinson) and Ms. Sinagra were explicitly described as "not expert witnesses," *id*. at 8. Neither was described as a "hybrid" witness. *Id*. If there were any doubt, the government conclusively abandoned any claim that Ms. Sinagra was a "hybrid" at trial.

6

government did not lay a foundation for Ms. Sinagra's "expertise," nor was the defense permitted to question any such expertise. *See Garcia*, 752 F.3d at 392. An expert is required to "'reliably appl[y] the principles and methods' for which she was qualified as an expert." *Id.* at 393 (quoting Fed. R. Evid. 702). "The Rule contemplates that an expert's opinion testimony will be helpful to the jury, not merely helpful to the prosecutor as transmutations of simple fact testimony." *Id.* (internal quotation marks omitted). It is clear, then, that Ms. Sinagra's testimony was only offered to describe "what CareFirst did" in its audits, and the jury was not permitted to rely on her untested coding "expertise." To the extent the jury did, as the government now claims, this casts additional doubt on the integrity of the verdict.

In any event, none of the witnesses the government seeks to recast as quasi-experts established that level 4 was the wrong code. Ms. Sinagra testified that "auditors don't necessarily make the same findings as to specific claims," 7/25/23 Tr. 149:23–150:3; that, due to transmission errors that riddled the first CareFirst audit, she did not know whether the complete records supported level 4, *id.* at 127:21–128:11; and that COVID exposure could be considered "an undiagnosed problem of uncertain prognosis," *id.* at 171:21–23. Ms. Raymond, whose testimony was limited to the period before October 2020, when she left DEC, at no point testified that providers were *not* making moderately-complex decisions, and she was "okay" with billing COVID-related visits at level 4 and 5 "[i]f I had the documentation to support it in the history and the exam." 7/24/23 Tr. 45:16–18; *see also* GX 602 (Mot. Ex., ECF No. 78-17).

Moreover, the government's reliance on Ms. Sinagra and Ms. Raymond to prove that level 4 was the wrong code reveals a central tension in its case. The government insists that DEC's medical records are inaccurate. Opp. at 7; *see also infra* Part II.B. Evidence of "what *actually occurred* during these patient encounters," the government claims, is what proves Dr. Elfenbein's

guilt. Opp. at 3 (emphasis added). But neither Ms. Sinagra nor Ms. Raymond knew what "actually occurred" during patient encounters. Ms. Raymond testified that she did not take part in patient encounters at DEC and made her coding decisions solely based on what was in the medical records. 7/24/23 Tr. 78:9–22, 88:14–19, 94:25–95:6. The same was true of Ms. Sinagra. *See* 7/25/23 Tr. 28:8–19, 127:21–128:11. Yet it is their testimony, based on their review of the medical records, on which the government relies to argue that the level 4 claims were false. *See* Opp. at 9–10.

As for Mr. Carroll and Ms. Silva, both testified for the defense as fact witnesses, not "hybrids." Unlike Ms. Raymond and Ms. Sinagra, they were providers at DEC who testified about the codes they selected to represent the encounters they had with patients. Neither had the knowledge or experience required to testify as an expert or was qualified as one—and their testimony offered no support for the government's contention that the visits were not level 4. Ms. Silva testified that, during the relevant period, she "usually" selected level 4, 8/1/23 Tr. 106:14–21, because she believed it was appropriate. *Id.* at 107:4–7. The government misleadingly suggests in its Opposition that Ms. Silva always coded in-person visits at the FedEx location at level 3. Opp. at 11. In reality, when asked about the FedEx location, Ms. Silva testified that she "rarely" used level 3, but that she "might" have coded "extremely straightforward" visits "[a]t any location" as level 3. *Id.* at 109:22–110:5.[3]

---

[3] It is curious that the government wishes to elevate Ms. Silva's testimony on this point to the status of expertise, given her testimony that very straightforward visits were rare and the government's position that use of the word "straightforward" in relation to a patient encounter automatically requires that visit to be coded at level 2, which contradicts Ms. Silva's testimony that she coded these "straightforward" visits at Level 3. *See, e.g.*, 7/27/23 Tr. 114:15–20 (government opposition to Rule 29 motion) ("And the use of the term straightforward [in Dr. Elfenbein's email] is interesting, Your Honor, because it's exactly what appears in level 2. And go figure, Dr. Elfenbein tells his providers that these are all simple and straightforward and speed is key."); 8/3/23 Tr. 16:6–12 (government closing argument) ("Let's take a look at another code, level 2, 99202, straightforward medical decision making. Where have you heard that word before? From the defendant. . . . 'Straightforward' appears in his instructions and in the level 2 code.").

The government similarly misconstrues the testimony of Mr. Carroll, who testified that he coded his patient encounters at level 4 because he believed, "at that time," that level 4 was justified. 7/31/23 Tr. 22:12–5; 23:4–7. The "time," of course, was "during the COVID surges. During the COVID pandemic." *Id*. at 45:22–23. The government excerpts a portion of Mr. Carroll's cross examination, in which he admitted that he no longer agreed with the level 4 coding of one visit. *See* Opp. at 10–11; 7/31/23 Tr. 43:15–25 ("Q. This visit should not have been a level 4. A. No."). The government neglects to include the *very next exchange*:

> Q. And you coded it that way because the defendant told you to, right?
>
> A. At that time I thought it was the appropriate coding.
>
> Q. At the time you thought it was appropriate coding?
>
> A. Correct.

*Id*. at 44:3–7. Mr. Carroll's contemporaneous understanding that the correct code was level 4 was supported by his review of the AMA's September 2021 coding guidelines. *Id*. at 22:19–23:7.

The government's after-the-fact attempt to convert fact witnesses into experts is reminiscent of the problems that proved fatal to the defendant's conviction in *Siddiqi v. United States*, 98 F.3d 1427 (2d Cir. 1996) (*Siddiqi II*). Siddiqi, an oncologist, was convicted for submitting claims for code 96500, chemotherapy injection "administered by qualified assistant under supervision of physician or by physician," *id.* at 1429, for injections while he was out of the country. The government revised its theory of prosecution three times—including in one instance after it became clear that its understanding of the code requirements was incorrect, *see Siddiqi I*, 959 F.2d at 1171, and later, in post-conviction proceedings, when it was forced to acknowledge that the evidence did not support its final theory at trial, *see Siddiqi II*, 98 F.3d at 1436. The Second Circuit vacated the conviction after finding no evidentiary support for the government's new post-trial theory, which relied on its interpretation of the term "supervision" in the code definition,

because the term was undefined and the government's expert offered no opinion concerning its meaning. *Id*. at 1439.

Similarly, here, the government began its case with its only expert witness, Stephen Quindoza, whose testimony on direct examination concerning the requirements of codes 99204 and 99214 was offered to explain the rules against which DEC's codes must be judged. When Mr. Quindoza retracted most of his testimony concerning the requirements for a level 4 E/M visit on cross-examination, the government had no choice but to abandon its reliance on his testimony, so it adopted the new "common sense" theory it sold to the jury. Now, confronted with the absence of any support for its homegrown interpretation of the level 4 code definitions, which are inconsistent with the CPT editorial panel's guidance and with CMS's own regulations, the government offers a new theory: the Court need only treat the testimony of fact witnesses as if they were experts, or close enough to fill the void in the government's evidence. This bait and switch is neither procedurally permissible nor supported by the evidence. The government's new theory, grounded in its revisionist history of the trial, cannot salvage the verdict.

### C. Evidence of the length of the provider visits does not establish that level 4 was the wrong code.

Yet again, the government argues that the length of a patient encounter is a proxy for the complexity of the provider's medical decision making. Opp. at 4–5, 13–14. The government takes this position despite having *no evidence to support it*. In fact, the evidence at trial conclusively established precisely the opposite. The government's own expert was forced to admit that, when coding based on medical decision making, time is not a factor. 7/18/23 Tr. 205:6–25 (testimony of Stephen Quindoza); DX 3 at 7, 11; DX 4 at 14; DX 218 at 41 (Mot. Exs., ECF Nos. 78-3, 78-4, 78-10). It is true that three patients testified that their provider visits were brief. It is also true that,

on very busy days, providers sometimes saw high volumes of patients. This evidence, however, simply does not establish that level 4 was the wrong code.

The visits at issue may have been shorter in duration than the government would have liked, but prosecutors do not get to establish minimum times for patient encounters when none exist. This is especially true when judging, with hindsight, patient encounters that occurred during a global pandemic. Dr. Hugh Hill, the only medical expert to testify at trial, explained that while he "wouldn't want to," he has treated patients in 20 seconds. 7/31/23 Tr. 114:25–115:4.[4] Suzana Silva, who treated a high volume of patients during the Omicron COVID surge, testified that "whoever needed extra time got extra time." 8/1/23 Tr. 105:6–9. Deborah Needle, who testified for the government, explained that treating patients for COVID-related concerns was "chaos," but that "we were trying to see patients and save lives." 7/24/23 Tr. 133:23–134:17, 138:11. She examined each patient, reviewed with them their histories and chief complaints, and made "professional medical judgments about what [she was] observing and what kind of treatment is necessary," including, among other things, "whether the patient, for example, might need to go to the hospital or seek some other medical care," and "whether they need medication." *Id.* at Tr. 190:11–191:6, 192:20–24.

It simply not the case, as the government claims, that "no [medical decision making] cognitive labor was expended by the providers" at DEC. *See* Opp. at 14. Every provider that

---

[4] The government makes much of Dr. Hill's surprise at the volume of patients seen at DEC. Opp. at 4–5. But it is undisputed that these patient encounters *did* occur. *See* Opp. at 30 ("The Government did not contend that Defendant was billing for patients who never came to get tested, or that patients who were billed did not receive tests and briefly see a provider."). Dr. Hill did not testify as an expert in CPT coding, and he expressed no opinion concerning the code applicable to any visit. His testimony that seeing 150 patients in a day "seems like [] an excessive burden," 7/31/23 Tr. 106:13, said nothing about the applicable CPT code and certainly did not establish that the visits were not level 4.

testified, including the government's own provider witnesses, proved otherwise, testifying about the types of medical decisions they made during COVID-related visits. 7/24/23 Tr. 190:11–191:11 (testimony of Deborah Needle); 7/26/23 Tr. 17:25–19:12, 23:12–18 (testimony of Kathleen Wrona); *see also* 7/31/23 Tr. 13:7–17:9 (testimony of Steven Carroll); 8/1/23 Tr. 98:5–101:17 (testimony of Suzana Silva).[5]

Similarly, DEC providers' use of templates to document their encounters, *see* Opp. at 14, proves nothing. It is undisputed that template use is commonplace in the medical field. *See infra* Part II.A. And there is no evidence whatsoever that Dr. Elfenbein instructed providers to sign and bill charts that inaccurately reflected their interactions with patients. *See, e.g.*, Opp. Ex. 36 (GX 626) (Dr. Elfenbein instructing providers to "DO THE THINGS you are documenting").

The government contends that providers did not spend enough time with patients to appropriately code those encounters at level 4. But the government judges the length of those visits against a standard that it cannot explain and, indeed, that does not exist.

### D.     The government's effort to collapse the elements of falsity and scienter is unavailing.

The government's contention that "evidence of the defendant's intent is relevant to falsity," Opp. at 12, is flatly wrong. Falsity and scienter are independent elements of health care fraud, both of which must be proved in order to convict. *See* Jury Instruction No. 38 (ECF No. 64); *see United States v. Jones*, 471 F.3d 478, 481–82 (3d Cir. 2006) (setting aside 18 U.S.C. § 1347 conviction because "[t]he Government has not established, nor did it seek to establish, any type of

---

[5] The government's reliance on the number of patients seen on the busiest days is simply a variation of its argument that the duration of a visit dictates its level, contrary to the evidence. The government contends that providers could not have met level 4 requirements if they saw 150 patients during their shifts, which lasted 14 hours on busy days. *See* 7/31/23 Tr. 16:14–22 (testimony of Steven Carroll); *id*. at 53:16–25 (testimony of SharRon Davis). While volumes were high, there was no evidence that they precluded meaningful interaction between providers and patients, and indeed, the providers' uniform testimony proved otherwise.

misrepresentation by Jones in connection with the delivery of, or payment for, health care benefits, items, or services"); *United States v. Memar*, 906 F.3d 652, 656 (7th Cir. 2018) (upholding health care fraud conviction because, in part, "[t]he government presented substantial proof to demonstrate the falsity of [the precancerous] diagnoses" upon which the claims for reimbursement were based); *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007) ("[I]n a health care fraud case, the defendant must be shown to have known that the claims submitted were, *in fact*, false." (emphasis added)). If the claims at issue met the requirements for level 4, the claims were not false, and there was no crime. As to falsity, Dr. Elfenbein's intent is irrelevant. An individual cannot be guilty of speeding—even if he intends to speed—unless he exceeds the speed limit, nor can he be guilty of making a false statement if he made an accurate statement but believed it was false. Here, the government did not establish the rules of the road, let alone provide evidence that Dr. Elfenbein failed to abide by them. Because the government did not prove that level 4 was the wrong code, it failed to prove the essential element of falsity. Consequently, Dr. Elfenbein is entitled to a judgment of acquittal.

## II.    The government's overstatement of the evidence underscores why the verdict was manifestly unjust.

### A.    Routine features of current medical practice are not evidence of fraud.

Time and time again, despite all evidence to the contrary, the government has tried to twist routine aspects of medical practice into evidence that Dr. Elfenbein committed a crime. The government urged the jury to find that Dr. Elfenbein committed fraud, and now urges the Court to find the evidence sufficient to support the verdict, because: (1) Dr. Elfenbein informed providers that E/M coding was important to the financial success of DEC, Opp. at 18–19; and (2) he asked DEC providers to use templates to document their encounters with patients, *id*. at 7–9, 14, 17–18. The government's reliance on this "evidence" of fraud reveals the fundamental weakness of its

case. *See United States v. Rafiekian*, 68 F.4th 177, 191 (4th Cir. 2023) (affirming trial judge's grant of a new trial where the government urged an inference that was not supported by the evidence).

At trial, the government made much of two emails written by Dr. Elfenbein in which he described E/M coding as the "bread and butter' of billing." *See* Opp. Ex. 37 (GX 628); *see also* Opp. Ex. 36 (GX 626).[6] In closing argument, the government told the jury that Dr. Elfenbein's use of the phrase "bread and butter" was a "tell" that supposedly revealed that Dr. Elfenbein "just wanted the money." 8/3/23 Tr. 37:17–38:11. But describing E/M coding as the "bread and butter" of medical billing is anything but nefarious—it is an accurate statement of how healthcare is paid for in this country. Not a single government witness testified otherwise. *See, e.g.*, 7/24/23 Tr. 175:8–11 (testimony of Deborah Needle) ("Q. I mean, the charting, the coding, the submission of the bills, that's the bread and butter of your practice, of how you get reimbursed for your work, correct? A. Correct."); *id.* at 37:4–17 (testimony of Cathy Raymond) (agreeing that "there's nothing unusual" about "trying to find the best code" that was "[c]ompliant with the service that was performed in order to maximize the reimbursement"); 7/18/23 Tr. 156:23–157:3 (testimony of Stephen Quindoza) ("Q. . . . Is it fair to say that E/M coding is the bread and butter of billing for payment for physician services? A. Bread and butter? Represents a bulk of what they bill for . . . typically.").

The government also repeatedly emphasized that DEC providers used templates to document their patient encounters, arguing that similar language appearing on patient charts was evidence of fraud. *See, e.g.*, Opp. at 7–9. Templates, however, are ubiquitous in the medical field. Numerous witnesses—both government and defense—testified that templates were common and,

---

[6] The government introduced a third email, Opp. Ex. 40 (GX 635), which was sent to a smaller group of providers but was substantively identical to GX 626.

indeed, can be helpful to providers. *See*, *e.g.*, 7/24/23 Tr. 30:20–22 (testimony of Cathy Raymond); 7/25/23 Tr. 180:8–10 (testimony of Courtney Sinagra); 7/31/23 Tr. 19:14–16 (testimony of Steven Carroll). It is true that Dr. Elfenbein created templates for his providers to use. Ms. Raymond created templates for providers as well. *See* 7/24/23 Tr. 29:23–31:9; DX 338. Ms. Silva, a provider, created her own templates. 8/1/23 Tr. 102:24–103:8 ("I would make separate templates for common complaints, such as strep throat or an ear infection, and use those to make my documentation faster."). It is simply not the case that template use—a common feature of modern healthcare—is indicative of fraud.[7]

### B. The evidence did not establish that the medical records were wholly inaccurate.

Contrary to the government's assertions, *see* Opp. at 7–9, the evidence at trial did *not* prove that all DEC medical records during the relevant period were unreliable. In a case involving tens of thousands of claims that were allegedly part of a "scheme," the government called only two medical providers and four patients to the stand. Not a single provider testified to routinely signing and billing medical charts containing inaccurate information.[8] *See, e.g.*, 8/1/23 Tr. 105:16–20 (testimony of Suzana Silva) (Q. Are you aware of any mistakes occurring in the documentation of patient encounters? A. There were occasionally mistakes. Q. To your knowledge, were those

---

[7] Indeed, templates not only permit more efficient documentation, but they serve the additional important function of providing providers a checklist consistent with the standard of care for diagnosis and treatment of common illnesses and conditions. *See* 7/31/23 Tr. 95:3–7 (Dr. Hill: using templates "enables you to be efficient and be confident that you're not missing something, that you're doing good care and taking care of patient safety"); *id*. at 19:20–25 (S. Carroll: "The template brings some information over, helps as a checklist to work through that patient, and then kind of adapts."); 7/26/23 Tr. 33:19–21 (K. Wrona: agreeing that a purpose of templates "was to give you a checklist of things to make sure that you covered everything").

[8] Ms. Wrona admitted to mistakes with respect to the documentation of one patient encounter. *See* 7/25/23 Tr. 203:24–206:5.

mistakes common? A. I would not call them common."). And while the government pointed out inconsistences between a handful of medical records cherry-picked from the more than 50,000 records, *see* GX 138, and the patients' admittedly limited recollections of their visits, the government made no effort to prove that such inconsistencies occurred as a matter of course.[9] Instead, it points to templated language, arguing without evidence that the presence of similar language across charts *ipso facto* means that the charts are wrong, contrary to the uniform testimony concerning the common use of templates. *See supra*, pp. 14–15. Furthermore, the government's dismissiveness of templates cannot explain its failure to examine DEC's paper charts, which providers completed by hand and contained no prepopulated fields. *See* 7/20/23 Tr. 104:1–3 (testimony of Cathy Raymond) ("Q. Okay. And what kind of information goes onto a T-Sheet? A. A T-Sheet functions as the patient's medical legal record. . . . Q. At this time were Drs ERgent Care providers using T-Sheets for encounters? A. Yes, we were."); *see also* GX 658 (Opp. Ex. 48) (Dr. Elfenbein to provider: "[I]f you wanna continue using paper that's fine, just transcribe the information into the electric [*sic*] chart.").

The government needs to convince the Court that the medical records have no evidentiary value in order to justify its failure to examine them in any meaningful way. Indeed, the extent to which the government cut corners here is laid bare by comparison of this case to *United States v. Janati*, 237 F. App'x 843 (4th Cir. 2007) ("*Janati II*"), a case the government cites as "similar" to this one, *see* Opp. at 25. In *Janati*, the government alleged that the defendants fraudulently coded patient visits at CPT level 5. To prove it, the government engaged an "expert on medical billing

---

[9] That numerous medical charts indicate exposure to COVID-19 despite the patient's failure to note a specific exposure is not evidence of widespread errors in the chart. Rather, it is a reflection of CMS's pandemic-era guidance to treat all patients tested for COVID as suspected of exposure to COVID. 7/31/23 Tr. 175:11–21; *see also* DX 221, pp. 6–7 (Mot. Ex., ECF No. 78-13).

codes" who "examined 471 office visits, including the visits which were the subject of the indictment." *Janati II*, 237 F. App'x at 845. In pretrial proceedings, which resulted in an interlocutory appeal, *see United States v. Janati*, 374 F.3d 263 (4th Cir. 2004) ("*Janati I*"), the government represented that it examined "approximately 1600 patient files" for evidence of fraudulent billing, *id*. at 267. It sought to present at trial expert opinion testimony about 1300 of those claims:

> [T]o prove that the Janatis upcoded office visit claims, a medical coding expert, Debra Pacha, has reviewed the documentation contained in hundreds of patient medical files to determine whether such documentation supports the Janatis' billings under CPT code 99215, the most expensive office visit code. Based on this review, Ms. Pacha will testify that the medical documentation does not support the Janatis' bills.

*Id*. at 271–72. As the Fourth Circuit put it, "[m]uch of the government's proof will depend on the testimony of experts who have compared the medical records for patients . . . with the patients' billing records and who intend to give their opinions that the billing records overstate the work performed." *Id*. at 267. Later, in affirming the conviction, the Fourth Circuit noted that "the Janatis correctly pointed out that selecting the proper billing code for a given visit required some judgment." *Janati II*, 237 F. App'x at 845. This was neutralized, however, by testimony of the government's expert, based on her review of the medical records, that "the visits that she examined were '[n]ot even close' to being properly classified at the Code 99215 level." *Id*.[10]

---

[10] Furthermore, in *Janati*, the government presented evidence that the defendants "eliminate[d] even the option of billing at a level lower than Code 99214." *Janati II*, 237 F. App'x at 847. Here, by contrast, the evidence demonstrated that providers could bill at a lower level if they wished. *See, e.g.*, 7/31/23 Tr. 35:11–22 (testimony of Steven Carroll); 7/24/23 Tr. 151:2–4 (testimony of Deborah Needle) (when she expressed "concern[] about coding," Dr. Elfenbein told her "to do what [she] felt was appropriate"); 8/1/23 Tr. 108:3–19 (testimony of Suzana Silva) (she did not "feel any pressure at First[] Call to code at a particular level").

By contrast, the government in this case offered <u>zero</u> expert testimony about the appropriateness of the coding of any particular claim. The only expert to offer an opinion about any of the claims at issue was the defense expert, Michael Miscoe, who reviewed the five visits that were the subject of indictment counts and a number of others that were part of the CareFirst audit. Mr. Miscoe's uncontradicted expert opinion was that the charts he reviewed supported the level 4 codes. 7/31/23 Tr. 200:18–25; 8/1/23 Tr. 3:19–7:18, 14:5–15.[11]

### III. The Court improperly excluded three key emails, and the government's cramped view of relevance and misunderstanding of hearsay do not establish otherwise.

The government argues that the Court correctly excluded three emails, DX 77, DX 60, and DX 66, because they are irrelevant and are not evidence of Dr. Elfenbein's state of mind. Its argument consists mostly of plucking isolated statements from the emails that the government contends are character evidence or statements offered for their truth, without regard to the statements throughout the emails that are clear evidence of state of mind. *See* Opp. at 29 ("the vast majority of [DX 77 (Mot. Ex., ECF No. 78-9), offered as evidence of motive] has nothing to do with Defendant's state of mind."); *id.* at 30 (DX 60 (Mot. Ex. ECF No. 78-7), offered as evidence of lack of intent to defraud, "contains hearsay statements, both by Defendant and others that are not subject to an exception"). The government's suggestion of other hypothetical impermissible purposes does not defeat the *permissible* purposes for which the defense actually offered the

---

[11] In closing argument, the government took cheap shots at the fact that Mr. Miscoe was a "paid" expert. *See, e.g.*, 8/3/23 Tr. 86:20–23, 88:5–7, 90:17–23, 91:20–22, 92:15–17. In its Opposition, the government again suggests that Mr. Miscoe's testimony is somehow untrustworthy because he was retained. Of course, the government paid for the services of an expert *in this very case*, and also paid handsomely for the services of a summary witness. *See* 7/27/23 Tr. 7:14–17 (testimony of Marylee Robinson) ("Q. How much has Stout been paid in connection with this case? A. As of June 30th, we had been paid about -- almost $63,000."). The jury was free to consider, in evaluating the credibility of these experts, the fact that they were paid for their services, but the government's one-way criticism of payment of retained experts is especially meritless given its failure to offer *any* expert testimony concerning the claims at issue.

emails. *See Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 567 (D. Md. 2007) ("Because evidence may be offered for more than one purpose, it may be relevant for its substantive truth, and potentially hearsay, *or relevant for some other purpose, and non-hearsay*.") (emphasis added). That the emails contained statements that could *also* be construed as hearsay or character evidence, as argued by the government, does not render them inadmissible. *See United States v. Safavian*, 435 F. Supp. 2d 36, 45 (D.D.C. 2006) (admitting emails as "as non-hearsay on the theory that they go to the defendant's intent, motive, or state of mind," while also noting that "the contents of those e-mails and the truth of their contents . . . cannot be proven through these e-mails").

Nor are emails offered for a permissible purpose rendered irrelevant because they are exculpatory—a position the government espouses when it casts every email offered by the defense as "self-serving." Opp. at 28, 31. The government's evidentiary construct would lead to a fundamentally unfair tilting of the scales in its favor by permitting it to base its case in large part on certain of Dr. Elfenbein's emails that it contends establish intent to defraud while excluding "self-serving" emails from the same period because they show lack of intent to defraud.[12]

The excluded emails were relevant to Dr. Elfenbein's state of mind and were offered for that purpose. The government dismisses DX 77 as a "motivational speech," Opp. at 28, but this "motivational speech" was direct evidence of Dr. Elfenbein's motive. The government's own interpretation of the email as only addressing Dr. Elfenbein's motivation for establishing "mass testing sites" rather than his motivation for billing patients for level 4 office visits, Opp. at 28–29,

---

[12] The government misleadingly repurposes references to "self-serving" hearsay statements in two decisions finding inadmissible exculpatory portions of post-arrest recorded statements under the rule of completeness in Fed. R. Evid. 106. *United States v. Gearheart*, Criminal Action No. 7:23-cr-00013, 2023 WL 4106252 (W.D. Va. June 21, 2023); *United States v. Conto*, No. 20-4563, 2022 WL 228845, *1 (4th Cir. Jan. 25, 2022). Neither case suggests that contemporaneous statements offered for a permissible non-hearsay purpose are inadmissible merely because they are helpful to the defendant.

is belied by its own repeated arguments concerning Dr. Elfenbein's motive. Throughout the trial, the government argued that greed was his motive not just for coding decisions, but also for encouraging his staff to keep patient visits short and for seeing large volumes of patients. *See, e.g.*, 8/3/23 Tr. 33:4–9 (government closing argument) ("In and out in under five minutes, speed is key, patient just wants to get home. . . . He wants to churn through the patients. That's what he wanted."). After constructing its entire case around its contention that Dr. Elfenbein's maintained high volume COVID-19 testing sites at which patient visits were brief because he was greedy, the government cannot contend that the defense was precluded from rebutting this government claim. This email speaks directly to the reason for rising to the challenge of overwhelming patient volumes: "I know volumes are overwhelming, but please understand the WHY. The why is all those people we are helping." DX 77.

DX 60 (Mot. Ex., ECF No. 78-7) is relevant because it directly rebuts another central government claim: that "Defendant implemented a plan to bill for Level 4 visits for every COVID-19 test with an additional level 4 visit." Opp. at 17. The government's belated carve-out to its theory, *see id.* at 30 ("There was no allegation that the scheme involved charging patients for a second Level 4 E/M visit when there was an issue with a previous swab"), appears to have been crafted solely to justify the exclusion of this email. No such cabined theory was charged in the indictment or presented to the jury. To the contrary, the government defined the universe of claims in furtherance of the scope of the charged fraud as including all level 4 office visits with a COVID test on the same day. *See, e.g.*, GX 138, 139, 140 (Mot. Ex., ECF No. 78-15), 142, 143; 7/27/23 Tr. 16:18–20:23. Had the level 4 claim described in DX 60 been submitted, as it would have been but for Dr. Elfenbein's email, it would have been another level 4 office visit on the same day as a test.

Finally, DX 66 (Mot. Ex., ECF No. 78-8) was relevant because it was evidence of Dr. Elfenbein's reaction to learning that unsupported codes were being assigned to COVID-related visits. It was not mere "character [evidence], suggesting that he did not commit fraud with respect to infusion billing," Opp. at 31; it was evidence that when Dr. Elfenbein saw a claim for a COVID-related office visit that he believed was not supported, he instructed his staff to change the code. Nor is this exhibit hearsay at all; it is an instruction, not offered for the truth of any asserted fact.

The government further argues that even if admissible, the emails were cumulative of other emails or of Dr. Elfenbein's testimony, and any error in excluding the emails was therefore harmless. Opp. at 31–33. But evidence may be cumulative without being extraneous. As the Second Circuit reasoned in *Siddiqi I*, contemporaneous documentary evidence that is "theoretically cumulative of [the defendant's] own oral testimony. . . is certainly much less impeachable than the defendant's own, self-interested testimony." 959 F.2d at 1173; *see also United States v. Ibisevic*, 675 F.3d 342, 351 (4th Cir. 2012) (finding reversible error where "the excluded testimony was the only evidence that would have corroborated the defendant's own testimony of assertedly innocent conduct"); *United States v. Martin*, 657 F. App'x 193, 201 (4th Cir. 2016) (unreported) (reversing conviction where testimony of the defendant was "not an adequate substitute for the evidence that would have been heard by the jury had the [out-of-court statements offered for a non-hearsay purpose] not been improperly excluded").

The government's view of cumulative evidence, like its view of hearsay, runs in one direction; in attempting to prove its case, it enjoyed the benefit of offering multiple emails that were verbatim identical, recognizing that multiple emails, even if identical, appear more important

than a single email.[13] At the same time, the government argues that two emails (DX 60 and 66) in which Dr. Elfenbein instructed his staff not to submit claims that he believed would be fraudulent were cumulative because the defense successfully offered *a single email* that referred more generally to avoiding the possibility of "accidental fraudulent billing." Opp. at 32 (citing DX 51). Nothing could be more central to the defense than Dr. Elfenbein's attempts to avoid billing that he understood to be fraudulent. And there is no better evidence of his state of mind than his contemporaneous instructions, each time he learned of unsupported claims for COVID E/M services, not to submit the claims because he believed they would be fraudulent.

The government's contention that DX 77 was cumulative is no more persuasive. There is no comparable contemporaneous statement of Dr. Elfenbein's motive, to help patients. The government's argument that this email was cumulative rests on two exhibits, both offered by the government. Opp. at 32–33. One of the emails the government identifies illustrates why DX 77 was so important. GX 638 (Opp. Ex. 41) concerns the substantial volume of patients seen during a COVID-19 spike but says nothing about his motive. In the absence of any statement of motive, the government contended that this email and others like it, in which Dr. Elfenbein comments on patient volumes or the amount of time providers should spend with patients, reflect that he was motivated by greed, although the email says no such thing. The government even argued that Dr. Elfenbein subordinated any concern about taking care of patients to his desire to make money. *See,*

---

[13] Indeed, the government even invited the jury in closing argument to count the number of emails containing the phrase "bread and butter." *See* 8/3/23 Tr. 38:7–11 ("My understanding is that the exhibit system that you all will have in the back room is searchable, and so if you want to see how many 'bread and butter' e-mails are, you can type in 'bread and butter' and you should be able to find them."). And the government offered three separate emails that copied nearly verbatim the same nine-paragraph summary of Earleigh Heights procedures, which included a reference to "complex medical issues." Opp. Ex. 46 (GX 647), GX 650, Opp. Ex. 47 (GX 654).

*e.g.*, 8/3/23 33:4–9 ("Read the e-mails. He wants to churn through the patients. That's what he wanted.").[14] Yet the government successfully objected to the one email, DX 77, that includes Dr. Elfenbein's clearest statement of his motive: "The why is all those people we are helping." The email was anything but cumulative.

By excluding DX 77, DX 60, and DX 66, the Court deprived the jury of crucial evidence that undercut the government's portrayal of Dr. Elfenbein's motive and intent. As explained *supra* Parts I–II, the evidence in this case was far from overwhelming. The government's harmless error contention does not pass muster.

## IV.  The government itself suspected that A.H.'s memory was faulty, and the Court should not have allowed A.H.'s specious and damaging hearsay testimony.

The Court erred in admitting A.H.'s testimony that someone she assumed to be a DEC employee admitted to submitting false claims as a matter of course because there was an insufficient evidentiary foundation for admission under the "agency" hearsay exception in Federal Rule of Evidence 801(d)(2)(D). As an initial matter, the government's weak attempts to prove the accuracy of A.H.'s testimony are unpersuasive. Unable to dispute the fact that A.H. testified to a prolonged conversation with a fax machine, the government asserts that fax machines "can have telephone receivers," without citation, and without any basis to suggest that incoming calls to DEC's fax line were answered by a person rather than a fax machine. Opp. at 37 n.7. The government's unwillingness to concede that A.H.'s testimony here was incorrect rings especially false given that, when convenient, the government casts its own doubts on A.H.'s memory. *See* Opp. at 15 (arguing that A.H.'s testimony that she received no provider visit nevertheless

---

[14] *See also id.*, Tr. 19:9–20:7 ("How many e-mails did you see where Dr. Elfenbein is saying, get on top of your charts, get on top of your charts, we're thousands of charts behind? There's a reason for that. It's because they were shuffling through patients like heads of cattle.").

constituted an execution of the scheme because she may not have "perceive[d]" the visit as a provider encounter).

Nor can the government point to any evidentiary foundation for the Court's agency finding. The government cites to *United States v. Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982), a case it describes as "similar" to this one. Opp. at 36. In *Portsmouth Paving*, the trial court allowed testimony about a phone call the witness made to the defendant's business where "the secretary" answered the call. 694 F.3d at 322. The court found that the secretary's statement was admissible against her boss not only because it is "common knowledge" that "a businessman's secretary is an agent of the businessman for purposes of relaying messages," but also because the evidence established that "the secretary" was one of only two female employees in the office, who "occasionally answered the telephone and by radio relayed messages to and from [the defendant]." *Id*. Here, by contrast, there was no evidence that the person who answered the phone (assuming that the call even happened) was an agent of Dr. Elfenbein's. A.H. had no memory of the person with whom she spoke; she could provide neither a name nor anything else that could have narrowed down the identity of the person and supported an agency finding. *See* 7/19/23 Tr. 119:14–19. There is no evidence that the person who answered the phone, even assuming they worked at DEC (which is by no means clear), reported to Dr. Elfenbein at all.

A.H.'s testimony was inadmissible, unreliable, and prejudicial. The government argues that any error in the Court's admission of this evidence was harmless, as A.H.'s testimony was just one piece of the "extensive evidence about the coding practices at Defendant's company." Opp. at 37. Not so. The jury heard a patient testify that when she complained about a bill for a visit that she did not believe occurred, DEC told her, "that's just what we do." 7/19/23 Tr. 122:23–24. While the government presented at best only circumstantial evidence of criminal intent, the jury may well

have construed A.H.'s dubious testimony as a confession that could be ascribed to Dr. Elfenbein. Indeed, during closing argument, that is exactly how the government asked the jury to interpret it: "And when [A.H.] called Drs ERgent Care because she got her Medicare notice, she said this isn't the service that I was provided. They said, that's just what we do." 8/3/23 Tr. 22:8–10.

The government's Opposition fails to rebut Dr. Elfenbein's showing that he is entitled to a new trial.

<u>**CONCLUSION**</u>

For the reasons explained above and in the Motion, the Court should enter a judgment of acquittal on all counts or, at a minimum, grant a new trial.[15]


September 22, 2023                    Respectfully submitted,
Baltimore, MD

                                     */s/ Gregg L. Bernstein*
                                     Gregg L. Bernstein (Bar No. 01340)
                                     Martin S. Himeles, Jr. (Bar No. 03430)
                                     Samantha A. Miller (Bar No. 21374)
                                     ZUCKERMAN SPAEDER LLP
                                     100 East Pratt Street - Suite 2440
                                     Baltimore, MD 21202-1031
                                     Tel. No: (410) 332-0444
                                     Fax No: (410) 659-0436
                                     gbernstein@zuckerman.com
                                     mhimeles@zuckerman.com
                                     samiller@zuckerman.com

                                     *Counsel for Defendant Ron Elfenbein*

---

[15] Dr. Elfenbein maintains that the Court violated his Sixth Amendment right to a public trial by closing the courtroom during *voir dire*. *See Presley v. Georgia*, 558 U.S. 209, 212 (2010); *Weaver v. Massachusetts*, 582 U.S. 286, 296 (2017). For the reasons explained in the Motion, Dr. Elfenbein is entitled to a new trial. *See* Mot. Part II.C.

**CERTIFICATE OF SERVICE**

I certify that on this 22d day of September 2023, a copy of the foregoing Reply in support of Defendant Ron Elfenbein's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, was served via CM-ECF to:

Matthew Phelps
Assistant United States Attorney
Office of the U.S. Attorney
36 S. Charles Street – 4th Floor
Baltimore, MD 21201
Matthew.Phelps@usdoj.gov

D. Keith Closer, Trial Attorney
U.S. Department of Justice
1400 New York Avenue, N.W. – 8th Floor
Washington, D.C. 20005
keith.clouser@usdoj.gov

*/s/ Gregg L. Bernstein*
Gregg L. Bernstein